UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| SARAH PALMQUIST, Individually and as Next Friend of E.P., a Minor, and GRANT PALMQUIST, | § § § § | |
| Plaintiffs, | § | Civil Action No. 3:21-CV-90 |
| v. | § § | |
| THE HAIN CELESTIAL GROUP, INC.. | § § § | |
| Defendant. | § § | |

## <u>MOTION TO EXCLUDE THE TESTIMONY OF DAMAGES EXPERTS DR. MATTHEW HYZY, MR. WILLIAM DAVENPORT, AND DR. STAN SMITH</u>

September 15, 2022

———————————————————————

## Table of Contents

I.      Introduction ............................................................................................. 1

II.     Legal Standard ....................................................................................... 4

III.    Dr. Hyzy's Opinions Do Not Meet the Requirements of Rule 702 ........................... 5

        A.      Dr. Hyzy Is Not Qualified to Opine About EP's Lifetime Care Needs ........... 6

        B.      Dr. Hyzy's Opinions Are Unreliable Because He Presents No Support
                for Many of His Care Recommendations ................................................ 8

                1.      Treating Physicians Did Not Endorse Specifics of Dr. Hyzy's
                        Care Recommendations ....................................................... 8

                2.      Dr. Hyzy Provides No Support for His Opinions Regarding the
                        Frequency and Duration of EP's Care ..................................... 9

        C.      Dr. Hyzy's Cost Survey Lacks Reliability Under Rule 702 and
                *Daubert* ........................................................................... 11

                1.      Vendor Survey ................................................................ 11

                2.      "Costs" Based on Expert Say-So ......................................... 15

                3.      Parental Choice .............................................................. 16

                4.      UCR-80 ........................................................................ 17

IV.     Mr. Davenport's Opinions Do Not Meet the Requirements of Rule 702 ................. 18

        A.      Mr. Davenport's Role in Life Care Planning ........................................ 18

        B.      For Several Major Categories of Expenses, Mr. Davenport Offers No
                Reliable Rationale Supporting His Choice of Inflation Rate ..................... 19

V.      Dr. Smith's Opinions Do Not Meet the Requirements of Rule 702 ....................... 21

        A.      Dr. Smith's Hedonic Damages Opinions Should Be Excluded Under
                Rule 702 and *Daubert*, As They Have Been in Many Federal Cases
                Considering the Same Issues ........................................................ 21

        B.      Dr. Smith's Testimony on "Loss of Society or Relationship" Should
                Be Excluded Under Rule 702 and *Daubert* Case Law ......................... 31

**C.**   **Dr. Smith's Testimony on Loss of Household Services Should Excluded As Unreliable.** ..................................................................... 32

**D.**   **Dr. Smith's Lost Wages Calculations for Ages 35 and Beyond Are Not the Result of Reliable Methods and Should be Excluded** ................................. 34

**VI.**   **Conclusion** ........................................................................................... 36

# I.  Introduction

EP suffers from severe autism and will likely require some amount of care throughout his life; these facts are undisputed.  What is disputed in this case: the cause of EP's condition, who is responsible for the costs of his long-term care, and the appropriateness of other damage quantifications (reduced enjoyment of life, reduced household contribution, and lost wages for EP; and loss of consortium for EP's parents).  On these latter questions, Plaintiffs present three experts: William Davenport, President and CFO of Physician Life Care Planning Inc. ("PLCP"), a for-profit expert witness service that does "over 99 percent" of its work for Plaintiffs' attorneys; Matthew Hyzy D.O., a physiatrist who has completed approximately 100 life care plans for PLCP in two years; and Stan Smith Ph.D., an economist and professional expert witness who has been deposed over 2,000 times.  Ex. 1, Hyzy Dep at 111:11-16; Ex. 3, Davenport Dep. at 72:5-9; Ex. 2, Smith Dep. at 23:23 – 24:1; Ex. 3, Davenport Dep. at 43:19 – 44:9, 66:1-17, 72:5-13.

Dr. Hyzy and Mr. Davenport together offer a "life care plan" claiming $45.5 million in future care costs for EP, much of it based on nothing more than Dr. Hyzy's say-so regarding the quantity of care EP will need and the future cost of that care.  Mr. Davenport concedes that the "overwhelming majority" of PLCP life care plans are litigation tools and "not used for case management" – that is, to actually plan for medical care and its costs.  Ex. 3, Davenport Dep. at 43:19 – 44:9, 72:5-13.  Nevertheless, Plaintiffs premise their future damages claim on the litigation-driven document created by PLCP.

Dr. Hyzy and Mr. Davenport's opinions do not meet the standards set by Rule 702, which require appropriately-qualified experts, using sufficient facts and data, to reliably

apply a reliable methodology to the facts of the case.  Fed. R. Evid. 702; *see also Burleson v. Texas Dep't of Crim. Just.*, 393 F.3d 577, 583–84 (5th Cir. 2004).  Dr. Hyzy fails on the threshold question of qualification.  He is an osteopath who focuses on spinal procedures and acute trauma rehabilitation.  He does not treat children or adults with autism, and until this case he had never developed a life care plan for an autistic patient.  In fact, he has never developed any life care plan for any patient outside the context of litigation.  All of Dr. Hyzy's life care planning experience – which began only in 2020 – is from litigation consulting with PLCP.

Dr. Hyzy also fails the reliability standard.  First, he fails to substantiate many of his care recommendations for EP, relying on his expert "say so," in the absence of specific support from EP's relevant treating physicians, medical records, autism treatment guidelines, or peer-reviewed medical literature.  Second, Dr. Hyzy's method for estimating treatment costs is similarly lacking in reliability, with many of his cost-of-care estimates based on nothing more than either unsupported best guesses, or his blind adoption costs listed in a PLCP-conducted "vendor survey."  Dr. Hyzy admits that he does not understand the methodological details of how the survey is conducted, but acknowledges that the survey process does not specifically account for EP's particular needs as a person with severe autism.

Mr. Davenport's analyses – in which he takes Dr. Hyzy's cost estimates and transforms them into a present value lump sum – are also methodologically unreliable.  For several major categories of services, Mr. Davenport's math relies on selectively identifying

high estimated inflation rates, resulting in an unrealistically high and unsupported cost estimate.[1]

Any one of these concerns – an unqualified expert, the unreliability of the experts' methodologies, and the unreliable application of the methodology to the facts of the case – should be dispositive under Rule 702 and the *Daubert* line of cases.  Taken together, they point clearly to the exclusion of Dr. Hyzy's and Mr. Davenport's opinions.

Dr. Smith's opinions should similarly be excluded under Rule 702 and *Daubert* case law.  Dr. Smith is an economist and the creator of a hedonic damages model that he asserts can be used to quantify both an injured person's reduction of enjoyment of life and their family members' loss-of-society damages.  As a professional litigation witness, Dr. Smith employs a boilerplate template for his expert reports.  Ex.2, Smith Dep. 23:23 – 24:4, 28:2-3, 34:20-21, 40:3-10.  There is, in turn, a rich body of federal case law analyzing – and almost universally rejecting – Dr. Smith's methodology for calculating hedonic damages, based on concerns about its reliability and helpfulness to the jury.  Dr. Smith's hedonic damages analyses and related loss-of-society analyses should similarly be excluded here, on the same grounds as invoked by the "overwhelming majority of courts" that "have concluded that his 'willingness-to-pay' methodology is either unreliable or not likely to assist the jury in valuing hedonic damages, or both."  *Smith v. Jenkins*, 732 F.3d 51, 65 (1st

---

[1] Mr. Davenport's Present Value and Future Value estimates are also drawn exclusively from Dr. Hyzy's initial cost analyses, so that any reliability concerns in Dr. Hyzy's report undermines the reliability of Mr. Davenport's report.

Cir. 2013). Dr. Smith's opinions on lost value of contribution in the home and lost wages should also be limited, based on his unreliable application of the relevant methodologies.

## II.    Legal Standard

Trial courts act as gatekeepers overseeing the admission of expert testimony. *Burleson*, 393 F.3d at 583–84 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). Pursuant to Rule 702, an expert witness qualified by "knowledge, skill, experience, training, or education" may provide an opinion if the proponent of the expert witness can establish "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Using the analytical framework provided by *Daubert*, the trial judge ensures that expert testimony "is not only relevant, but reliable." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998); *see also In re Silica Products Liability Litigation*, 398 F. Supp. 2d 563, 620 (S.D. Tex. 2005).

Under the Rule 702 / *Daubert* framework, trial courts "must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Burleson*, 393 F.3d at 583 (5th Cir. 2004) (quoting *Daubert v. Merrel Dow Pharm. Inc.*, 509 U.S. 579, 592–93). Employing this framework, a court may conclude that there is "simply too great an analytical gap between the data and the opinion proffered" and deny the admission of opinion evidence "that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

4

In effect, "[t]he district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (quoting *Kumho*, 526 U.S. at 152). Thus, when an expert's opinion is based on "data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

## III.  Dr. Hyzy's Opinions Do Not Meet the Requirements of Rule 702

Dr. Hyzy's opinions should be excluded both because he is not qualified to opine about EP's lifetime care needs, and because his report is fundamentally unreliable in its failure to support many of its care recommendations and cost estimates.[2]

---

[2] To the extent that Dr. Hyzy attempts at trial to opine as to general or specific causation, his opinions should also be excluded. Despite language in his report suggesting that he is offering general and specific causation opinions, during his deposition Dr. Hyzy clarified that he is not opining that exposure to metals can cause autism (Ex. 1, Hyzy Dep. at 44:5 – 46:6), did not review documents showing metal levels in baby food (*Id.* at 51:3-23), did not review data on metals toxicology or epidemiology (*Id.* at 51:24 – 52:24), and is not opining that metals or baby food caused any of the thirteen diagnostic conditions he attributes to EP (*Id.* at 30:7 – 34:24, 41:23 – 42:9, 92:6-17). In short, he did not assess the cause of EP's autism and made no effort to rule out other potential causes of EP's autism or other conditions.

### A.      Dr. Hyzy Is Not Qualified to Opine About EP's Lifetime Care Needs

In opining about EP's lifetime care needs as a child with severe autism, Dr. Hyzy –
a rehabilitation physician who specializes in spinal procedures and interventional
orthobiologics, not life care planning or treatment of autism – steps far beyond the bounds
of his qualifications, offering the types of opinions inside the courtroom that he has never
offered outside the courtroom.

***No Expertise in Autism and Related Conditions***:  Treating patients with autism –
EP's primary diagnosis – simply is not within the realm of Dr. Hyzy's regular work as a
physician.  The last time Dr. Hyzy diagnosed a patient with autism was during a brief
rotation in his medical residency, nearly a decade ago.  Ex. 1, Hyzy Dep.  at 35:25 – 36:5,
39:8-24.  Similarly, he has not provided day-to-day care for patients with autism since that
residency rotation, nor does he have relevant experience with Applied Behavioral Analysis
("ABA"), a standard therapy for autistic patients.  *Id.* at 39:8-24; 61:12-24.  Dr. Hyzy is
not a specialist in any areas directly, or even tangentially, related to EP's conditions: a
neurologist or child neurologist, a psychiatrist or child psychiatrist, a gastroenterologist, a
pediatrician, a child development expert, or an epileptologist.  *Id.* at 128:22 – 130:18.  Nor
is he a metals toxicologist qualified to opine on the claims of metals exposure in this case.
*Id*. at 128:22 – 129:1.

By Dr. Hyzy's own admission, his clinical practice focuses "mostly" on
"interventional spine pain management" with related research focusing on "autologous
orthobiologics . . . mostly blood, platelet-rich plasma and bone marrow concentrate."  *Id* at
21:7 – 22:5.  Consistent with this focus, Dr. Hyzy's "research publications and peer-

reviewed journals are surrounding that treatment of the orthopedic or spine," while his clinical work focuses on "classic physical medicine rehab, brain injury, spinal cord injuries, amputations[.]" *Id.* at 22:1-15.  And among Dr. Hyzy's pediatric patients – which comprise "less than 5 percent" of his patients – the most common injuries are "partial drowning, lack of oxygen, things like that." *Id.* at 100:25 – 101:21.

Dr. Hyzy did not deepen his knowledge of autism or autism treatment to participate in this case.  He spent "probably less than 20 minutes" researching autism-related medical literature to prepare his litigation opinions and did not review any autism treatment guidelines.  *Id.* at 53:2-12.  In fact, the first time Dr. Hyzy ever reviewed the American Academy of Child and Adolescent Psychiatry's *Practice Parameters for the Assessment and Treatment of Children and Adolescence with Autism Spectrum Disorders* was at his deposition*.  Id.* at 187:20 – 188:6.

***No Experience Preparing Life Care Plans Outside Litigation***:  Not only does Dr. Hyzy lack expertise in autism or autism treatment, but he has never prepared a life care plan for any of his patients.  The entirety of Dr. Hyzy's life care planning experience is confined to preparing reports for litigation, beginning around 2020.  *Id.* at 119:20 – 120:2; *see also id.* at 113:10 – 114:1.  And the training to qualify as a PLCP life care planner is minimal: "an initial American Academy of Physician Life Care Planners conference was recommended.  Read the whole book, buy the book that we're discussing, A Physician's Guide to Life Care Planning.  Then I reviewed, based upon the recommendations, the other large main book. . . . Then some self-study regarding different things, reviewing different types of redacted life care plans as examples." *Id.* at 114:2-23.

Moreover, in Dr. Hyzy's two years of preparing life care plans for litigation, none of those plans have addressed care for a patient with autism, or with any injuries stemming from toxic metal exposure. *Id.* at 124:24 – 125:5. Nor has any of his expert testimony, in the life care planning space or otherwise, addressed these alleged injuries. *Id.* at 122:1 – 123:15.

Finally, of the approximately 100 life care plans Dr. Hyzy has prepared, he estimates that only five or six were for children under age 18. *Id.* at 125:9-23. None of these were for children with autism. *Id.* at 124:24 – 125:5.

**B.     Dr. Hyzy's Opinions Are Unreliable Because He Presents No Support for Many of His Care Recommendations**

Even if he were qualified to prepare a life care plan for EP, Dr. Hyzy's opinions regarding EP's specific care needs should be excluded for failure to meet *Daubert* and Rule 702's reliability standards, which require reliable application of the facts to a reliable methodology. Rather than grounding his care recommendations in reliable sources – such as treatment recommendations from EP's providers, guidance from medical literature or autism treatment guidelines, or any other objective standard – many of Dr. Hyzy's recommendations appear to be based simply on his say-so. This does not satisfy Rule 702.

**1.     Treating Physicians Did Not Endorse Specifics of Dr. Hyzy's Care Recommendations**

Dr. Hyzy devoted virtually no time to discussing EP's current care and future needs with his past or current healthcare providers.

The extent of Dr. Hyzy's inquiry into EP's current and likely future care trajectory was a 15-minute discussion with Dr. Arthur Krigsman, EP's current gastroenterologist, (*Id.*

at 62:14-17), and a 30-minute call with EP's current neurologist Dr. Joshua Rotenberg, who the Palmquists met through their counsel and who began treating EP during the course of this litigation.  *Id.* at 75:7-9.  Dr. Hyzy did not ask for Dr. Krigsman's feedback on "the specific duration, frequency, timeframe, hours of multitude of therapeutic interventions or the specific home health aides."  *Id.* at 69:18 – 70:17.  To the extent that Dr. Hyzy's call with Dr. Rotenberg discussed specific therapy and treatment recommendations, it was "not in detail" regarding the frequency or duration of recommended care.  *Id.* at 77:8-25.  Nor did he speak with any of EP's various non-physician therapists – either current or past – despite recommending multiple daily therapy treatments for EP.  *Id.* at 84:11-13.

### 2. Dr. Hyzy Provides No Support for His Opinions Regarding the Frequency and Duration of EP's Care

Although he recommends an aggressive treatment schedule with multiple forms of daily therapy, Dr. Hyzy fails to employ sufficient facts or data to support his recommended frequency or duration of therapy – whether evidence from the medical records, recommendations in autism treatment guidelines, findings from medical literature, or specific endorsement by EP's treating physicians.  Similarly, although he recommends continual 2-on-1 professional monitoring of EP at all hours of the day, including while sleeping, Dr. Hyzy provides no evidence to support his opinion.

Dr. Hyzy's pattern is consistent:

| Recommended Care | Dr. Hyzy's Frequency / Duration | Support for Hyzy's Frequency/Duration Recommendations | | | |
|---|---|---|---|---|---|
| | | Practice Guidelines | Medical Literature | Medical Records | Treating Physicians |
| Occupational Therapy[3] | 365 days/year 11 years | NO | NO | NO | NO |
| Speech Therapy[4] | 365 days/year 11 years | NO | NO | NO | NO |
| Behavioral Therapy | 365 days/year 11 years | NO | NO | NO | NO |
| Behavioral Psychologist[5] | 1 day/week 11 years | NO | NO | NO | NO |
| Sensory Integration Therapy[6] | 1 day/week 11 years | NO[7] | NO | NO | NO |
| Home Health Aides[8] | 28 hours/day 365 days/year | NO | NO | NO | NO |

[3] For relevant testimony related to the entries in this row, *see* Ex. 1, Hyzy Dep. at 250:16 – 251:10, 252:4-15, 255:2-9.  When confronted with the stark difference between his recommendations and the prescriptions documented in EP's medical records, Dr. Hyzy observed that "I obviously had a different methodology as a life care planner for my recommendations than his treating physicians." *Id.* at 255:2-9.

[4] For relevant testimony related to the entries in this row, *see id.* at 257:3 – 258:5.

[5] For relevant testimony related to the entries in this row, *see id.* at 185:11-20,189:25 – 195:15.

[6] For relevant testimony related to the entries in this row, *see  id.* at 300:19 – 301:6.

[7] Not only did Dr. Hyzy fail to substantiate his opinions, but his opinions actually *conflict* with both peer-reviewed literature and autism guidelines, which do not recommend sensory integration therapy based on lack of efficacy.  *Id.* at 301:21 – 308:15; Ex.9, Hyzy Dep. Ex. 17; Ex. 6, Hyzy Dep. Ex. 11;  Ex. 10, Hyzy Dep. Ex. 18.

[8] Dr. Hyzy recommends that EP have 28 hours per day of home healthcare assistance, in the form of two home health care aides any time he is not at his special needs school.  This

| Nursing Care[9] | 4 hours/day 365 days/year | | NO | NO | NO | NO |
|---|---|---|---|---|---|---|

In short, Dr. Hyzy's opinions on the frequency and duration of EP's future care are not based on "sufficient facts or data" drawn from the medical records, medical literature, autism treatment guidelines, or recommendations by EP's providers.  Fed. R. Evid. Rule 702.  Instead, Dr. Hyzy offers his opinions on the frequency and duration of care EP needs based on nothing more than his *ipse dixit* assertions.

## C.    Dr. Hyzy's Cost Survey Lacks Reliability Under Rule 702 and *Daubert*

In addition to failing to reliably substantiate his care recommendations, Dr. Hyzy fails to reliably substantiate his cost-of-care estimates.   Dr. Hyzy's cost sourcing methodology comes in four varieties, each of which is unreliable.

### 1.    Vendor Survey

For certain line items in his life care plan, Dr. Hyzy reports pricing information based on a PLCP-conducted "vendor survey," which purports to provide pricing data from a small selection of vendors within 100 miles of the Palmquists.  Ex. 4, Hyzy Report at

---

includes 2-on-1 monitoring as EP sleeps and during all therapies.  Ex. 1, Hyzy Dep. at 273:16-23; 286:4-19.   Dr. Hyzy could not cite any sources in the medical literature or recommendations from treating physicians to support this opinion.  *Id.* at 281:8 – 282:11.  He based his opinion on "experience" with autistic children (none), and his discussion with another paid expert in this litigation.  *Id.* at 283:1-13.

[9]  Although Dr. Hyzy opines that nursing care would be primarily to provide EP with his medications, he admits that "I do not think strictly it takes [EP's parents] four hours just for medications".  Ex. 1, Hyzy Dep. at 281:2-6; Ex. 4, Hyzy Report at 250.

75.[10]  Dr. Hyzy does not speak with the vendors, oversee the PLCP employees who do, or

provide any objective documentation of vendor costs.

More importantly, however, Dr. Hyzy's application of PLCP's "vendor survey" to

his life care plan pricing presents significant Rule 702 reliability requirements:

| Methodology Issue | Dr. Hyzy's Answer | Testimony |
|---|---|---|
| Is the vendor survey updated and accurate? | Unknown | **Q** How often is that list updated?<br>**A** *I don't know. . . .*<br><br>**Q** [H]ow is that list maintained to be an accurate representation of the care providers in a particular field in the greater Houston area?<br>**A** *I'm not exactly sure* . . . [11] |
| What methodology is used to select surveyed vendors? | Unknown | **Q** So do you have any sense of the methodology that was used to determine who to call?<br><br>**A** *There likely is some list of the providers. I don't have access to that*, but – given the amount of work in Houston and the state of Texas. But I can't speculate on that. *So I'd have to talk to my staff and specifically ask them the methodology* . . . .[12] |
| Do surveyed vendors serve patients with severe autism? | Unknown | [N]o, we're *not providing the nuances of a diagnosis to the vendor* when we're asking for, you know, the average 40-minute consult self-pay fee.[13] |

---

[10] A 100 mile radius leads to a potential area of service well beyond the metro Houston area and what the Palmquists might consider reasonable service providers.  For instance, Bridge City, Texas – at the northern end of Sabine Lake – is 99.6 miles from the federal courthouse in Houston.

[11] Ex. 1, Hyzy Dep. at 162:22 – 164:21 (emphasis added).

[12] *Id.* at 320:2-21 (emphasis added).

[13] *Id.* at 177:4-22 (emphasis added).

| Are surveyed vendors realistic options for Palmquist family? | Unknown | **Q** In selecting the care providers who are listed in any of the surveys, did anyone make an analysis of whether it was likely that the Palmquists might go to that specific care provider, given, say, the distance from the home and other factors?<br><br>**A** *Not yet.* . . .[14] |
| Do surveyed vendors provide care consistent with the life care plan (*e.g.*, in the location and with the frequency required by the plan)? | Unknown | **Q** [I]n calling the OT providers who are included in the survey, did the individuals who made those calls indicate where the therapy would need to be provided?<br><br>**A** *I'm not sure*. I'd have to reach out to them to ask them, my staff, if they specifically address location in Pearland. . . .<br><br>**Q** And when calling these providers on the phone, was there the specific request as to whether they could provide OT 365 days of the year?<br><br>**A** *I don't think that was requested either.*[15] |

In addition to these methodological problems with Dr. Hyzy's vendor survey, another aspect of survey design raises more red flags: the sample size of at most three vendors per category. Basic statistics tells us that small samples are not reliable estimates of broader averages. Dr. Hyzy's methodology ignores this fundamental proposition by relying on no more than three vendors – and sometimes only *one* – to develop his pricing

---

[14] Ex.1, Hyzy Dep. at 175:16-21 (emphasis added). This is a practical concern regarding the reliability of PLCP's pricing estimates. For example, Dr. Hyzy's cost estimates for pediatric dentists includes no dentists in Pearland, where the Palmquists live, but it includes two that are 30-40 miles from their home. *See* Ex. 4, Hyzy Report at 81 (11301 Fallbrook Drive - 41.8 miles from Pearland; 9742 Katy Freeway - 31.1 miles from Pearland; 12700 N. Featherwood Drive - 9.4 miles from Pearland). The more distant vendors were also the most expensive.

[15] Ex. 1, Hyzy Dep. at 255:13-19, 256:13-16 (emphasis added).

survey.  Dr. Hyzy offers no statistical support or peer-reviewed literature to support his claim that accurate pricing for goods and services can be obtained by surveying three vendors within a 100 mile radius of the Palmquists' home.  His claim that "three is a very good methodology to average" is nothing more than his *ipse dixit*.  Ex. 1, Hyzy Dep. at 178:11-25; *see also id.* at 160:5-10 (Q.  Now, are you offering the opinion – the opinion from a statistical perspective, that averaging a sample from three providers will lead to a reliable estimate of average prices in -- for a service in a geographical region?  A. Yes.).

Yet even the most cursory inquiry makes clear that other local vendors often provided the same goods and services at lower prices, so that expanding Dr. Hyzy's sample size would yield markedly lower estimates.  Take the example of the medication Lamictal (lamotrigine):

| Dr. Hyzy's Surveyed Pharmacies and Prices[16] | Additional Pearland Pharmacies and Prices[17] |
|---|---|
| Kroger<br>• $1918.99 (brand)<br>• $74.99 (generic)<br>Walgreens<br>• $1675.93 (brand)<br>• $191.89 (generic)<br>Walmart<br>• $1722.26 (brand)<br>• $164.29 (generic)<br><br>Overall Average: $958.08<br>Generic Average:$143.72 | HEB<br>• $12.46 (generic)<br>Costco<br>• $10.97 (generic)<br>Randall's<br>• $9.18 (generic)<br>Amazon<br>• $25.00 (generic)<br><br><br>Generic average: $14.40 |

---

[16] Ex. 4, Hyzy Report at 87.

[17] Ex. 1, Hyzy Dep. at 223:19 – 234:8, 239:12-22; Ex.7, Hyzy Dep. Ex. 12; Ex. 8, Hyzy Dep. Ex. 13.

The numbers are clear: Dr. Hyzy's methodology of surveying just three providers – be it pharmacies, home healthcare agencies, or any other vendor – is unreliable, resulting in failure to accurately capture average pricing in the relevant geography.  When small tweaks in sampling methodology yield such dramatic cost differences, it is a warning sign that the expert's approach is not based on "sufficient facts or data" and lacks the reliability required under Rule 702 and *Daubert*.

As a result of this methodological choice and all those listed above, Dr. Hyzy's life care plan is not designed to reflect the likely cost of care, developed from the reliable application of an appropriate methodology.  Instead, it is designed to yield an unreliable and inflated cost estimate.

## 2. "Costs" Based on Expert Say-So

Dr. Hyzy's life care plan includes a second approach to cost estimation: plucked-from-thin air, unsubstantiated costs based on nothing more than his expert say-so.  For example, the following projections do not rest on any estimates, documentation, calls to providers, or even on the mysterious PLCP vendor list:

| Good or Service | Dr. Hyzy's Estimate | Basis for Dr. Hyzy's Estimate | Testimony |
|---|---|---|---|
| Home Modification | $50,000 | Personal opinion/ experience | **Q**    Did you talk to any contractors? Do you provide any substantiation for the $50,000 specifically in the report?<br>**A**   It's just an estimate based upon my experience for those safety and -- concerns and damages already caused by EP.<br>**Q**   Okay. But there's no -- there are no details in your report as to |

| | | | how you came up with that estimate; is that correct? <br> **A** That's correct.[18] |
|---|---|---|---|
| Private transportation | $365,500 ($100 per day) | Personal opinion/ experience | **Q** Okay. But in your report, there's no substantiation for the hundred dollars a day, right? It's just kind of a number you've picked because it sounded right? <br> **A** It's a number I picked based on conservative estimate on how much it costs to get a professional driver, an Uber, a Lyft, a ride share, things like that. <br> **Q** But none of that is documented in your report, right? <br> **A** No. This is -- isn't typically documented in my report.[19] |

Dr. Hyzy's opinion that EP's family will need $168,000 in "essential services" – such as a maid, gardener, or chef – is similarly unsupported by any documentation, and is simply based on his opinion after seeing the Palmquist's home. In short, for more than a half-million dollars of claims that Dr. Hyzy includes in his report, the sole pricing source he draws upon is nothing more than his personal opinion.

### 3. Parental Choice

A third approach Dr. Hyzy uses when pricing the line items in his life care plan is "parental choice." If parents specify a particular caregiver of choice, Dr. Hyzy's life care plan estimates that caregiver's cost. Here, the Palmquists have specified that they wish for EP to attend various programs at Avondale House, a special needs organization. In total,

---

[18] Ex. 1, Hyzy Dep. at 268:42 – 269:4, 270:13-16.
[19] Ex. 1, Hyzy Dep. at 266:19 – 267:25.

Dr. Hyzy's life care plan recommends 70 years and $9.49 million dollars of care with Avondale House; Mr. Davenport updates this figure to a present value of more than $15.8 million.  Behind this significant dollar figure, though, is a methodology that is entirely lacking:

| Methodological Concern | Included in Hyzy Report? |
| --- | --- |
| Documentation of Avondale House program costs? | NO[20] |
| Investigation into actual, average costs to Avondale House families? | NO[21] |
| Assessment regarding potential duplicate care (*i.e.*, comparing Avondale offerings against Hyzy's other recommended therapies)? | NO[22] |

### 4.    UCR-80

In some instances, Dr. Hyzy employs "Usual, Customary, and Reasonable" (UCR) billing data from a medical claims vendor to support his cost-of-care opinions.  Dr. Hyzy uses the 80th percentile of UCR billing ("UCR-80"), rather than an average billed cost.  *Id.* at 152:19-22.

A reliable cost-estimating methodology would account for what cash payers actually pay for medical goods and services.  UCR-80 billing, however, is not representative of what a cash-paying individual will actually pay for medical care.  Despite the fact that medical billing often includes non-insurance related discounts and adjustments that are not accounted for in UCR-80 billing, Dr. Hyzy's methodology refuses to account

---

[20] Ex. 1, Hyzy Dep. at 150:13-23, 295:16-23.

[21] *Id.* at 150:13-23, 295:16-23.

[22] *Id.* at 262:15 – 263:6.

for these discounts.  For instance, when presented with a specific example in which the Palmquists received a non-insurance-related, four-figure administrative write-off on a medical invoice, Dr. Hyzy made clear that his pricing methodology would not consider these kind discounts off UCR pricing.  *Id.* at 147:5-24.  A cost-of-care methodology that intentionally ignores data that affects the cost of care is not reliable.

## IV.   Mr. Davenport's Opinions Do Not Meet the Requirements of Rule 702

Mr. Davenport's opinions do not pass Rule 702 / *Daubert* muster because he applies an otherwise-reliable methodology (simple financial formulas) in an unreliable and outcome-driven manner, choosing inputs (inflation rates for goods and services) that leads to an unsupportable Present Value estimates for several major categories of services.

### A.   Mr. Davenport's Role in Life Care Planning

In his role as an expert witness for PLCP clients, Mr. Davenport has described his work as primarily serving as "a human calculator" to prepare present value analyses.  Ex.3, Davenport Dep. at 23:6-16.  Since he began serving as a PLCP expert in 2016, Mr. Davenport has been deposed "between 2- and 300", with "over 99 percent" of his work being for plaintiffs.  *Id.* at 66:1-17.

Mr. Davenport takes the dollar values in Dr. Hyzy's report and attempts to estimate the lump sum amount the Palmquists would need to receive today to cover EP's care over the course of his lifetime.  He does not know if any clients have ever followed the investment strategy modeled in his report.  In fact, he claimed that it is "irrelevant" whether his proposed model has ever been put into practice by any of the hundreds of families for whom he has prepared Present Value analyses.  *Id.* at 68:17-25.

18

The crux of Mr. Davenport's analysis depends on two judgment calls.  For the first, and most relevant for a Rule 702 / *Daubert* analysis, Mr Davenport selects future inflation rates for each of the goods and services included in Dr. Hyzy's report.  The higher the inflation rate, the larger Mr. Davenport's Future Value estimate will be.  Second, Mr. Davenport selects an investment vehicle in which the Palmquists could invest a lump sum, at a given rate of return, over the next 70 years.  The lower the investment return rate, the higher Mr. Davenport's Present Value estimate will be.

The framework of selecting inflation rates and investment return rates, then applying basic financial formulas, is uncontroversial.  But Mr. Davenport's application of this methodology lacks reliability: he cherry-picks unsupported inflation rates for major several categories of goods and services, despite the presence of more-supportable and lower rates within the very data sets he relies upon.  The result is an inflated and unsupported Present Value estimate.

## B.    For Several Major Categories of Expenses, Mr. Davenport Offers No Reliable Rationale Supporting His Choice of Inflation Rate

Mr. Davenport draws upon three data sets when selecting inflation rates to apply: (1) historical inflation rate data for specific categories of goods and services, as documented by the Bureau of Labor Statistics ("BLS"), (2) long-range forecasts for increases in wages generally, from the United States Social Security Administration ("SSA"), and (3) long-range, general forecasts for increases in the costs of goods and services, as reported in the Consumer Price Index ("CPI").

Although these data sets are reliable, in several instances Mr. Davenport's selection among them is emblematic of an unreliable approach to applying an otherwise-reliable methodology:

| Good or Service | Mr. Davenport's Inflation Rate | Reliable Inflation Rate | Why Davenport rate unreliable? |
|---|---|---|---|
| Home health care and nursing services, including both agency overhead and wages ($6.4 million) | 3.41 to 3.68% (SSA wage forecast)[23] | 1.72% (BLS average rate for home healthcare services, including both agency overhead and wages)[24] | Davenport admits home health care and nursing services include agency overhead, not just wages. [25] |
| Avondale House Group Home ($15.1 million) | 3.7% (BLS average rate for "nursing homes and adult daycare")[26] | 2.4% (CPI forecast for goods and services) | Davenport admits Avondale house is neither a nursing home nor an adult daycare.[27] |

In these cases, where Mr. Davenport's opinions are not the product of reliably applying a reliable methodology, the opinions should be excluded under Rule 702.

---

[23] Ex. 3, Davenport Dep. at 101:1-23, 103:6-11, 124:16 – 125:1, 131:15 – 132:25, 133:5-23, 134:10-23.

[24] *Id.* at 126:19 – 127:1, 127:20 – 128:5, 131:15 – 132:2.

[25] Ex. 1, Hyzy Dep. at 319:17-24; Ex. 3, Davenport Dep. at 107:17-24, 141:23 – 142:6, 229:2-5.

[26] Mr. Davenport's chosen inflation rate is 54% higher than the CPI forecast, accounting for millions of dollars in additional cost in Mr. Davenport's estimate. *Id.* at 217:2-6, 218:7 – 219:6.

[27] *Id.* at 211:16 – 212:7, 213:12-20 ("Q. Okay. So for Avondale House, which is included by name in Dr. Hyzy's report. A. Yes. Q. -- you understand that that's not a nursing home; correct? A. Presumably. . . . Q. And you understand it's not a daycare program; correct? A. By definition, no. Yes."). *See also Id.* at 211:19 – 212:11, 212:23 – 213:5, 214:19 – 216:7 (conceding that he had made no effort to investigate to what extent the Avondale group home fit his preferred data category).

## V.    Dr. Smith's Opinions Do Not Meet the Requirements of Rule 702

### A.    Dr. Smith's Hedonic Damages Opinions Should Be Excluded Under Rule 702 and *Daubert*, As They Have Been in Many Federal Cases Considering the Same Issues

Here, as in other litigation, Dr. Smith attempts to quantify the plaintiffs' loss of enjoyment of life, primarily by surveying three distinct – but equally inapplicable – sets of studies: (1) literature on "consumer behavior and purchases of safety devices"; (2) literature on "wage risk premiums to workers"; and (3) "studies consisting of cost-benefit analyses of regulations."  Ex. 2, Smith Report at 9.  By surveying some of these studies, purporting to find a "central tendency" within their range of findings, and applying several non-scientific adjustment factors, Dr. Smith claims to quantify the "loss of enjoyment of life" for EP. *Id.* at 22.  His range: $7.2 – 8.1 million.  He uses the same literature to estimate loss-of-society damages for EP's parents: $4.8 million for Sarah Palmquist and $4.5 million for Grant Palmquist.

Dr. Smith's testimony on hedonic damages and loss of society should be excluded on two related grounds.  First, they are not the product of reliable principles and methods, reliably applied to the facts of the case.  Fed.R.Evid. 702(c-d).  As a result, not only will his opinions not help the trier of fact understand the evidence, but they raise concerns about jury confusion.  Fed.R.Evid. 702(a).

In decades spent advocating for his theories regarding quantification of hedonic damages, "Dr. Smith's testimony regarding hedonic damages has been found inadmissible by the vast majority of federal courts."  *Balan v. Vestcor Fund*, Case No. 3:19-cv-351-MMH-JBT, 2021 WL 2138876 at *1 (M.D. Florida) (May 26, 2021) (granting motion to

21

exclude Smith's testimony on reduction in value of life); *see also Smith v. Jenkins*, 732 F.3d at 66 ("The overwhelming majority of courts have concluded that his 'willingness-to-pay' methodology is either unreliable or not likely to assist the jury in valuing hedonic damages, or both.")[28]. This judicial skepticism applies equally to each of the three bodies of data Dr. Smith uses to support his claims.

*Value of Life Studies:* Courts have repeatedly cited concerns regarding Dr. Smith's misappropriation of economics literature addressing consumer willingness to pay for safety devices such as smoke detectors as a proxy for placing a dollar value on enjoyment of life. As the First Circuit explained in *Smith v. Jenkins*,

> Like the Seventh Circuit, we have serious doubts that the underlying studies actually measure the value of life. *Mercado, 974 F.2d at 871.* In terms of consumer purchases, spending on items like air bags and smoke detectors is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated

---

[28] *See also Allen v. Bank of Am., N.A.*, CIV. CCB–11–33, 2013 WL 1164898, at *12 (D. Md. Mar. 19, 2013); *Richman v. Burgeson*, No. 98 C 7350, 2008 WL 2567132, at *2–4 (N.D. Ill. June 24, 2008); *Davis v. ROCOR Int'l,* 226 F. Supp. 2d 839, 842 (S.D. Miss. 2002); *Saia v. Sears Roebuck & Co., Inc.*, 47 F. Supp. 2d 141, 148–50 (D. Mass. 1999); *Brereton v. United States*, 973 F. Supp. 752, 758 (E.D. Mich. 1997); *Kurncz v. Honda N. Am., Inc.*, 166 F.R.D. 386, 388–90 (W.D. Mich. 1996); *Ayers v. Robinson*, 887 F. Supp. 1049, 1059–64 (N.D. Ill. 1995); *Sullivan v. U.S. Gypsum Co.*, 862 F. Supp. 317, 321 (D. Kan. 1994); *Glisson v. Correctional Medical Services, Inc.*, No. 1:12-cv-01418-SEB-MJD, 2018 WL 6807295, *5 (S.D. Ind. Dec. 27, 2018); *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1195 n. 5 (9th Cir. 2005) (collecting state cases where Dr. Smith's testimony was excluded); *Santiago v. Fischer*, No. 09-CV-1383 (MKB), 2020 WL 9816014, at *5-7 (E.D.N.Y. Sept. 4, 2020); *Mercado v. Ahmed*, 756 F. Supp. 1097, 1103 (N.D. Ill. 1991), aff'd, 974 F.2d 863, 868–71 (7th Cir. 1992).  *But see Shephard v. Gonzales*, No. 4:17-CV-01167, 2018 WL 10626471, at *1 (S.D. Tex. Dec. 12, 2018) (denying motion to exclude Smith's testimony, without analysis).

> safety requirements as it is by any consideration by consumers of how much life is worth. Also, many people may be interested in a whole range of safety devices and believe they are worthwhile, but are unable to afford them. More fundamentally, spending on safety items reflects a consumer's willingness to pay to reduce risk, perhaps more a measure of how cautious a person is than how much he or she values life."

*Smith*, 732 F.3d at 66-67.

When asked whether willingness to pay for a safety product may be influenced by factors other than how much an individual values his or her life, Dr. Smith insisted that he could offer no expert comment. Ex. 2, Smith Dep. 160:20 – 161:5, 162:2-6. Yet Dr. Smith continues to use the same statistical value-of-life literature to support his claims, and he has made no discernible adjustment to his methodology, despite it having led to decades of exclusions in federal court.

Dr. Smith's misappropriation of this literature is also troubling because it "equate[s] the value of life with the value of enjoyment of life, though it is readily apparent that the two are not the same." *Smith*, 732 F.3d at 67; *see also Sullivan v. U.S. Gypsum Co*., 862 F. Supp. 317, 321 (D. Kan. 1994) ("The studies relied on by Mr. Smith do no use methodology designed to calculate the loss of enjoyment of life, yet are nonetheless extrapolated by Mr. Smith into what he claims to be valid data for calculating damages for . . . loss of enjoyment of life.").

***Wage Risk Premium Studies:*** Similar reliability concerns apply to Dr. Smith's use of wage-risk premium studies, which attempt to quantify the degree to which job-related risks may lead to higher levels of compensation:

> And as for the wage-risk premiums that Dr. Smith purportedly
> took into account, "[t]o say that the salary paid to those who
> hold risky jobs tells us something significant about how much
> we value life ignores the fact that humans are moved by more
> than monetary incentives." *Id.*; see *Wilt v. Buracker*, 191
> W.Va. 39, 443 S.E.2d 196, 205 (1993) ("Anyone who is
> familiar with the wages of coal miners, policemen, and
> firefighters would scoff at the assertion that these high risk jobs
> have any meaningful extra wage component for the risks
> undertaken by workers in those professions.").

*Smith*, 732 F.3d at 67.

Dr. Smith conceded during his deposition that there are "a billion reasons" why a person may choose to accept a risk job separate from any potential wage premium. Ex. 2, Smith Dep. 178:15 – 180:5 ("There are other factors. . . . There's a billion factors. I'll admit it. Stop the list. Save us some time here today.").  Yet his value-of-life analyses assume that the value of life can be extracted by analyzing wage premiums in risky jobs.

Dr. Smith's opinions employing wage risk premium data are also unreliable because he refuses to update his analyses in the face of contrary data.  When confronted with a recent study finding *no evidence* to support a wage risk premium (actually, one among dozens of studies that have found no such wage risk premium), Dr. Smith dismissed this contrary data with a wave of the hand.  *Id.* 163:10-24 (characterizing economists who do not find wage risk premiums as suffering from "incompetence" and being "incapable of conducting proper research[.]"; *see also id. at* 171:17 – 177:1 ("I see what it says. I see what it concludes. So be it.").  Yet Dr. Smith also grudgingly acknowledged that three of the studies that found no wage risk premium were by Dr. Kip Viscusi, an economist Dr.

Smith cites extensively in his report and characterizes as "a leading researcher in the field" of value-of-life analyses.  Ex. 5, Smith Report at 15; Ex 2, Smith Dep. 170:12-24.

*Regulatory Cost Analyses:* Dr. Smith's third body of data – studies addressing the cost of government's health-and-safety regulations, including the cost per live saved – have fared no better in Courts' analyses of their use in hedonic damages calculations:

> Finally, the cost of government health and safety regulations per life saved "may suggest a collective policy judgment the government has made, or may represent a policy selected for reasons other than the cost-benefit analysis 'hedonic analysis' implies, or even a mistaken policy." Dorn, 397 F.3d at 1195[.]

*Smith*, 732 F.3d at 67.[29]

In other words, "government calculations about how much to spend (or force others to spend) on health and safety regulations are motivated by a host of considerations other than the value of life: is it an election year? how large is the budget deficit? on which constituents will the burden of the regulations fall? what influence and pressure have lobbyists brought to bear? what is the view of interested constituents? And so on." *Mercado*, 974 F.2d at 871; *see also Ayers v. Robinson*, 887 F. Supp. 1049, 1061 n.4 (N.D.

---

[29] Leading value-of-life research Dr. Viscusi published an article criticizing the use of value-of-life literature to quantify hedonic damages in the courtroom, in which he specifically addressed the misuse of these regulatory data.  Ex. 12, Viscusi K, *Misuses and Proper Uses of Hedonic Values of Life in Legal Contexts*, Journal of Forensic Economics, Vol. 13, No. 2 ("It is consequently incorrect to state, as some hedonic damages experts have done, that the adopting of hedonic values simply follows governmental practice.  The government's use of these values is quite specific and not for purposes of setting compensation levels."); *cf.* Ex. 5, Smith Report at 18 (In a section of his report explicitly arguing that his opinions meet *Daubert*'s general acceptance requirement, stating "[i]t is important to note that this methodology is endorsed and employed by the U.S. Government as the standard and recommended approach for use by all U.S. Agencies in valuing life for policy purposes . . . .").

Ill. 1995) ("Government regulations are really a different kettle of fish for two reasons. First, it is not at all clear that agencies use willingness-to-pay or any other purportedly scientific approach to estimate life values. . . . [And] the willingness-to-pay literature itself illustrates the way in which government agencies abandon science to secure politically acceptable compromises[.]").

Given the fundamental failure of the consumer safety decision literature, wage-risk premium studies, and regulatory cost analyses to support any quantitative analysis of how individuals value their enjoyment of life, "Dr. Smith's method for valuing life is based on assumptions 'that appear to controvert logic and good sense.'" *Smith*, 732 F.3d at 67. His hedonic damages methodology "requires 'too large a leap to accept' the notion that the consumer, workplace, and regulatory decisions of individual actors, viewed in the aggregate, 'accurately reflects the value society places on the average human life.'" *Doe v. Colgate University*, 457 F. Supp. 3d 164, 177–78 (N.D.N.Y. 2020); *see also Hauck v. Wabash Nat'l Corp.*, No. CV 18-471 KG/LF, 2021 WL 2351785, at *5 (D.N.M.) (June 9, 2021) ("Dr. Smith's opinion assigning a dollar-amount to Ms. Chambers' hedonic-damage award is unreliable pursuant to *Daubert* and its progeny."), *Jennings v. Nash*, No. 18-3261-CV-C-WJE, 2020 WL 770325, at *3 (W.D. Mo) (Feb. 17, 2020) ("[T]he speculative inferential leap between Dr. Smith's examination of various types of studies and ultimate hedonic damages calculation undercuts the reliability of such testimony."). On this basis alone, Dr. Smith's hedonic damages testimony should be excluded.

***Dr. Smith's Ad Hoc Adjustments to His Value-of-Life Figures Fail Rule 702 Requirements:*** Dr. Smith's adjustments to these already-unreliable value-of-life

calculations reinforce concerns about methodological reliability and rigor.  For instance, in calculating the "value of life" from which he derives both his hedonic damages and parental loss-of-society damages, Dr. Smith applies a "conservative" 24% reduction to his actual estimate "based on a review conducted in the late 1980s." Ex. 5, Smith Report at 19.  He offers no scientific explanation for why he adjusts this figure, or how he selected a 24% reduction, as opposed to any other adjustment.  Ex. 2, Smith Dep. 188:9 – 189:1 ("What was your method for deciding to reduce that value of life estimate by 24 percent specifically? A. To find a figure that the jury would view as conservative. . . . An approximate one-quarter reduction. You know, if you buy a pizza and you say I want to lose weight, I'm going to be conservative in my meal plan, I'm going to take off a quarter of the pizza and feed it to my dog, and I'm going to try and be conservative when I eat. It's just that one-quarter off seeking to be conservative. Q. Is there -- are there any other factors that played into that 24 percent decision? A. No.").

When faced with this same inexplicable 24% adjustment in another case, one court recently noted, "the fact that the number is more conservative than what Dr. Smith could have chosen does not render it reliable or scientific."  *Snyder v. Bank of America*, Case No. 15-cv-04228-KAW, 2020 WL 6462400, at *9 (N.D. Cal) (Nov. 3, 2020); *see also Ayers*, 887 F. Supp. at 1060 (rejecting Dr. Smith's opinion because although he could have chosen a higher number, "a conservative opinion in that sense does not equate to a scientific one"), *Starling v. Banner Health*, No. CV-16-00708-PHX-NVW, 2018 WL 1015470, at *3 (D. Ariz.) (Feb. 21, 2018) ("[T]he arbitrariness of the 'conservative' 25 percent reduction is troubling.  As before, Smith 'provides no explanation or method for calculating the

conservative factor based on data or theories originating from economic research, leaving the Court with no option but to conclude that the conservative value is derived through unmethodical, subjective 'eyeballing.'") (citing *Stokes v. John Deere Seeding Grp.*, No. 4:12-cv-04054-SLD-JAG, 2014 WL 675820, at *5 (C.D. Ill. Feb. 21, 2014).

Dr. Smith calculation of EP's impairment benchmark (percentage estimate of reduction in enjoyment of life) is similarly unscientific. Dr. Smith bases his impairment benchmark on nothing more than notes from a call that one of his staff members had with EP's mother. Ex. 2, Smith Dep. 184:2 – 185:18, 200:3-13. At no point did Dr. Smith speak directly to either of EP's parents. More critically, at no point did he consult any experts in psychology, autism, neurology, or any relevant field to assess the reduction in EP's quality of life resulting from his autism – despite having recommended such expert evaluations in his own publications. Ex. 11, Berla et al.*, Hedonic Damages and Personal Injury: A Conceptual Approach* (1990) ("The psychologist's percentage applied to the dollar value of total (lost) pleasure of life would result in a hedonic damages estimate for each year or stage of life."). Dr. Smith's arbitrary, untestable, and unscientific approach fails Rule 702 and *Daubert*. *See Snyder*, 2020 WL 6462400 at *10 ("There is also no explanation for why Dr. Smith chose the impairment benchmarks he did, other than that they are 'based' on an interview one of his staff members had with Plaintiff. . . . Thus, there is no way of testing Dr. Smith's assumption that Plaintiff's life has in fact been reduced by that impairment benchmark, or if it is an arbitrary number. This does not satisfy Daubert.").

Here, as in other litigation, Dr. Smith's hedonic damages opinions "are marinated in a proprietary blend of theoretical 'studies' (developed for use in other contexts), and

peppered with arbitrary 'benchmarks' *a la ipse dixit*, and, finally, tabulated with present value spreadsheets to give the illusion of forensically precise calculations in [plaintiff's] specific case. Beyond the illusion, the reality is more akin to hocus pocus." *Families Advocate, LLC v. Sanford Clinic North*, No. 3:16-CV-00114, 2019 WL 1442162, at *5 (D.N.D.) (Mar. 31, 2019).  As an "unreliable" (*Cramer v. Equifax Information Services*, No. 4:18-SV-1078 CAS, 2019 WL 4468945, *6 (E.D. Mo. Sept. 18, 2019)) and "troubled science in the courtroom," *Kurncz v. Honda N. Am., Inc.*, 166 F.R.D. 386, 388 (W.D. Mich. 1996), Dr. Smith's opinions on hedonic damages should be excluded under Rule 702(b-c) and *Daubert*.

**Dr. Smith's Analysis Would Not Assist the Jury:** Dr. Smith's opinions should also be excluded under Fed.R.Evid. 702(a), as they have been in many other cases, because "even assuming that Dr. Smith's formula is a reliable measure of the value of life, it was of no assistance to the jury in calculating Smith's loss of enjoyment of life."  *Smith*, 732 F.3d at 67.  His model does little more than ask the Plaintiff the degree to which their enjoyment of life has been reduced, and then apply that percentage to the value-of-life literature discussed above.  *See Allen v. Bank of Am., N.A.*, 933 F. Supp. 2d 716, 734 (D. Md. 2013) (Dr. Smith's methodology "is based almost entirely on asking laypersons how a particular event has affected their enjoyment of life" and as a result fails to "provide any assistance to the jury in making that determination for themselves."); *see also Kurncz*, 166 F.R.D. at 390 ("[I]n the end, Mr. Smith's method is nothing more than a compilation of lay responses. Giving the jury a number based on lay preferences in and of itself is no more helpful or appropriate than informing them of other jury verdicts or of the gallery's

preferences. . . . [T]he Court does not believe the jurors would accept the method so much as they might latch onto the first expert figure lobbed their way."); *Families Advocate, LLC*, 2019 WL 1442162 at *7 (expressing concern that because his models "do appear mathematical and scientific on the surface" that the jury will "rely on Dr. Smith's qualifications to imbue his calculations with an illusion of legitimacy.  It is certainly not a well-kept secret that such testimony is often used to establish a false anchor for the jury's deliberations[.]"); *Saia v. Sears Roebuck & Co., Inc.*, 47 F. Supp. 2d 141, 149–50 (D. Mass. 1999) ("[T]he court finds that Dr. Smith's testimony will not assist the jury in understanding the evidence or determining any fact in issue. . . . The court does not find Dr. Smith's proffered opinion to be sufficiently reliable for the jury to obtain any value from hearing his testimony."); *Davis v. ROCOR Int'l*, 226 F. Supp. 2d 839, 842–43 (S.D. Miss. 2002) ("The Court finds, without deciding the issue, that even if the methodology used by Smith in estimating hedonic damages constitutes 'scientific knowledge' for the purposes of Rule 702 of the FRE and Daubert, Plaintiffs have not shown that Smith's testimony is necessary in that there has been no showing that it will assist the trier of fact to understand or determine a fact in issue in this case.").

**B.** **Dr. Smith's Testimony on "Loss of Society or Relationship" Should Be Excluded Under Rule 702 and *Daubert* Case Law**

Dr. Smith's testimony on "loss of society or relationship" – in other words, the reduction in value of the parent-child relationship to EP's parents – should be excluded for the same reasons as his hedonic damages testimony should be excluded.[30]

As a threshold matter, Dr. Smith uses the same body of studies (consumer willingness-to-pay studies, wage-risk premium studies, and regulatory cost studies) to derive a "value of a life" for both his hedonic damages and loss-of-society analyses. Ex. 5, Smith Report 8–11, Ex. 2, Smith Dep. 203:11 – 204:7. As a result, all methodological concerns that apply to his hedonic damages analysis apply directly to his parental loss-of-society analysis.

Dr. Smith's testimony on parental loss-of-society should also be excluded under Rule 702(a) because it will not assist the jury. "[T]he law does not consider these types of damages to be beyond the jury's ability to understand and determine on its own." *Families Advocate, LLC*, 2019 WL 1442162, at *6. In other words, "Dr. Smith is no more qualified than anyone else to place a precise dollar value on the loss of the enjoyment of life, or the value of a parent's loss of consortium with her child." *Id.*; *see also ROCOR Int'l*, 226 F. Supp. 2d at 842–43 (granting motion to exclude Dr. Smith loss-of-relationship testimony based on the finding that "Plaintiffs have not shown this expert testimony would assist the

---

[30] Dr. Smith's opinions on "loss of society or relationship" should also be excluded under Texas law, which does not permit such recovery for parents of injured children. This exclusion is addressed in the concurrently-filed Motion in Limine to Exclude Evidence or Argument on Certain Damages Claims.

jury in understanding the evidence presented at trial or that it would assist the jury in calculating 'loss of relationship' damages in the event such calculation was warranted.")

### C. Dr. Smith's Testimony on Loss of Household Services Should Excluded As Unreliable.

Dr. Smith attempts to calculate "pecuniary loss of tangible housekeeping chores and household management services" also fall short of the reliability standard laid out in Rule 702 and *Daubert*. Ex. 5, Smith Report at 6.

Here, Dr. Smith quantifies the weekly hours a statistically-average male contributes to all domestic activities (based on the American Time Use Survey, or "ATUS"), attaches a dollar figure to this amount based on a blended average wage of individuals who provide similar services, inflates the figure by a "conservative" 50%, adjusts for the time-value of money, and then claims that amount in damages.[31]  Like his hedonic damages and loss-of-society calculations, his lost services estimate lacks reliability and should be excluded under *Daubert*.

First, Dr. Smith's inflates his estimate of average wages for service providers by "a conservative estimate of 50 percent hourly non-wage component reasonably charged by agencies or free-lance individuals who supply such services on a part-time basis[.]" *Id.* at 7.  As with his "conservative" adjustments for value-of-life calculations, however, "a conservative opinion . . . does not equate to a scientific one." *Ayers*, 887 F. Supp. at 1060.

---

[31] Note that Dr. Hyzy's life care plan appears to include the replacement cost for these services throughout the course of EP's life, first by providing a stipend for "essential services" during his youth, then by including the full cost of 56 years at an adult residential group home, where residents receive necessary assistance with activities of daily living. Thus, the experts' damages calculations are inappropriately duplicative.

Dr. Smith seems to admit as much: when asked why he used a 50% upward adjustment rather than another figure such as 40% or 70%, he responded, "I don't know. I haven't thought about that." Ex. 2, Smith Dep. 149:24 –150:5.

Second, when asked about whether "agencies or free-lance individuals" such as housecleaners might complete household tasks more quickly and efficiently than the homeowner – which should result in a lower hours estimate for lost services – Dr. Smith dismissively responded, "I don't agree that somebody can come in and necessarily do laundry faster than you. I think you are probably better at sorting colors and deciding what things should be washed together. If you have ever gotten a pink bedsheet back because somebody you hired put in a red shirt with a white sheet, you'll know what I mean." *Id.* at 142:12-19.[32] He offered no support for the proposition beyond his *ipse dixit*.

Third, Dr. Smith attempts to calculate a loss-of-contribution figure for EP at ages 13-14, despite the fact that ATUS data exists only for ages 15 and older. When asked about his speculative calculations, he explained that "the only data we have is -- on record is males 15 to 17. You haven't had adult -- or children in the teen years, I expect; but you would expect to find that a 13-year-old is far more compliant to do services in the household. Then once males turn 15 to 17, they're out buying cars, dating girls, and good

---

[32] Dr. Smith also refused to substantiate his report's example of cost of household services, for which he listed (without citation) supposed pricing for a house cleaning service, Merry Maids. When confronted with the absence of support for his claim, Dr. Smith withdrew that portion of his opinion. Ex. 2, Smith Dep. 123:1-10 ("Q. I am just at a loss for where this data comes from. I think that -- A. Then ignore it. Strike that sentence. Strike it. *I withdraw that statement, that reference*. You don't think it's appropriate. *I'm not here to justify it or support it*. Since I didn't need it, I don't have to. I don't rely on it. I need not support it or justify it. *I'm just telling you that's my experience*."). This ad hoc, unsupported, and mercurial approach to expert testimony fails Rule 702.

luck finding them." *Id.*125:10-19.  When asked why he began his calculations at 13, rather than some other age, Dr. Smith responded, "[n]o deep Ph.D.-level thinking.  At 13, we have teenagers who work.  That's my background, training, and experience and hundreds and hundreds of interviews. . . .  I offer 13 purely because that's my method; and I believe it's appropriate for the reasons I gave, not beyond that." *Id.* at 129:16 – 130:8.  As a calculation based not on data, but instead on the witness's personal opinions and observations, these speculative damage opinions should be excluded.

Finally, even where ATUS data are available, Dr. Smith used only statistically average numbers for males of a certain age.  He makes no effort to account for potentially relevant variables that could affect household labor contribution across the decades, such as socioeconomic status.  *Id.* at 130:9-17.  Because his calculations are unmoored from any analysis of contributions specific to male of EP's socioeconomic background (which is far from "average"), his method is unreliable under Rule 702, and his analyses should be excluded.

### D.    Dr. Smith's Lost Wages Calculations for Ages 35 and Beyond Are Not the Result of Reliable Methods and Should be Excluded

Dr. Smith's lost wages calculations for EP at ages 35 and beyond are also the result of unsound application of the methods to the data, and they should be excluded.

Although his methods and math are exceedingly opaque, Dr. Smith's basic approach to estimating EP's lost wages involves modeling a range of potential incomes at each year during his career, and then adjusting for the time value of money.  In each of three models (college graduate, master's degree, and professional degree), Dr. Smith uses one wage

growth equation from the time EP enters the workforce until age 35.  At age 35, however,

Dr. Smith makes a mid-career adjustment: he adjusts EP's annual earnings at age 35 to

reflect the *average* annual earnings for a 35-to-44 year old, and then from each year forward

compounds those earnings by an additional growth factor:

> **Q** And that mid-career, that's an average wage for someone,
> what, ages 35 to 44 or something like that?
>
> **A** Yes. At age 35, that's the average it starts.
>
> **Q** Okay. And so even though he's on the younger side of that,
> you give him sort of the -- the benefit of the doubt by giving
> him the average wage of someone his age to ten years older?
>
> **A** I don't agree with your characterization.
>
> . . .
>
> **Q** I said -- the 35 to 44, that's approximately a decade-long
> period, correct? And you used an average wage in that decade-
> long period?
>
> **A**  And? Your question is?
>
> **Q** Is that -- am I correct in understanding that?
>
> **A** *How could you fail to understand that? Of course, you're*
> *correct. Yes. Yes. Yes. Yes. . . .*
>
> **Q** And you start to apply this when he's at the youngest point
> in this decade-long period?
>
> . . .
>
> THE WITNESS: *At age 35*.

*Id.* at 113:25 – 115:10 (emphasis added).

This approach artificially inflates EP's salary from age 35 onward, by assuming that

at 35 he is making the average wage of a 35-44 year old in his profession.  Annually-

compounding salary growth from age 35 forward amplifies the unreliability of Dr. Smith's estimate.  In short, Dr. Smith's post-35 wage analysis is based on unsupported assumptions and divorced from the hard data, yielding a result that fails Rule 702's reliability requirement.

## VI.    Conclusion

For the reasons discussed above, Defendant respectfully requests that the Court exclude the opinions of Dr. Hyzy and Mr. Davenport, and partially exclude the opinions of Dr. Smith.

DATED: September 15, 2022    _____

Michael X. Imbroscio (admitted *pro hac vice*)
Phyllis A. Jones (admitted *pro hac vice*)
David N. Sneed (admitted *pro hac vice)*
Kathleen E. Paley (admitted *pro hac vice*)
Elizabeth T. Fouhey (admitted *pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
202-662-6000
202-778-5868 [Fax]
mimbroscio@cov.com
pajones@cov.com
dsneed@cov.com
kpaley@cov.com
efouhey@cov.com


Ali Mojibi (admitted *pro hac vice*)
COVINGTON & BURLING LLP

36

1999 Avenue of the Stars
Los Angeles, CA 90067
424-332-4803
424-332-4749 [Fax]
amojibi@cov.com

Brian G. Cano
State Bar No. 24045613
SDTX Bar No. 622595
FEE, SMITH, SHARP AND VITULLO, L.L.P.
2777 Allen Parkway
Suite 800
Houston, TX 77019
713-362-8300
713-362-8302 [Fax]
bcano@feesmith.com


**ATTORNEYS FOR DEFENDANT**
**THE HAIN CELESTIAL GROUP, INC.**

## <u>CERTIFICATE OF SERVICE</u>

THIS WILL CERTIFY that a true and correct copy of the foregoing instrument has been served to all attorneys of record in this cause of action on the 15th day of September, 2022:

Kurt Arnold
Caj Boatright
Roland Christensen
Brittany Clark
ARNOLD & ITKIN LLP
6009 Memorial Drive
Houston, TX 77007
Tel: 713.222.3800
Fax: 713.222.3850
e-service@arnolditkin.com
karnold@arnolditkin.com
cboatright@arnolditkin.com
rchristensen@arnolditkin.com
bclark@arnolditkin.com


Charles Parker
Anderson Parker
Parker & Sanchez, PLLC
700 Louisiana Street, Suite 2700
Houston, Texas 77002
Charlie@ParkerSanchez.com
Andy@ParkerSanchez.com
Tel: 713.659.7200
Fax: 713.659.7203

Constance H. Pfeiffer
Jason LaFond
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002
cpfeiffer@yettercoleman.com
Tel: 713.632.8000
Fax: 713.632.8002

**Phyllis A. Jones**