# Exhibit 1





# Transcript of Matthew Hyzy, M.D.

**Date:** June 17, 2022
**Case:** Palmquist, et al. -v- The Hain Celestial Group, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
1   IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF TEXAS
2   GALVESTON DIVISION
    Case No. 3:21-CV-90
3   ------------------------------------------
    VIDEO-RECORDED DEPOSITION OF MATTHEW HYZY
4   June 17, 2022
5   SARAH PALMQUIST, Individually and as Next Friend of
    E.P., a Minor, and GRANT PALMQUIST,
6   Plaintiffs,
    vs.
7   THE HAIN CELESTIAL GROUP, INC.,
    Defendant.
8   ------------------------------------------
9
10
    APPEARANCES:
11
12      PARKER & SANCHEZ, PLLC
13        By Charles Parker, Esq.
          700 Louisiana Street
          Suite 2700
14        Houston, Texas 77002
          713.659.7200
15        charlie@parkersanchez.com
            Appearing on behalf of Plaintiffs
16
17      Covington & Burling, LLP
18        By Kathleen E. Paley, Esq.
          One CityCenter
          850 Tenth Street, NW
19        Washington, DC 20001
          202.662.5641
20        kpaley@cov.com
            Appearing on behalf of Defendant
21
22      ALSO PRESENT: Dwayne Beuthel, Videographer
23
24
25
```

**2**

```
1           Pursuant to Notice and the Federal Rules of
2   Civil Procedure, the deposition of MATTHEW HYZY,
3   called by Defendant, was taken on Friday, June 17,
4   2022, commencing at 8:07 a.m., at 9777 South Yosemite
5   Street, Suite 200, Lone Tree, Colorado, before
6   Barbara J. Davalos, Registered Merit Reporter and
7   Certified Realtime Reporter within and for the State
8   of Colorado.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1                    I N D E X
2
    EXAMINATION                              PAGE
3   BY MS. PALEY                               6
4
5
6   EXHIBIT       DESCRIPTION       INITIAL  REFERENCE
7
    Exhibit 1     Defendant The Hain Celestial    7
8                 Group, Inc.'s Notice of
                  Intention to Take Oral and
9                 Videotaped Deposition of
                  Matthew Hyzy, M.D. with
10                Subpoena Duces Tecum
11  Exhibit 2     Biography for Dr. Matthew W.    18
                  Hyzy
12
    Exhibit 3     Depositions by Dr. Matthew     18
13                Hyzy
14  Exhibit 4     Physician Life Care Planning   19
                  Retention Agreement
15
    Exhibit 5     Docs to PLCP                   19
16
    Exhibit 6     Online bio for Matthew         20
17                William Hyzy, D.O.
18  Exhibit 7     Catastrophic Life Care Plan    22
                  prepared by Matthew Hyzy,
19                3/30/22
20  Exhibit 8     Excerpts from A Physician's   103
                  Guide to Life Care Planning
21
    Exhibit 9     Medical records from Texas    141
22                Children's Hospital
23  Exhibit 10    Context 4 Healthcare document 154
                  entitled Usual, Customary &
24                Reasonable Healthcare Fee
                  Data
25
```

**4**

```
1              I N D E X  (Continued)
2   Exhibit 11    AACAP Official Action,        324
                  Practice Parameter for the
3                 Assessment and Treatment of
                  Children and Adolescents with
4                 Autism Spectrum Disorder
5   Exhibit 12    Printout from Amazon Pharmacy 324
6   Exhibit 13    Printout from GoodRx          324
7   Exhibit 14    FDA News Release, FDA         324
                  Approves Cyltezo, the First
8                 Interchangeable Biosimilar to
                  HUMIRA
9
    Exhibit 15    Avondale House printout       324
10                entitled Our Services, The
                  School at Avondale House
11
    Exhibit 16    Avondale House printout       324
12                entitled Our Services,
                  Residential
13
    Exhibit 17    American Academy of           324
14                Pediatrics, Identification,
                  Evaluation, and Management of
15                Children with Autism Spectrum
                  Disorder
16
    Exhibit 18    Article entitled Nonmedical   324
17                Interventions for Children
                  with ASD: Recommended
18                Guidelines and Further
                  Research Needs
19
    Exhibit 19    DHA Laboratory Lab Testing    324
20                Micronutrient Test
21
22  PREVIOUSLY MARKED EXHIBITS
23
    None
24
25
```

---

**Page 5**

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record at 8:07 a.m. Today is June 7th -- 17th, 2022. This begins the video-recorded deposition of Matthew Hyzy taken in the matter of Sarah Palmquist, et al. v. The Hain Celestial Group.

This deposition is being taken at 977 South Yosemite Street in Lone Tree, Colorado. The court reporter is Barbara Davalos. The videographer is Dwayne Beuthel.

Counsel will introduce themselves and the parties they represent beginning with the plaintiffs' counsel first.

MR. PARKER: Charlie Parker representing the Palmquist family.

MS. PALEY: Kathleen Paley representing Hain Celestial.

THE VIDEOGRAPHER: Will our court reporter please swear in the deponent.

MATTHEW HYZY, being first duly sworn in the above cause, was examined and testified as follows:

THE VIDEOGRAPHER: You may begin.

---

**Page 6**

EXAMINATION

BY MS. PALEY:

Q   All right. Good morning, Dr. Hyzy.

A   Good morning.

MR. PARKER: Can I do one thing real quick. Of course we want to read and sign, and can I have the agreement to read and sign before any notary public?

THE REPORTER: Before a notary public?

MR. PARKER: Before any notary public.

MS. PALEY: Oh. Yeah. I mean, as in any notary public would be sufficient?

MR. PARKER: Right.

MS. PALEY: That's fine.

MR. PARKER: Great.

MS. PALEY: It doesn't have to be a specific state, et cetera?

MR. PARKER: Correct.

MS. PALEY: Understood. That's fine.

Q   (BY MS. PALEY) All right. So I know you've been deposed before, so I'll be brief with all the preliminaries. Can we agree to give each other time to ask a whole question and complete a whole answer, and just try not to step on each other for the sake of the court reporter?

---

**Page 7**

A   Yes, ma'am.

Q   Okay. And if I ever step on you because I don't realize you're finished, you know, with an answer, my apologies. I'll try my best not to do that, but glad we can both do that.

If you need any clarification of my questions, please let me know. Is that okay?

A   Yes.

Q   And I think we should probably aim to take brief breaks every hour or so. But if you need any break that's not on the hour, just let me know. We can finish the pending question, and then we can take a break. Okay?

A   Okay.

Q   All right. I'm going to mark for the record the notice of deposition sent out in this case. This will be Exhibit 1.

(Exhibit Number 1 was marked.)

MS. PALEY: Charlie, I'll give you the backup.

And Elizabeth, our --

MR. PARKER: Let's see. You got one marked for him?

MS. PALEY: Here we go. Yep. Here's the marked version.

---

**Page 8**

MR. PARKER: Okay. I've got two.

MS. PALEY: All right.

Q   (BY MS. PALEY) I apologize. We have the luxury of a large conference room today, so there's going to be a lot of reaching. Also our associate wasn't able to make it. So that -- hence, another, you know, long reach here rather than having her do it.

MR. PARKER: We're going to give you extra time for that.

MS. PALEY: Thank you.

Q   (BY MS. PALEY) All right. Do you see Exhibit 1, the notice of deposition?

A   Yes, ma'am.

Q   And did you receive this before today?

A   I did.

Q   And did you review Exhibit A, which is the final page of the notice?

A   I did.

Q   Okay. And did you bring any documents with you today, sir?

A   I did not.

Q   Okay. Let's just run through these very quickly. Item 1 on the Exhibit A, do you have any materials that are responsive to Item 1 that you

9

1  haven't produced before today?
2      A   Everything has been produced.
3      Q   Okay.  And so let me just then sort of
4  zoom in on Items 5 through 7, just to clarify my
5  understanding.  Item 5 asks for all documents
6  relating to the deponent's cost survey in the life
7  care plan of Ethan Palmquist, including notes from
8  calls or meetings or any materials received from the
9  providers who are referenced in the life care plan.
10      Do you have any such notes, materials
11  received, anything related to your cost survey?
12      A   There are no other documents other than
13  what's published in my life care plan.
14      Q   Okay.
15      MR. PARKER:  And in the documents that we
16  provided to you.
17      Q   (BY MS. PALEY)  And we received a set of
18  documents yesterday which appeared to be maybe some
19  forms that Dr. Palmquist had filled out and some
20  invoices.  But I haven't seen any notes from the cost
21  survey efforts or any materials received from
22  providers who are referenced in the cost survey.
23      A   So there are no notes, just those specific
24  files that I think you both are discussing.  And I
25  don't typically take handwritten notes for my type of

10

1  work, dictations, history, et cetera, or physician
2  meetings, phone-to-phone meetings.  So there's
3  nothing else on Number 5 that I could produce today.
4      Q   So how -- when you get on the phone --
5      MR. PARKER:  Hold on just one second, sir.
6  So I've got a copy of the email that -- and I can
7  send it to you, but everything that we sent him we
8  sent you a copy of.  You've got that?
9      MS. PALEY:  I've got that.
10      MR. PARKER:  Okay.  That was --
11      MS. PALEY:  Yes.
12      MR. PARKER:  Okay.
13      MS. PALEY:  I just wanted to know if there
14  were any notes from his cost survey.
15      MR. PARKER:  Okay.
16      MS. PALEY:  When he called a certain
17  pediatric dentist, did he have notes?  When he talked
18  to Avondale House, were there notes?
19      MR. PARKER:  I was worried for a second,
20  you hadn't -- there was a mix-up.
21      MS. PALEY:  I received that.  Thank you,
22  Charlie.
23      Q   (BY MS. PALEY)  So Doctor, when you do
24  these cost surveys -- well, first of all, is it you
25  who's calling the providers to get their costs?

11

1      A   I typically do not call the providers,
2  given my busy clinical schedule.  So typically one of
3  my team members we delegate this to.  We have an
4  educate and train team at Physician Life Care
5  Planning to do that cost survey analysis.
6      Q   So PLCP, is that the acronym for Physician
7  Life Care Planning?
8      A   That's correct.
9      Q   And that's the organization that you've
10  contracted with to do today's work, correct?
11      A   That's correct.
12      Q   And do those individuals who make the
13  calls to, say, a pediatric dentist or a specialty
14  school, do they have any notes?
15      A   It's my understanding that there are no
16  notes.  They have the document or the specific
17  vendor, the cost.  That gets sent to me and I review
18  it.  If I need to validate it, I may or may not call
19  them to validate, depending on my experience with the
20  actual charge.
21      Q   And so when you say they have the document
22  or the specific vendor --
23      A   Uh-huh.
24      Q   -- the costs that get sent to me, what do
25  you mean by that?  What documents do they have?

12

1      A   So if they were to pull a cost for a
2  specific procedure, a medication or something like
3  Avondale House, then that is sent to me as I'm
4  building and drafting my life care plan.  And so if
5  that is questionable on my end, then I may verify it
6  by calling them myself.  But given my busy clinical
7  practice, it's not my standard to verify every single
8  thing.  I need to delegate to my staff to do that.
9      Q   And so you've received emails or other
10  communications from the PCLP folks who call the
11  vendors, correct?
12      A   Not exactly correct.
13      Q   What have you received from them?  You
14  said --
15      A   PLC- --
16      Q   PLCP.
17      A   -- Physician Life Care Planning --
18      THE REPORTER:  I'm sorry --
19      A   What was your question, Ms. Payne [sic]?
20      Q   (BY MS. PALEY)  You say, If they were to
21  pull a cost for a specific procedure, a medication or
22  something like that, they send it to me.
23      How do they send it to you?
24      A   Well, we have a working product.  And so
25  depending on how that day plays out, it could be a

13

1  phone call or it could be in my working product,
2  which would be like a draft of my life care plan
3  before I finalize it.
4      Q    And is that working product, is that
5  something that both you and the PLCP -- PLCP folks
6  can access at the same time, something like a Google
7  Doc?  I mean, not that specifically but --
8      A    Sort -- excuse me.  And I'm sorry,
9  Ms. Paley, P-a-l-e-y?
10      Q    Correct.
11      A    Okay.  I think I misspoke earlier.
12          So not exactly like a Google Drive.  The
13  life care plan is my plan.  I authored it and
14  reviewed every word.  And so they're able to give me
15  information that then I plug into there.  But it's
16  not similar to a Google Drive business document where
17  you're just adding realtime, where multiple people
18  have access to that.  It's definitely not that.
19      Q    Okay.  And so the folks at PLCP, they may
20  have notes or documents from the vendors.  They
21  didn't send them to you, but you discussed the
22  material with them; is that correct?
23      A    Well, I can't comment if they have
24  specific dots -- excuse me, documents or notes,
25  because that would be part of our working product.

14

1  What I am reviewing is the actual numbers, the costs,
2  CPT codes, things like that, that I am providing to
3  them on my recommendations to then source or do our
4  cost vendor analysis.
5      Q    All right.
6          MS. PALEY:  And Charlie, we can deal with
7  this, you know, later and separately.  But I'd like
8  to call for the production of any notes, materials,
9  anything that would be responsive to Request 5 here
10  that would be in the possession of Physician Life
11  Care Planning but not Dr. Hyzy specifically.
12          MR. PARKER:  If you will send me an email
13  to that effect when we finish, I will be glad to see
14  if there are any such documents.
15          MS. PALEY:  I can do that.
16      Q    (BY MS. PALEY)  Item 6 on the notice of
17  deposition is, All documents relating to the
18  deponent's telephone conferences with Dr. Krigsman,
19  Dr. Rotenberg, Dr. Settles and/or Dr. Nelson,
20  including any notes or calls from those telephone
21  conferences.
22          Do you have any notes or other
23  documentation of those conferences?
24      A    Other than what is documented in my life
25  care plan, there are no other notes, handwritten

15

1  notes or documents.  I don't typically take
2  handwritten notes.  When I do a
3  physician-to-physician, peer-to-peer -- and that's
4  something that I do frequently, discussing with
5  neurosurgeons, neurologists or even like insurance
6  authorization folks for hospital-based stuff.  And so
7  there are no handwritten notes or documents relating
8  to those specific phone calls.
9      Q    And I think I know the answer, but I'll
10  just ask the question.  You didn't record those phone
11  calls, did you?
12      A    They are not recorded.
13      Q    Okay.  Item 7 is -- if you need to take a
14  break for water at any point, I understand.  It's
15  very dry in here.
16      A    Welcome to Colorado.
17      Q    We both have our water bottles.
18          MR. PARKER:  For Item 7, as I discussed
19  with Elizabeth, the UCR80 survey is under a license
20  agreement, and we -- he cannot produce it.  And if
21  you want to follow it up, we're glad to produce the
22  license agreement and give everybody notice and do
23  all that.
24          MS. PALEY:  Understood.  Thank you.  And I
25  got notice of that yesterday, Charlie.

16

1          MR. PARKER:  Okay.
2      Q    (BY MS. PALEY)  So I just want to ask one
3  question about the UCR80 survey.
4      A    Uh-huh.
5      Q    When doing the UCR80 survey, do you
6  personally get into the Context 4 Healthcare database
7  to look up those 80th percentile costs?  Or is that
8  also done by the staff at Physician Life Care
9  Planning?
10      A    I do delegate to the staff.  If there is a
11  major concern or question, I may access it to verify
12  something.  But given what I do for a living, I
13  typically don't need to because it's very transparent
14  and consistent with what kind of I know as billable
15  charges.
16      Q    Okay.  So just to round this out, are
17  there any other materials that you considered beyond
18  what's identified in your report -- listed in your
19  report as materials that you considered and beyond
20  the materials that Mr. Parker sent us yesterday,
21  which includes a list of like medical records?
22      A    There are no other materials.
23      Q    And does your report include the full
24  scope of your opinions in this case?
25      A    It does.

17

1    Q    Okay.
2    A    **Ms. Paley?**
3    Q    Yes.
4    A    **Just to clarify, I am an osteopathic DO.**
5    **And on the notice of deposition, it does have -- it**
6    **listed as MD incorrectly.**
7    Q    Understood. Thank you. Thanks for noting
8    that for the record.
9         Now for the sake of efficiency, I'm going
10   to mark a bunch of the sort of basic documents right
11   now as exhibits. We'll get them in front of you, and
12   then you can move between them as needed. So this
13   will be just a moment.
14        So I'm going to mark as Exhibit 2 -- just
15   one moment here. I want to keep my documents
16   straight.
17        MR. PARKER: Do you want me to come over
18   there and outline your exhibits for you, for your
19   assistant?
20        MS. PALEY: I told Elizabeth I would try
21   to muddle through without her. It's been a while
22   since I've flown solo on a deposition.
23        MR. PARKER: As I explained to Dr. Hyzy, I
24   said, I'm old school. And he said, What do you mean
25   by old school? You can take this down if you want.

18

1    And I showed him his full report with notes and tabs,
2    et cetera.
3    Q    (BY MS. PALEY) All right. We'll mark as
4    Exhibit 2, which I'll send your way.
5         (Exhibit Number 2 was marked.)
6    A    **Thank you.**
7    Q    (BY MS. PALEY) This is your -- Dr. Hyzy,
8    is this your CV?
9    A    **Correct.**
10   Q    Okay. And then we'll mark as Exhibit 3 --
11        (Exhibit Number 3 was marked.)
12   Q    (BY MS. PALEY) Sorry. I didn't get that
13   one far enough. And, Dr. Hyzy, Exhibit 3, is that
14   your list of expert test--- deposition -- strike
15   that.
16        Is that your list of expert testimony
17   given in the last four years?
18   A    **I did have a discovery deposition**
19   **yesterday.**
20   Q    Okay.
21   A    **So that is not on this current list. I**
22   **think that is the only one in addition to this**
23   **current list.**
24   Q    Okay. And we will walk through the list
25   in just a bit.

19

1         I'll mark as Exhibit 4 the physician --
2    I'm waiting for our court reporter, who's making do
3    with a challenging chair. We'll mark as Exhibit 4
4    the Physician Life Care Planning retention agreement.
5         (Exhibit Number 4 was marked.)
6    Q    (BY MS. PALEY) Is this familiar to you as
7    the retention agreement in this case?
8    A    **Yes, ma'am.**
9    Q    Okay. We'll mark as Exhibit 5 --
10        MS. PALEY: Charlie, I believe this might
11   be what you were referring to or one of the documents
12   you were referring to.
13   Q    (BY MS. PALEY) -- a list of docs to PLCP.
14        (Exhibit Number 5 was marked.)
15        MR. PARKER: Okay.
16   Q    (BY MS. PALEY) Is this familiar to you as
17   a list of materials that you received as part of your
18   life care planning work, the first three pages here?
19   A    **That's correct.**
20   Q    Okay. And then we have a few invoices on
21   the next pages. Do you see those?
22   A    **I do.**
23   Q    And do those look to be your invoices in
24   this litigation?
25   A    **These would be the invoices from Physician**

20

1    **Life Care Planning to the law firm.**
2    Q    Understood.
3         And then you received separate payment
4    from Physician Life Care Planning?
5    A    **That is correct.**
6    Q    Okay. We're almost to the end of the
7    great exhibit marking --
8    A    **Well, thank you --**
9    Q    -- exercise.
10   A    **-- for bringing all these. It's nice to**
11   **stay organized and not burn all my printer paper.**
12   Q    I understand. The one benefit of being
13   back in the office is that we now have -- we have our
14   big, multifunction printers again.
15        So I'm going to mark as Exhibit 6 what I
16   believe to be your online bio.
17        (Exhibit Number 6 was marked.)
18   Q    (BY MS. PALEY) I just want to confirm
19   that's what that is. Do you recognize this?
20   A    **This is my private practice.**
21   Q    Okay.
22   A    **Centeno-Schultz Clinic online bio as you**
23   **described it.**
24   Q    And it mentions that you work in
25   interventional orthobiologics; is that correct?

21

```
1     A    That's correct.
2     Q    What -- for the layperson, what does that
3  mean?  That sounds -- it sounds very fancy.
4     A    So this is kind of a longer answer, if I
5  may take the time to answer that.
6     Q    Sure.
7     A    So number one, you know, I graduated from
8  medical school and then started physical medicine and
9  rehabilitation residency.  So completed that.  And
10 that is my board certification.  And that includes
11 numerous pediatric rotations and training in
12 neurosurgery, neurology, orthopedics, pain
13 management, interventional spine, sports medicine,
14 hospital-based care, ICU, et cetera.
15        When I came to Colorado after Texas for my
16 fellowship, my fellowship was here with my group,
17 Centeno-Schultz Clinic, and our main office is north
18 side of Denver.  Today we're sitting at my satellite
19 office here.  And so that's an interventional spine
20 pain management fellowship.  So our practice is
21 mostly that, but our research is under autologous
22 orthobiologics.  Autologous meaning from your own
23 body.
24    Q    Okay.
25    A    And so that's mostly blood, platelet-rich
```

22

```
1  plasma and bone marrow concentrate.  So the majority
2  of my research publications and peer-reviewed
3  journals are surrounding that treatment of the
4  orthopedic or spine.  And so the term orthobiologics
5  is encompassing the body's own ability to heal, which
6  is mostly the blood platelet-rich plasma or the bone
7  marrow concentrate.
8        So I'm typically four days in clinic doing
9  procedures, with a flex day, as well as still seeing
10 patients in the hospital, training residents and med
11 students, both hospital, classic physical medicine
12 rehab, brain injury, spinal cord injuries,
13 amputations and in the procedures in my clinic.  So
14 that, I think is the best way to answer that
15 question.
16    Q    Okay.  Thank you.  That was very
17 informative.
18        (Exhibit Number 7 was marked.)
19    Q    (BY MS. PALEY)  All right.  And then
20 Exhibit 7 -- I'm about to lose my microphone.
21 Exhibit 7 is a copy of your life care plan in this
22 case.  If you can just take a quick look and confirm
23 that's what it is, that would be great.
24    A    Without going through all 265 pages, this
25 looks like the complete life care plan.  Thank you
```

23

```
1  for providing that.
2     Q    And we double-sided it to save a little
3  bit of tree.
4     A    I understand.
5     Q    And I promise I haven't inserted anything
6  in here that wasn't already in there already.  So it
7  should be the original.
8        All right.  Let's talk about the process
9  of preparing a life care plan.
10    A    Yes.
11    Q    Now, is the first step to understand what
12 the patient's injuries are and what their medical
13 needs are?
14    A    Essentially the first step is before that
15 on -- do I, as a physician, want to undertake the
16 case or not.  So specifically with Mr. Palmquist --
17 referring to Ethan, the minor -- I was contacted by
18 the Arnold Lincoln law firm very early February,
19 perhaps February 2nd.  I had a phone call with their
20 attorney, and he described the clinical situation.
21        And I explained to him my skill set and my
22 experience with pediatric cases, whether it was like
23 independent medical exams or pediatric life care
24 plans.
25        So once we had that discussion, at that
```

24

```
1  point is when the other document you're referencing,
2  I believe as Exhibit 4, our retention agreement.
3  After that phone call, I believe that's when Roland
4  Christensen, on behalf of Arnold Itkin, started the
5  retention agreement to go through then the next steps
6  in preparing the life care plan.
7     Q    And -- thank you.  That was helpful.
8        Do you know if Arnold & Itkin just sort of
9  found you on their own or if it was Physician Life
10 Care Planning that pointed them in your direction?
11    A    Well, it would be Physician Life Care
12 Planning, because there's numerous physicians.  We're
13 all the board certified physical medicine and
14 rehabilitation physicians that work as independent
15 contractors for Physician Life Care Planning.  And so
16 depending on the type of case or the specific
17 experts' availability, timeframe, skill set, that's
18 kind of how the law firm and the team at PLCP decide
19 where the case can go.
20    Q    Okay.  And then what I had originally
21 meant -- which I didn't clarify, but now we can turn
22 to it is -- once you've decided that you're going to
23 prepare a life care plan for a particular -- I won't
24 say patient but client, is -- are the sort of initial
25 steps understanding what's the injury and then
```

25

1  determining what's the medical need?
2     A    So it's a little bit more involved and
3  complex than that, Ms. Paley.  So the initial steps
4  are the law firm needs to upload all the medical
5  records so I can start reviewing them.  In this case,
6  it was extensive.  And then at that point, we
7  schedule a interview or examination.
8        In this case, I started with Dr. Sarah
9  Palmquist, the mother, over the phone to understand
10 things.  And then roughly a week later, I did a
11 face-to-face visit with them in Texas at their house.
12       From there, I'm working on my dictation of
13 their diagnoses, impairments, disabilities, moving
14 into the entire 265 pages of my opinions.  And then
15 the future medical needs, then the cost analysis.
16 And then I'm reviewing it before I finalize and send
17 it back to the law firm.
18    Q    Okay.  But then your plan that you put
19 together is not a -- it's not a prescription for
20 care; is that correct?
21    A    That's correct.
22    Q    And I took that -- that language is
23 probably familiar to you because it's taken directly
24 from your report on page 4.
25    A    Yes.

26

1     Q    When you say it's not a prescription for
2  care, what does that -- what does that mean?
3     A    So when I am seeing patients in a
4  hospital, I need to create medical orders for
5  specific therapies and speech evaluations and
6  cognitive evaluations, order seizure medications, get
7  them discharged, et cetera, with a prescription for
8  those things as they leave the hospital.  Or in the
9  clinic, you know, in my outpatient practice, the
10 exact same process.  We have to prescribe medical
11 care, DMEs, referrals to other therapists or
12 physicians or testing or imaging studies or
13 medications.
14       When we are practicing medicine, we're
15 usually staying in more of an acute phase.  It could
16 be four weeks, six weeks, 12 weeks.  Some of my
17 patients I see maybe every six months to nine months.
18 So that would be a prescription for care.
19       But in a life care plan, it's different
20 because it's an outline on what's -- in my opinion,
21 what is going to be reasonable medical care, based
22 upon his specific clinical indications, the
23 diagnoses, the impairments, the duration of life
24 expectancy, et cetera.  So that would be, I think,
25 the distinction.

27

1     Q    Okay.  And your report, in the same
2  paragraph that talks about this not being a
3  prescription for care, says, It represents a logical
4  model of care which anticipates a medically related
5  goods and services that will likely be required by
6  Mr. Palmquist throughout the probable duration of
7  care.
8        What do you mean by "likely be required"?
9     A    So I am defining "likely be required" as
10 within a reasonable degree of medical probability,
11 directly related to his primary impairments and
12 disabilities and diagnoses for the future.
13    Q    And so can you say more likely than not
14 that Ethan will need each of the goods and services
15 outlined in your life care plan?
16    A    I would agree.  How I define "probable"
17 and "more likely than not" would be 51 percent or
18 greater.  And there are some other areas I think
19 where I did put that in my plan in slightly different
20 language or vernacular though.
21    Q    So when you say -- I just want to make
22 sure I understand.
23    A    Uh-huh.
24    Q    When you say care would likely be
25 required, you are defining that as more likely than

28

1  not?
2     A    That's correct.
3     Q    Okay.  And can you say -- did I understand
4  that as to the particulars of the -- you know, the
5  type of care; you know, the -- the iPad, the bed, the
6  visits to various specialists?
7        Now, can you say more likely than not that
8  Ethan will need each of these goods and services
9  listed in the plan with the -- with the frequency and
10 duration that you outline in the plan?
11    A    Yes.  I would agree that would be probable
12 and/or more likely than not, in my opinion, for those
13 other types of medical-related goods and services.
14    Q    Okay.  And so, again, just to make sure I
15 understand sort of the scope of how you're describing
16 this work.  Are you reco- -- not writing a
17 prescription for care, but are you recommending that
18 Ethan pursue or receive each kind of care listed in
19 this life care plan?
20    A    So recommendation is one way to describe
21 it.  Outlining it is another way to describe it.
22 Using my life care plan as a template for his family
23 and case managers and others would be another way to
24 describe it.  This life care plan is outlining, in my
25 opinion, what would be optimal to then move back into

29

1  achieving my four clinical objectives of life care
2  planning.
3      So it's -- again, I'm not prescribing it
4  to him or his family, but it is something that could
5  be described as recommended and outlined as a total
6  plan or a guide for the family.
7      Q    So is this -- in sort of sum, is this your
8  best estimate of Ethan's like potential care needs?
9      A    At the time of the completion, March 30th,
10 absolutely, I would agree -- excuse me, March 30th,
11 2022.
12     Q    Uh-huh.
13     A    Yes. That would have been the best
14 recommendations at that time.
15     Q    So let's look at your report. I think
16 we'll probably spend the most time in your report
17 today. And Page 1, as numbered on the bottom right
18 side of the report, you begin with an overview and an
19 executive summary, Section 1.1.
20     A    Yes.
21     Q    And I'm just going to read that first
22 sentence of the executive summary. This life care
23 plan, this report has been prepared for Mr. Ethan
24 Palmquist, a 7-year-old left-handed dominant male who
25 suffered a severe acquired brain injury with global

30

1  neurodevelopmental delays and Crohn's disease
2  secondary to heavy metal toxicity -- heavy metal
3  toxicity with severe regression in May 2017.
4      I think I got that right. Is that
5  correct?
6      A    Yes, ma'am.
7      Q    Okay. Now, again, just to make sure I
8  understand the scope of your opinions here, are you
9  offering a specific causation opinion in this case?
10     A    I am not offering a specific causation
11 opinion on Ethan's diagnoses other than what I have
12 reviewed in the treating medical records regarding
13 the heavy metal toxicity.
14     Q    Okay. So have you independently evaluated
15 the medical records, the metal testing results and,
16 you know -- strike that. Just a second.
17     Have you independently evaluated the
18 medical records in this case and the metal testing
19 results and the testing results for Earth's Best Baby
20 Foods to determine that it was those foods that
21 caused Ethan to develop the cluster of diagnoses that
22 you issue in this plan?
23     A    Can we try to break down the question?
24     Q    Sure.
25     A    Because I heard numerous things of

31

1  records, medical records and labs and the food.
2      Q    Yeah. So have you -- are you offering a
3  specific causation opinion that it was eating Earth's
4  Best Baby Food that caused Ethan to develop the
5  cluster of I believe it's like 11 or 14 diagnoses
6  that you put in this report?
7      A    So my report is simple in taking Ethan
8  with his diagnoses and the future care that I'm
9  recommending. I'm not offering a specific causation
10 opinion regarding what you're stating as Earth's Best
11 Baby Food.
12     Q    Okay. And are you -- based on your review
13 of the materials that you listed in your materials
14 considered, are you working under the assumption that
15 it was the consumption of Earth's Best Baby Foods
16 that caused Ethan to develop the cluster of diagnoses
17 in your report?
18     A    Well, there's a large outline of my
19 summary of records which starts on Page 6. And then
20 there's additional documents that I have reviewed
21 that are also summarized later on in the report. I
22 can pull up the specific page if you want that. And
23 so those are the specific records I have reviewed,
24 which do include lab tests.
25     And then talking with Dr. Sarah Palmquist,

32

1  the mother, along with other treating physicians in
2  the medical record, I would say that it's clear to
3  me, based upon the mother and the treating
4  physicians, that there is heavy metal toxicity. But
5  I am not opining directly on Earth's Best because I
6  don't recall looking at specific things directly from
7  that manufacturer.
8      Q    Okay. And so with regard to -- we'll put
9  Earth's Best aside. With regard to Ethan's diagnoses
10 and metal toxicity, have you done an independent
11 evaluation of Ethan's metal exposure to determine
12 that he was exposed to sufficient levels of metals to
13 cause his cluster of diagnoses listed in your report?
14     A    Other than reviewing these records that
15 we've outlined, I have not performed an independent
16 evaluation of what you're describing.
17     Q    Okay. And I may come back to that a
18 little bit later today just to make sure -- just to
19 make sure I understand the scope of what you've done.
20 But is it fair to say you've taken what you learned
21 from Dr. Palmquist and you've looked at the medical
22 records from, say, like, you know, Dr. Megson or what
23 have you, and based on those you've made a
24 determination that Ethan suffers from metals
25 toxicity, but you haven't undertaken an independent

33

1  analysis of his metal levels and his exposures and,
2  you know, the very particulars of what metal might
3  have caused the cluster of symptoms that you list in
4  your report?
5     A    So that would be one way to describe it,
6  but it's also not including my review of additional
7  records and lab studies and the examination of Ethan
8  at his house. So those things need to be included.
9  In addition to discussing with the mother, Dr. Sarah
10  Palmquist, and the treating physician medical records
11  as well.
12    Q    Okay. And that's actually where I just
13  was seeking some clarification. You've looked at
14  Ethan's metal testing results, correct?
15    A    That's correct.
16    Q    And are you opining that based on those
17  metal testing results, you believe that the levels
18  reported in those results could be and, in fact, here
19  are causative of heavy metals toxicity?
20    A    Well, I think it's more than just one lab
21  report. I think it, again, is the entire timeline of
22  his development and regression, plus interview with
23  the family and the mother and Ethan, plus the
24  treating medical records -- excuse me, the treating
25  providers and their medical records.

34

1        So using the totality of information,
2  that's why I do have heavy metal toxicity in my
3  Page 1 executive summary.
4     Q    Are there any particular metal testing
5  results that you believe are supportive of a finding
6  of heavy metal toxicity?
7     A    I would have to have those labs in front
8  of me to -- to answer that question, Ms. Paley.
9     Q    But off the top of your head, there's no
10  particular results that stuck out?
11    A    So I wasn't asked to do an independent
12  review of the heavy metal toxicity or the lab reports
13  on that. My job as a physiatrist and a physical
14  medicine rehab specialist is very simple: Taking
15  Ethan, with his diagnoses today and impairments, and
16  then using my experience to predict within a
17  reasonable degree of medical certainty his future
18  care. And then the rest of the report ensues.
19    Q    Okay. So is it fair to say your report
20  was not focusing on a causation assessment. Your
21  report was focusing on, Given where Ethan is now,
22  here's the care I anticipate he might need?
23    A    I think that's a good summary of my
24  report.
25    Q    In your -- in your regular practice, have

35

1  you ever diagnosed a patient with autism spectrum
2  disorder?
3     A    I have previously.
4     Q    How many times?
5     A    Typically, it's not just me as a
6  physiatrist doing this. It would be -- like my
7  experience at Dell Children's Hospital in Texas,
8  working with geneticists, psychologists, neurologists
9  and the physiatrist or PM&R doctor, also known an
10  physiatrist. So in my four months of focused Dell
11  Children's Hospital training, there was probably
12  anywhere between five to ten that we diagnosed in
13  those four months.
14    Q    Okay. And that four months was a -- I'll
15  try to get this phrasing right. Is that a rotation
16  in your residency?
17    A    So physical medicine and rehabilitation
18  physicians are trained in pediatric rehab, diagnosis,
19  treatment. And I also was trained in the neurology
20  aspect and neurosurgical aspect. And so we have to
21  do pediatric rotations as part of the residency. In
22  my specific program, we had a dedicated Children's
23  Hospital in Texas to do that; four months for that
24  specific rotation.
25    Q    Okay. And since that four-month rotation

36

1  during your residency, have you diagnosed any
2  patients with autism spectrum disorder?
3     A    I typically would refer to other pediatric
4  specialists here locally in Denver. So I have not
5  diagnosed since that timeframe.
6     Q    Okay. And in your regular practice, have
7  you ever diagnosed a patient with Crohn's disease?
8     A    A similar type of situation where I might
9  have it on my differential diagnosis but then would
10  want to refer to a gastroenterologist. Because they
11  would need to have an interventional procedure, like
12  a colonoscopy or EGD upper endoscopy, to confirm or
13  refute that specific diagnosis.
14    Q    And how often does Crohn's come up in your
15  work as an interventional orthobiologist --
16  biologicist?
17    A    So I wouldn't use that term because that's
18  just -- it's, number one, the term would be
19  orthobiologics, in that we defined as the autologous
20  blood, platelet-rich plasma or bone marrow. But my
21  work is a physiatrist, physical medicine and
22  rehabilitation. I have faculty appointments at both
23  medical schools in town. I have hospital-based
24  practice. I still see pediatrics in my clinic. Plus
25  I do procedures.

**37**

1    It just so happens that the majority of my
2 clinical research and clinical procedures are
3 involving orthobiologics versus surgery or like
4 hygo-steroid (phonetic) epidural for sciatica would
5 be, you know, kind of an example.
6    Q    So I can clarify the question.  How often
7 does Crohn's come up in your clinical work, more
8 broadly?
9    A    Yeah.  So more broadly, we're managing
10 patients, I'm treating patients that have this
11 existing diagnosis or patients have other complaints
12 other than their spine, orthopedic, neurological
13 system that they're talking to me about.  And I'll
14 have to, then, refer to the GI doctor or
15 gastroenterologist for those confirmatory studies.
16 So it's pretty frequent.
17    I mean, different autoimmune diseases or
18 autoimmune colitis or inflammatory bowel disease, I
19 mean, I'm definitely seeing patients at least once a
20 month that have that working diagnosis differential
21 or an existing diagnosis already.
22    Q    And do you care for -- do you -- strike
23 that.
24    Do you care for patients with respect to
25 their Crohn's specifically?  Do you provide the

**38**

1 medical care to take care of their Crohn's disease?
2    A    So when I have a patient admitted to an
3 inpatient rehab unit, I'm a primary physician, which
4 is full management, prescribing the medications.  So
5 if a patient comes in with this existing diagnosis,
6 it's my responsibility to continue the medications,
7 monitor the medications, monitor their symptoms while
8 we're also doing whatever else they're admitted on
9 inpatient rehab unit for.  So in that regard, yes.
10    In the regard of doing colonoscopies and
11 EGD, no, I don't perform those types of
12 gastrointestinal procedures.
13    Q    Okay.  So apart from the inpatient setting
14 where you're managing patients on their current
15 regimen of medications --
16    A    Uh-huh.
17    Q    -- while you perform, you know, other
18 interventions, apart from that do you provide -- you
19 know, it sounds like -- am I correct to say you don't
20 provide day-to-day care for Crohn's patients with
21 respect to caring for their actual Crohn's disease?
22    A    That would -- that would, again, be a very
23 broad summary.  Because, really, no physician or
24 healthcare provider will provide day-to-day care for
25 any patient with inflammatory bowel disease.  But

**39**

1 yes, at times, right, I have to prescribe things in
2 the hospital, or even in my outpatient clinic.  Some
3 patients do need steroids packs for a flare, and so
4 that has been something I've done.  But, again, I'm
5 not a gastroenterologist that's performing the
6 colonoscopy to confirm or refute a diagnosis of
7 inflammatory bowel disease.
8    Q    Okay.  And similarly with autism, in your
9 clinical practice, although you may see patients who
10 have autism, is it correct that you're not providing
11 the day-to-day care and management of their autism
12 spectrum disorder?
13    A    Yes, with the same kind of global
14 summary -- that would be a simplified summary.  It's
15 not day-to-day care.  That would be a correct
16 statement.
17    Q    Okay.  And in your regular practice, have
18 you ever determined the etiology of a patient's
19 autism?
20    A    Not since my residency training and time
21 spent at Dell Children's in Texas.
22    Q    And that was a four-month period during
23 residency, correct?
24    A    That's correct.
25    Q    And during that four-month period in

**40**

1 residency, did you determine the etiology of
2 patients' autism spectrum disorder?
3    A    So I think I kind of alluded to that
4 earlier about the comprehensive collaboration between
5 multiple specialists, neurologists, general
6 pediatricians, pediatric developmental specialists,
7 the geneticist Ph.D., the neurologist and the PM&R
8 doctor.  And so we had kind of like a comprehensive
9 clinic where the children would come in and have
10 evaluations from all those different specialties.
11    So me, personally, it was not my specific
12 role to undertake the etiology of a spectrum or
13 constellation of symptoms or syndrome that we can
14 refer to as autism.
15    Q    So others may have done that sort of
16 etiological evaluation during your residency, but it
17 wasn't your personal role to do so; is that correct?
18    A    As the physiatrists, we're working
19 together and identifying the functional improvement,
20 medication management, procedural intervention for
21 that patient with autism for the remainder of their
22 life, starting, you know, whatever age they are, even
23 into adulthood.  So that would be the main role of
24 our specialty, physical medicine and rehabilitation.
25    Q    So it's not personally your specific role

41

1  to undertake the etiological evaluation, correct?
2      A    That's correct.
3      Q    Okay. And similarly for Crohn's -- maybe
4  we can sort of sort-circuit this. In your day-to-day
5  work -- I want to get this phrasing right -- is it
6  your role personally to undertake an etiological
7  evaluation of a patient's Crohn's disease?
8      A    I would refer to the gastroenterologist.
9  So it's not in my day-to-day workflow.
10     Q    Okay. And in the course of your practice,
11  have you ever determined that the ingestion of metals
12  caused any injury to a patient of yours?
13     A    I -- I'm not recalling a specific patient
14  at this time --
15     Q    Okay.
16     A    -- in my day-to-day practice.
17     Q    All right. I'm just looking at my outline
18  because I may be able to skip a few questions. I
19  want to be --
20         MR. PARKER: That's wonderful.
21     Q    (BY MS. PALEY) -- respectful of your time.
22         MR. PARKER: Wonderful. Thank you.
23     Q    (BY MS. PALEY) All right. So, Doctor,
24  just so I understand, again, the scope of your
25  opinions, are you opining that exposure to any

42

1  specific metals caused Ethan to develop autism?
2      A    I'm not opining on those specific metals,
3  and I don't think I have that documented in my life
4  care plan either.
5      Q    Okay. And similarly for Crohn's disease,
6  are you opining -- opining that exposure to any
7  specific metals caused Ethan's Crohn's disease?
8      A    I also did not put that in my life care
9  plan, and I am not opining on that question either.
10     Q    Okay. And as for any of the other
11  diagnoses that you list in your life care plan -- I
12  don't have the page in front of me, but I think there
13  are 12 or 14 diagnoses, something like that, are you
14  opining that exposure to any specific metals caused
15  any of those diagnoses?
16     A    Can you just give me one second please?
17     Q    Yeah. And I'm trying to find the page so
18  I can point you to it. Page 63 and 64, Diagnostic
19  Conditions 1 through 13. And I'll just let you take
20  a look at that and then I'll re-ask the question.
21     A    Yes, please. What was the question?
22     Q    Okay. Are you opining that exposure to
23  any specific metals caused -- strike that.
24         Are you opining that exposure to metals
25  caused Ethan to develop any of these specific

43

1  diagnostic conditions you list in 1 through 13?
2          MR. PARKER: Object as to form.
3      A    So I think we -- we basically touched on
4  this already. Based upon my review of the history,
5  medical records, treating physicians, which did
6  include lab reports, it is my opinion, consistent
7  with other physicians', that heavy metals did have a
8  role in his neurocognitive disorder. And so that is
9  similar to other neurocognitive disorders caused from
10  other types of injuries; lack of oxygen, tumors,
11  trauma, et cetera.
12         And so Section 4.1, my 13 diagnostic
13  conditions, in my opinion, are related to that and
14  that's why I have them listed here.
15     Q    (BY MS. PALEY) And so two questions
16  coming from that.
17     A    Uh-huh.
18     Q    Is -- do you believe that the science
19  shows that metal exposure causes autism specifically?
20  Not neuro -- not a range of neurocognitive disorders,
21  but autism specifically?
22     A    So I think --
23         MR. PARKER: Excuse me. You've got to
24  slow down. Give me time to object.
25         THE DEPONENT: Yep.

44

1          MR. PARKER: I'm an old southern boy.
2  That's all I ask.
3          Object as to form.
4      A    What was the question, Ms. Paley?
5      Q    (BY MS. PALEY) Do you believe that metal
6  exposure causes autism specifically? Not a range of
7  neurocognitive disorders more broadly, but autism
8  specifically?
9          MR. PARKER: Again, I object as to form.
10     A    So I hear the question as, does metal
11  exposure cause autism specifically. Is that correct?
12     Q    (BY MS. PALEY) Correct.
13     A    Well, I haven't been asked to opine upon
14  that. And my role here is, again, understand his
15  current functional situation, diagnoses and his
16  future rehabilitation needs and medical care. I --
17     Q    Okay. Sorry. I didn't mean to cut you
18  off. It was more of a reflexive "okay."
19     A    So I don't have an opinion on that
20  statement. I wasn't asked to do that. I'm not
21  prepared to answer that question.
22     Q    Okay. And so you haven't undertaken any
23  assessment to rule out other potential causes of
24  autism in this case; is that correct?
25     A    Can you help me understand what you mean

45

1    by potential assessments?
2        Q    Have you undertaken any analysis to rule
3    out like a -- the term is not differential diagnosis,
4    because that's not what we're talking about.  But
5    have you taken any -- have you undertaken any
6    analyses to rule out other potential causes of
7    Ethan's autism?  I'm guessing that's no, if you're
8    not opining on the cause of autism, but I just want
9    to be clear.
10       A    So to be clear, I'm not a treating
11   physician for Mr. Ethan Palmquist.  So I wouldn't
12   have diagnostic tests and things to identify
13   etiology, differential diagnoses.  I am the PM&R
14   physician to, again, identify current diagnoses and
15   then future medical care.
16       Q    Okay.  But you did receive his medical
17   records in this case, right?
18       A    That would be outlined in my report.  Yes,
19   ma'am.
20       Q    Okay.  And based on your review of those
21   medical records, you didn't undertake an analysis
22   that would rule out other potential causes of autism;
23   is that correct?
24       A    I just don't still understand exactly what
25   you mean by "undertake an analysis," Ms. Paley.

46

1        Q    Did you do any work of any kind to rule
2    out other potential causes of Ethan's autism?
3        A    I think I answered the question, because
4    that's not my role.  I'm not a treating provider.
5    And the work undertaken is the entire publication of
6    the life care plan.
7        Q    And are you opining -- I might have asked
8    this, and if I did, I apologize.  I really genuinely
9    don't recall.
10            Are you opining that exposure to metals
11   caused Ethan's Crohn's disease?
12            MR. PARKER:  Form.  It was asked and
13   answered.
14            MS. PALEY:  Okay.  Thank you.  I genuinely
15   did not remember.
16       Q    (BY MS. PALEY)  With apologies, can you
17   remind me of your answer, just so we don't have to go
18   back through the record?
19       A    So, again, based upon the treating
20   physicians, where I reviewed their medical records,
21   and understanding the history and temporal sequence
22   or time line of events, that -- that statement or
23   question is probable that that contributed to his
24   development of Crohn's disease.  And that's why I
25   have contributed care and that diagnosis for Crohn's

47

1    disease in my life care plan based upon those
2    treating physicians and their existing medical
3    records.
4        Q    And so your analysis as to the cause of
5    Ethan's Crohn's disease is based on what you see in
6    the medical records but not based on any broader
7    review of the literature and whether metal exposure
8    causes Crohn's disease; is that correct?
9        A    The medical record review would document
10   that metal cause of Crohn's, when I did speak to the
11   treating gastroenterologist, Dr. Krigsman, that was
12   of his opinion.
13            And then I think your last question was a
14   literature review.  And I was not asked to do a
15   literature review specifically in this case, to
16   answer that last question.
17       Q    Okay.  And so -- all right.  You weren't
18   asked to do a literature review; therefore, you --
19   just to be clear, you haven't undertaken a literature
20   review regarding any association between metal
21   exposure and Crohn's; is that right?
22       A    That's correct.
23       Q    And have you ruled out all other potential
24   causes of Ethan's Crohn's disease?
25            MR. PARKER:  Objection as to form, asked

48

1    and answered.
2        A    I think, again, you know, I don't -- I
3    don't rule out things, because I'm not a treating
4    physician.  We don't establish a treating
5    physician/patient relationship and a therapeutic
6    relationship with either the family or Ethan because
7    he's a minor.  That's not my role.
8            And so based upon my review of this
9    detailed medical summary, the other treating
10   physicians, in my opinion, did do what you're asking:
11   They evaluated other causes of Crohn's disease.
12       Q    (BY MS. PALEY)  And when you say "based
13   upon my review of this detailed medical summary" --
14       A    Uh-huh.
15       Q    -- who drafted the detailed medical
16   summary in your report?
17       A    That would be both myself and my team at
18   Physician Life Care Planning.
19       Q    Okay.  And so does the team at Physician
20   Life Care Planning undertake the first draft of the
21   medical summary and you review and edit from there?
22   I just want to understand the process.
23       A    Yeah.  As we discussed earlier, the
24   process is all the records are uploaded and I have
25   a HIPAA-compliant -- so I can review them.

49

1  And I'm reviewing them. And I have specific staff
2  trained in what I ask them to do, specific location
3  of care, date of care, providers, diagnoses,
4  treatment plan, diagnostic studies.
5        And so with that, then they're able to
6  kind of give me an outline. And then from there,
7  both my staff and I are creating the actual words on
8  the paper of the specific summary per each medical
9  encounter.
10    Q   And did you train that staff or did
11 Physician Life Care Planning train that staff?
12    A   It's a little bit of both, because this is
13 my life care plan and I have reviewed all the pages
14 and authored them. And I have discussions over phone
15 with the staff on specifically what I'm looking for,
16 or at times I need to change it myself. And then
17 they also are trained via Physician Life Care
18 Planning directly with the onboarding process, is
19 what I was told. I'm not involved in the hiring or
20 onboarding process.
21    Q   Understood. Have you reviewed all of the
22 medical records in this case or at least have --
23 strike that.
24        Have you reviewed all of the medical
25 records that you received in this case?

50

1    A   So all of the medical records that I
2  summarize initially -- and then if you would just
3  give me one second -- I do have that other page we
4  alluded to, which included other documents, which
5  starts on Page 53, Section 2.3. I have reviewed all
6  of those medical records and -- and the list of other
7  documents on Page 53 and 54 personally.
8    Q   Okay. And do you have an estimate as to
9  about how much time you spent reviewing those medical
10 records and the other documents listed on Pages 53 to
11 54 of your report?
12    A   Yes. My best estimate is between 30
13 and 35 hours on reading thousands of pages of what
14 we're describing; the full medical records and these
15 additional other documents.
16    Q   Okay. And I'm going to ask about a few
17 categories of materials. I don't -- I don't think I
18 see them listed in your documents, but I just want to
19 understand if I missed anything.
20    A   Okay.
21    Q   So did you review any documentation
22 demonstrating the metal concentrations in Earth's
23 Best Baby Food? I don't think I see it listed, but I
24 just want to be clear.
25    A   Yeah. Thank you for an opportunity to

51

1  clarify. Can you help me understand exactly what
2  you're asking me one more time, please.
3    Q   Yeah. Have you reviewed any documents
4  from any source that provide testing data showing the
5  concentrations of metals in Earth's Best Baby Food?
6    A   Just so I understand, you're not asking if
7  I've had the lab reports from Ethan. You're asking
8  if there's lab reports just from the food; is that
9  correct?
10    Q   Well, I'll name a couple potential sources
11 of materials.
12    A   Okay.
13    Q   Have you reviewed a congressional
14 subcommittee report that reported on the levels in
15 metals in baby foods from Earth's Best and other
16 manufacturers?
17    A   I do not recall reviewing that report.
18    Q   Okay. And have you reviewed a report by
19 an organization called Healthy Babies Bright Futures
20 that included an appendix that had metal levels in
21 Earth's Best and other manufacturers' baby foods?
22    A   I do not recall receiving that review and
23 that report.
24    Q   Okay. Did you review any literature
25 addressing metals toxicology?

52

1    A   Do you mean documents provided or
2  peer-reviewed literature?
3    Q   Peer-reviewed literature.
4    A   Not specifically for this case. I have,
5  in my career, come across different things for
6  acquired brain injuries and encephalopathy for heavy
7  metal toxicity.
8    Q   But did you refresh your review of any of
9  those materials as part of your work in this case?
10   A   I was not asked to do that. So I did not
11 do any minor or extensive literature search or PubMed
12 or National Library of Medicine search in this case.
13       THE REPORTER: Or National?
14       THE DEPONENT: I'm sorry. National
15 Library of Medicine and PubMed. Thank you.
16   Q   (BY MS. PALEY) And did you review any
17 literature -- which I mean like peer-reviewed,
18 published literature -- addressing the epidemiology
19 of metals exposure, whether related to autism or
20 otherwise?
21   A   I did not in this case.
22   Q   Okay. And did you review any literature
23 addressing the causes of autism?
24   A   In this case, I did not.
25   Q   Okay. Did you review any literature or

---

**53**

1  any -- strike that.
2       Did you review any literature or treatment
3  guidelines addressing current practices in treating
4  autism?
5    **A   I think when I was reviewing some of the**
6  **treating physician documents, I likely did do a quick**
7  **Google search on an update or maybe even up-to-date**
8  **website. I don't recall those specifics. That would**
9  **have been probably mid-March timeframe. Probably**
10 **less than 20 minutes I spent doing that. That was**
11 **not a specific guideline from like the American**
12 **Academy of Pediatrics, per se.**
13   Q   Okay. Thank you.
14       MR. PARKER: Is this a good breaking
15 point?
16       MS. PALEY: Actually, yeah. Let me --
17 give me five seconds.
18       MR. PARKER: Sure. Sure.
19       MS. PALEY: Yeah. It's a good breaking
20 point. Let's do that.
21       MR. PARKER: And we'll make it quick so
22 you can -- no hurry. I'm recommending --
23       THE REPORTER: Excuse me --
24       MR. PARKER: -- you walk around to your --
25       THE REPORTER: Excuse me. We have to go

---

**54**

1  off the record.
2       THE VIDEOGRAPHER: The time is 9:10.
3  We're off the record.
4       (Recess from 9:10 a.m. to 9:23 a.m.)
5       THE VIDEOGRAPHER: The time is 9:22.
6  We're back on the record.
7    Q   (BY MS. PALEY) Okay. Welcome back,
8  Doctor. Let's talk a little bit about your
9  examination of Ethan.
10      I understand that around March 10th or so,
11 you you had a video chat with Dr. Palmquist; is that
12 correct?
13   **A   Specifically his mother, Dr. Sarah, that's**
14 **correct.**
15   Q   Okay. And about how long did that video
16 chat last?
17   **A   I think that was anywhere probably between**
18 **75 and 85 or 90 minutes.**
19   Q   Okay. And what did you cover during the
20 course of that video discussion? It can be high
21 level at this point.
22   **A   High level is the general history from**
23 **birth up until about May 2017, which I kind of**
24 **summarize here on Page 55. And then past that, the**
25 **specific changes in his function, speech, behavior,**

---

**55**

1  **medical treatment, medical tests, medication**
2  **prescriptions, things like his EEG, hospital**
3  **admissions, spinal tap, everything that the treating**
4  **providers were doing to work him up as well as treat**
5  **him.**
6    Q   Was Ethan involved in that video chat at
7  all?
8    **A   Ethan I don't think has the ability to**
9  **participate in that type of chat. So initially the**
10 **one-on-one, Dr. Sarah Palmquist and I, it was just**
11 **us. Ethan was not involved.**
12   Q   And then do I understand it correctly that
13 on March 14th, you had an in-person visit of about
14 90 minutes with the Palmquists?
15   **A   Yeah, a little bit more than 90 minutes at**
16 **their house. But it was 90 minutes of kind of**
17 **one-on-one. I don't want to use the term chasing**
18 **Ethan around the house, but essentially I was**
19 **following him to observe him, attempting some**
20 **observations, exams, and then also kind of clarifying**
21 **with the father, Grant, Mr. Palmquist. And that's**
22 **also when I was able to see the two little sisters as**
23 **well as the maternal grandmother at their house in**
24 **Pearland, Texas.**
25   Q   And when you say "clarifying with the

---

**56**

1  father, Grant," what do you mean by that?
2    **A   Because I didn't have the opportunity to**
3  **speak with him previously in that week prior. So**
4  **"clarify" as in, Well, Grant, how are things going?**
5  **How is the activities of daily living? How are you**
6  **dealing with your son? How is this affecting you,**
7  **know, the life with the two daughters, et cetera.**
8        **So reporting on his perspective in**
9  **addition to mother, Dr. Sarah's, perspective.**
10   Q   And from your description, I assume that
11 Ethan is ambulatory?
12   **A   That's correct.**
13   Q   And does he require any complicated
14 feeding procedures?
15   **A   So I think I did put a little bit of that**
16 **in my exam. He -- he's unable to prepare food and a**
17 **hundred percent feed himself independent. And he**
18 **obviously can't clean up food.**
19       **He also has to be supervised because he**
20 **will eat nonorganic things at times. And so that's**
21 **been reported by the family, and I did see him eat**
22 **some dirt as well when I was at their house.**
23   Q   What assistance does he need with feeding
24 itself? I understand not preparing or cleaning up,
25 but with feeding itself.

57

1      A    So the only thing that I observed that he
2  was able to do was essentially lick peanut butter off
3  of a spoon, in a direct observation.  I wasn't there
4  at the dinner or kind of lunchtime.  I was kind of in
5  the middle afternoon time.  So I don't have a direct
6  observation of that, but I have the report from his
7  mom about the setup, supervision.  At times, he does
8  have to be fed.  At times, he can take things and
9  shove them into his mouth.
10      So that would be a kind of supervision
11  with setup, minimal assistance is how I would
12  describe that --
13      Q    Okay.
14      A    -- for Ethan physically getting safe food,
15  real food in his mouth.
16      Q    And there were no concerns about him
17  choking on peanut butter?  Licking from the spoon?
18  Anything like that?
19      A    During my observation of the peanut
20  butter, I did not have any concerns of him choking on
21  peanut butter at that time.
22      Q    Okay.  And just to make sure I understand,
23  you haven't provided Ethan with any medical
24  treatment, right?
25      A    That is correct.  We have not established

58

1  that treating patient/provider relationship.
2      Q    And you don't intend to establish a
3  treating patient/provider relationship; is that
4  correct?
5      A    That's correct.
6      Q    Okay.  Just for a matter of clarification,
7  so I understand, if we could look at Exhibit 5.
8  Exhibit 5 is the collection of -- let's -- first the
9  list of materials received and then the collection of
10  invoices.  I just have a couple questions from there.
11      A    Sure.
12      Q    If you look at -- there's some like Bates
13  numbers on the bottom right side.  If you look at
14  Page 2531, it's an invoice dated March 11th, 2022.
15  It looks like you had an IME on the 14th of March; is
16  that correct?
17      A    That's what the invoice states, and that's
18  what we were just discussing with the home visit,
19  face-to-face visit with Ethan and his family on
20  March 14th, 2022.
21      Q    Okay.  And then if you look at the prior
22  page, Page 2530.
23      A    Uh-huh.
24      Q    The invoice date is about a month earlier.
25  It's February 16th.  But it lists a second IME on the

59

1  same date as the first.  And I just want to make sure
2  I understand what happened.  Did you conduct two
3  IMEs, independent medical evaluations?
4      A    So I can explain, I guess, this page and
5  initially also the utilizing Page 002529.  On the
6  Page 2529, on the initial life care plan, that
7  includes the initial examination.  This specific
8  instance, it was the one-on-one call with the mother.
9      Q    Okay.
10      A    Moving to the next page, 2530, we do
11  charge for any repeat examinations.  In this case, it
12  is IME.  And it's just labeled as second, not to
13  denote there was two separate face-to-face visits,
14  but it was second because the first contact was the
15  direct call with Dr. Sarah.
16      And then the following page, on 2531,
17  those invoices are just denoting travel from --
18  obviously out of my office, not seeing patients in
19  the hospital or doing procedures, the cost of travel
20  to Houston.
21      Q    Okay.  So I didn't miss a second in-person
22  examination of Ethan or anything?
23      A    That's correct.
24      Q    And then I believe you noted in your
25  report that you had some follow-up with Dr. Palmquist

60

1  around March 23rd or so.  That's on Page 55 of your
2  report, I believe it is.
3      A    Yes.
4      Q    Okay.  On -- yeah.  Paragraph,
5  introduction, I had the opportunity to speak with
6  Dr. Sarah Palmquist on March 23rd when she identified
7  he was plateauing without progress.
8      How long was that call on March 23rd?  Or
9  was that a call, I should actually ask.
10      A    It was just kind of a direct cell phone to
11  cell phone.  That was about 2 to 3 minutes.
12  Basically everything else is the same other than what
13  I dictated here, changes in the ABA.  And she told me
14  that he won't have that option as of June 2022.  And
15  that was it.
16      Q    And have you had any other contact with
17  Dr. Palmquist apart from what we've discussed here?
18      A    No, ma'am.
19      Q    Okay.  Any -- just to make sure I'm being
20  thorough, any emails, texts, any kind of written
21  communication from Dr. Palmquist?
22      A    No.  I don't feel that would be
23  appropriate at this time, to continue that.  It would
24  need to be a full evaluation to amend or supplement
25  my report.

61

1    Q    Have you learned since March 23rd that
2 Ethan was dismissed from the ABA program?
3    A    I think it's what I have here on Page 55,
4 where the mother, Dr. Sarah, was telling me he was
5 going to be.  But I have not had the mother tell me
6 since then that that actually occurred, because we
7 have not spoken since March 23rd.
8    Q    Okay.  So from Dr. Palmquist or from any
9 other source, no updated information on Ethan's
10 dismissal from the ABA program; is that correct?
11    A    I believe that's correct.
12    Q    And do you have any experience with
13 patients in ABA?  Do you recommend patients being
14 like put in ABA programs?
15    A    So back in Texas, yes.  More recently in
16 Colorado, no.
17    Q    And back in Texas, was that during the
18 four-month rotation during the residency?
19    A    That, and then occasionally we would see
20 somebody in our outpatient clinic, meaning like the
21 University of Texas PM&R outpatient resident clinic.
22 And so at times, I'm sure that came up.  I can't
23 recall a specific instance.  I'm trying to remember
24 2013, 2014, 2015, et cetera.
25    Q    Okay.  Well, now since we have Exhibit 5

62

1 out in front of us, can you turn to the next page,
2 2532.  And this is a March 21st, 2022, invoice from
3 Physician Life Care Planning to Arnold & Itkin.
4    A    I'm sorry, which page?
5    Q    2532.  And I'll wait for you to get there.
6    A    I'm there.  Thank you.
7    Q    Okay.  And I understand, based on this
8 invoice that you spoke with two of Ethan's treating
9 physicians; is that correct?
10    A    That's correct, yeah.
11    Q    Okay.  Total time was about 45 minutes; is
12 that right?
13    A    Yes.
14    Q    Okay.  And let's talk about your
15 conversation with Dr. Krigsman.  You spoke with
16 Dr. Krigsman for about 15 minutes; is that right?
17    A    Roughly, give or take.
18    Q    I see the invoice date is the 21st of
19 March.  Do you know when you actually spoke with him?
20    A    It might have been that day or one to
21 three day -- one to three days prior.  I don't recall
22 specifically the day, but it likely was surrounding
23 that timeframe, March 21.
24    Q    Okay.  That's some efficient invoicing.  I
25 will give credit to whoever takes care of the

63

1 invoicing.
2        Now, Dr. Krigsman treats Ethan for GI
3 issues; is that right?
4    A    Yes.  It's my understanding he's a
5 gastroenterologist.
6    Q    Does he provide any other medical
7 treatment to Ethan beyond gastrointestinal issues?
8    A    I would have to re-review his last one or
9 two notes to fully answer that completely.
10    Q    Are you aware of -- like does he provide
11 Ethan with treatment for neurological issues?
12    A    Typically not --
13    Q    Okay.
14    A    -- per my memory on my medical record
15 review.
16    Q    And does Dr. Krigsman treat Ethan for his
17 autism specifically?
18    A    I don't recall reviewing that specifically
19 either.
20    Q    And out of all of Ethan's providers, how
21 did you decide to contact Dr. Krigsman specifically?
22    A    That's a good question.  So because
23 Dr. Krigsman performed the types of scope tests and
24 is prescribing the specific medicine for Crohn's
25 disease and, as you alluded to, I'm not daily

64

1 managing Crohn's disease and prescribing these
2 patients steroids or HUMIRA type of treatments or
3 doing colonoscopies.  We do -- I do, and physician
4 life care planners, call treating physicians at
5 times.
6        So specifically I had a few questions for
7 him, which I outlined on Page 55.  And that was the
8 reason why I wanted to reach out to the
9 gastroenterologist, to make sure that I understood
10 what he was thinking and his recommendations.
11    Q    So I see the paragraph that you're
12 referring to on Page 55.
13    A    Yeah.
14    Q    Introduction, Section 3.1.  And are you
15 referring to the last sentence of that paragraph?
16    A    Yes, ma'am.
17    Q    Okay.  And did Dr. Krigsman comment on
18 Ethan's need for antiseizure medication?
19    A    That would be the -- Dr. Rotenberg,
20 neurologist, on the antiseizure medications.
21    Q    And did Dr. Krigsman provide comment on
22 Ethan's need for supervision?
23    A    Yes.  My recollection and my documentation
24 is Dr. Krigsman, normal life expectancy, lifelong
25 care, lifelong Crohn's disease and supervision.

65

1    Q    And did Dr. Krigsman specifically review
2  the care recommendations in your report?
3    A    No, ma'am.  Because my report was
4  finalized and published March 30th, and we had our
5  phone call before that completion date.
6    Q    Did he review the care recommendations in
7  any draft version of your report?
8    A    I never sent him a draft version, but that
9  would be really a question for him and/or counsel, if
10  they had received my report, because I do not know.
11    Q    Okay.  So --
12        MR. PARKER:  We didn't send anybody
13  anything.
14        MS. PALEY:  I don't understand.  I'm
15  sorry.
16        MR. PARKER:  I assure you we did not send
17  it to him.
18        MS. PALEY:  Okay.  Thank you.  Thank you.
19    Q    (BY MS. PALEY)  And so if Dr. Krigsman
20  didn't receive a draft version of the report, is it
21  safe to say he didn't review and provide comments
22  specifically on the frequency and duration of the
23  recommended care in your report?
24    A    No.  I think that's incorrect.  I wouldn't
25  agree with that.

66

1    Q    Well, how -- how did he provide commentary
2  on the frequency and care -- frequency and duration
3  of the recommended care in your report if he -- if he
4  didn't see the report?
5    A    Sure.  So that, again, is part of me being
6  a physician, understanding the medication dosing,
7  frequency and duration.  So moving to answer this
8  question, a few pages forward to Page 59, and looking
9  at the three main medications that Dr. Krigsman is
10  prescribing, HUMIRA.  Numbered next is the Pentasa.
11  Numbered next is Entocort.
12    Q    Okay.  And did Dr. Krigsman provide
13  commentary on your recommendations regarding the
14  frequency and duration of the HUMIRA, Pentasa and
15  Entocort recommendations in your report?
16    A    That's a great question, and definitely
17  getting there to answer the question.  Because the
18  current prescriptions and frequency and dosing were
19  available to me from medical record review and the
20  medication regimen from Dr. Sarah Palmquist, we
21  discussed that on the phone, which is what's outlined
22  on Section 310.
23        Moving then into my specific
24  recommendations on the medication side, they are the
25  same dosing, duration, frequency that Dr. Krigsman

67

1  recommended when I spoke to him and what he currently
2  is prescribing for Ethan.  So it's consistent from
3  that current dose to what I have recommended in my
4  life care plan.
5    Q    And regarding duration, did you
6  specifically discuss the idea of essentially lifelong
7  treatments with HUMIRA, Pentasa and Entocort?
8    A    Specifically, Dr. Krigsman and I first --
9  Do you expect him to have a normal life expectancy?
10  Yes, given the treatment.  Okay.  Then do we have the
11  anticipation, from your GI subspecialty, all
12  medicines will be for that duration of life?  Yes.
13        And that's why I document that on Page 55
14  and have my medication treatment per the methodology
15  for the remainder of Ethan's life expectancy.
16    Q    Now, I notice if we look back on Page 55,
17  that last sentence that we were talking about, you
18  note that, Both treating physicians agreed that we
19  expect to have -- that we expect Ethan to have a
20  normal life expectancy, will need lifelong care,
21  lifelong antiseizure medicine, lifelong Crohn's
22  disease medicine, among lifelong supervision and
23  other care outlined in my report.
24        And here's my question.  Are -- what other
25  care outlined in your report did you specifically

68

1  speak with Dr. Krigsman about?
2    A    Yeah.  Those were the basic essential
3  service -- excuse me, not essential services, like
4  DME things regarding his bowel/bladder habits, and
5  the follow-up visits, which also include like the
6  colonoscopy procedure, office visits from a pediatric
7  GI specialist, Dr. Krigsman, and then transitioning
8  to an adult GI specialist.  And then all of these are
9  in Section 5.
10    Q    Okay.  And so when you spoke with
11  Dr. Krigsman, he was only commenting on sort of the
12  GI-related issues that you recommended in your
13  report.  He was not commenting on things like the
14  neurological issues or specific therapies that were
15  recommended for Ethan by you, anything like that?
16        I just want to understand, was he
17  commenting within the scope of his expertise as a GI?
18  Or did he provide a broader assessment of what is
19  outlined in your life care plan?
20    A    Can you just repeat the last part of your
21  question, please.  That was a long one.
22    Q    It was.  And I apologize for that.  That
23  kind of evolved as it went along.
24        Did Dr. Krigsman comment on your report
25  within the scope of his expertise as a GI or, more

69

1  broadly, on all the care outlined in your report?
2      A   Okay.  So he didn't comment on my report
3  because I did not send it to him.  As far as I know,
4  Physician Life Care Planning and counsel did not send
5  it to him.  So I think that was your first question.
6          Second question, GI scope of practice is
7  what he commented on.  However, I did tell him my
8  suggestions on the counseling, the therapy, home
9  health aides.  And I don't recall any disagreement
10 with that.  Instead of being redundant and wordy --
11 because it already is long -- I sort of summarized
12 that on Page 55, the way that I dictated it, because
13 it's clear to me what that means.
14         I'm happy to continue to explain that.
15     Q   Okay.  And just understand, this call with
16 him was about 15 minutes?
17     A   Yes, ma'am.
18     Q   So I take it you couldn't get into any
19 great detail about the, you know, frequency of care
20 you were recommending regarding counseling, therapy,
21 health aides, things like that?
22     A   15 minutes is a lot of time for a
23 doctor-to-doctor, peer-to-peer discussion, actually,
24 because we are not talking about our kids and the
25 weather and how hot it was and the airplanes or all

70

1  this stuff that we've been side-talking about.  It is
2  straight objective.  And this is my role as a PM&R
3  doctor, and I am doing his future medical care, and I
4  have these four pertinent questions for you.  He
5  answered them as we discussed.  And then I made the
6  suggestions that I need some increased therapy and
7  daily home health aides.  Okay.  Great.  Sounds
8  reasonable.  And that was it.
9      Q   Okay.  Any more detail on that increased
10 therapy?  I mean, I just want to know, did you talk
11 about the very specifics of the recommendations or
12 the concept of having home health aides, various
13 therapies?
14     A   Global concept is more how I would
15 describe it, not the specific duration, frequency,
16 timeframe, hours of multitude of therapeutic
17 interventions or the specific home health aides.
18     Q   Okay.  That's very helpful.  That's all I
19 was getting at.  I'm sorry it took me so long to get
20 to it.
21         Did you -- strike that.
22         Did you know that Dr. Krigsman is known
23 for his controversial research that has claimed that
24 the MMR vaccine causes autism?
25     A   I mean, I'm not familiar with how you

71

1  would describe "controversial" or his specific
2  research publications.  I do know that he is a
3  published physician researcher, like myself, in his
4  specific specialty.  And we were not discussing his
5  independent research when we had that conversation.
6  We were, again, being objective, getting to the point
7  on the questions at hand on specific Crohn's disease
8  management.
9      Q   Were you aware of Dr. Krigsman's research
10 on MMR vaccines and autism?
11     A   I might have seen it on his website in
12 passing or in passing or something, but I have never
13 read abstracts or full papers on it.
14     Q   And do you believe that the MMR vaccine or
15 any components of the vaccine cause autism?
16     A   Well, I'm not prepared to answer that
17 question at this time, because I haven't researched,
18 prepared for that.  So I wasn't asked to do that.  So
19 right now, you know, I can't opine on that.
20     Q   Okay.  Do you believe that it's generally
21 accepted in the medical community that MMR vaccines
22 or any components of them cause autism?
23     A   That's a hard question, because how do you
24 define the medical community, number one.  And all
25 physicians have slightly different baseline training

72

1  and specialty.  Some physicians may or may not have
2  kids.  Some physicians may have autoimmune disease in
3  their family, and maybe they have a complication or
4  family member that might skew their perspective.
5          And so without a consensus statement from
6  the AMA or a specific American Academy of Pediatrics
7  statement, I don't have any opinion or reference to
8  answer your question.
9      Q   Okay.  So you're going to just kind of
10 punt on that one?
11     A   I cannot answer that.  I don't have an
12 opinion on that one right now.
13     Q   Okay.  Did Dr. Krigsman's research have
14 any influence into your -- sort of how you weighed
15 his comments on the life care plan recommendations?
16     A   So, again, I did not read any specific
17 research from him.  Therefore, it is unable -- his
18 research -- to have weight on my opinions for my
19 document, catastrophic life care plan.  It is
20 consistent that I've seen in pediatric patients with
21 this type of diagnosis transition to adults, as well
22 as adults that need lifelong care with these types of
23 medications.  So that is consistent with my scope of
24 practice and my knowledge of this type of disease.
25         But, again, there is no specific research

73

1 we discussed or I reviewed that had any weight or
2 input in my life care plan.
3     Q    Okay.  And as I understand it, you sort of
4 maybe haven't read his specific articles but have a
5 general sense of maybe the area and leanings of his
6 research.  I just want to know, did --
7         MR. PARKER:  Objections.  I'm sorry.
8 Finish your question.
9     Q    (BY MS. PALEY)  Okay.  My question is
10 just, did your general knowledge of his research and
11 leanings in that area, did that have any influence
12 Was it in any way a toggle in terms of how you
13 evaluated his response to the recommendations that
14 you discussed with him?
15        MR. PARKER:  Objection as to form, mainly
16 as to the commentary before the question.
17        THE VIDEOGRAPHER:  Pardon me.  This is the
18 videographer.  Sir, if you're going to have your mic
19 off -- which is okay -- can you speak up?
20        MR. PARKER:  Objection as to form, mainly
21 as to the commentary right before the question.
22     A    I'm sorry, what was the question?
23     Q    (BY MS. PALEY)  Did your general knowledge
24 of his research and leanings have any influence in
25 the way that you evaluated his response to your

74

1 recommendations in the life care plan during your
2 discussion with him?
3     A    I think I answered that last time.  And
4 so, again, given my understanding of lifelong care
5 for these diagnoses and his response of, He needs
6 lifelong care and medication for these, that first
7 part is no.
8         The second part is that when physicians
9 are published or doing ongoing research in their area
10 of expertise, gastroenterology, the only thing that I
11 could say is that that bolsters that physician's
12 experience and opinions regarding specific diagnoses,
13 because not only are they treating them, but they're
14 also actively engaging in research surrounding those
15 diagnoses.
16        No research from Dr. Krigsman has been
17 reviewed by myself; and, therefore, again, it's not
18 contributing to my opinions in my life care plan.
19     Q    Does research bolster the physician's
20 experience and opinions even if that research has
21 been discredited?
22        MR. PARKER:  Objection as to form.
23     A    You know, I can't necessarily answer that,
24 because clearly there's differences of opinions
25 today, in this room.  There's differences of opinions

75

1 between different physicians.  It happens all the
2 time.  And so unless there's everything lined up in
3 front of me with specific abstracts and research
4 papers and letter to the editors and commentary and
5 rebuttals, I have no basis of information to answer
6 your question.
7     Q    (BY MS. PALEY)  Okay.  Now, you spoke with
8 Dr. Rotenberg for about 30 minutes, right?
9     A    Yes, ma'am.
10     Q    And to the best of your knowledge, did
11 Dr. Rotenberg have any role in Ethan's care before
12 the initiation of this lawsuit?
13     A    I'm not sure how to answer that question
14 because I don't think I know the date of the
15 initiation of the lawsuit.  I don't even know exactly
16 what that legal term means of what you're telling me.
17     Q    Fair enough.  That's okay.
18        Were you aware that counsel in this case
19 actually introduced Dr. Rotenberg to the Palmquists?
20     A    I don't recall reading that or being told
21 that.  So I don't know if that's speculation or fact.
22     Q    Okay.  So you just don't know one way or
23 the other?  It wasn't -- I'll strike that.  There's
24 no question there.  It's okay.
25     A    Okay.

76

1     Q    How did you specifically choose to speak
2 with Dr. Rotenberg regarding your recommendations for
3 Ethan's life care plan?
4     A    Well, the similar, you know, concept of
5 what we discussed with the GI doctor.  Because
6 there's neurological diagnosis, neurological
7 medications and future neurological care that has
8 been discussed.  So speaking directly to the
9 pediatric neurologist allows me, then, to go through
10 the similar line of questioning -- life expectancy,
11 duration of care, specific medications, testing,
12 et cetera -- and then sort of the details surrounding
13 the antiepileptic medications or seizure medications.
14     Q    Okay.  And just to maybe short-circuit
15 this a little bit.  We talked about the process that
16 you used in discussing your recommendations with
17 Dr. Krigsman.  Was that essentially the same process
18 that you used in discussing your recommendations with
19 Dr. Rotenberg, just a slightly different focus, neuro
20 versus GI?
21     A    Generally speaking, that was, you know,
22 very similar, a little bit more time spent because
23 there was a little bit more involved on the
24 neurological aspect.  And we -- we, as physical
25 medicine and rehabilitation physicians, are speaking

**77**

1  to urologists and neurosurgeons frequently.  And so
2  there's a lot of specifics on things I have in my
3  medical plan that I wanted to make sure that a
4  treating physician would agree with my
5  recommendations moving forward.  And those
6  neurological ones are slightly more involved than his
7  GI symptoms and GI treatment.
8      Q    And to the extent that you discussed
9  recommendations for Ethan's various therapies, home
10  health aides, educational programs with
11  Dr. Rotenberg, did you discuss those at the same -- I
12  think you may have used the term life -- global level
13  as you did with Dr. Krigsman?
14      A    I think with -- with Dr. Rotenberg, I
15  discussed slightly more in the sense of this is,
16  again, my role as a PM&R doctor.  These are my four
17  objectives in the life care plan.  Let's review
18  current treatment.  Those next questions, and then a
19  little bit more in detail on specifics regarding home
20  healthcare aides, supervision, things like the
21  Avondale House or adult group home house.
22          But it's not in detail as of it starts at
23  this age, it's once a day, once a month for this
24  duration for life.  That detail was -- was not
25  discussed with Dr. Rotenberg.

**78**

1      Q    Okay.  Thank you.
2          I also see if we flip -- I'm trying to
3  look for the page.  You had a brief joint conference
4  with Drs. Nelson and Settles; is that correct?
5      A    Yes, ma'am.
6      Q    And that's on Page 2533.  Now, you spoke
7  with these experts jointly, correct?
8      A    Referring to jointly as all three of us
9  were on the same conference call?
10      Q    Correct.
11      A    That's what we did.  Correct.
12      Q    All right.  And how did you decide to
13  speak to Drs. Nelson and Settles specifically?
14      A    That information was because I'm a
15  retained expert offering my opinion in this case
16  regarding the future medical care and then the cost
17  of that, which is essentially what my life care plan
18  is, right?
19      Q    Uh-huh.
20      A    And they have a different skill set than I
21  have.
22      Q    And did they review a draft of your life
23  care plan?
24      A    No, ma'am.  The date here, we have about
25  March 22nd.  And that could have been the date I

**79**

1  submitted billing or the date we spoke on the phone.
2  Regardless of that detail, it was within, you know,
3  again, one or so days of March 22nd, 2022.  And this
4  was, Okay, these are my thoughts, an introduction of
5  myself and what I do and my experience.  These are my
6  thoughts.  These are what I have on my thoughts and
7  my recommendations.  And what are your thoughts?
8  Because they, again, have a slightly different skill
9  set than I have, given their education and training.
10      Q    How would you describe their slightly
11  different skill sets?
12      A    Well, it's my understanding that
13  Dr. Nelson is an MD, Ph.D. and he is board certified
14  in I think pediatrics and pediatric neurology.  And
15  then Dr. Settles is a doctor of psychology -- I hope
16  I didn't say that wrong.  And so she has a slightly
17  different skill set to evaluate a patient's
18  intelligence and function, executive, memory and
19  behavior that's outside of sort of medical physicians
20  evaluating diagnoses and treatment plans and risk
21  benefits of said treatment plans.
22      Q    Did you ever see drafts of their expert
23  reports?
24      A    I have never seen a draft of their expert
25  reports.

**80**

1      Q    Okay.  And why did you have this call
2  jointly rather than individually with each of them?
3      A    It's my understanding that they're both
4  faculty I think at Tulane and their geographically
5  similar area.  We had approximately one week from --
6  you know, I was in -- I'm sorry, let me think about
7  this.  March 14th, I was at their home.  Come back to
8  Colorado.  I have my busy medical practice, and we're
9  having phone calls after clinic at like 5:30, 6 p.m.
10  Mountain Time.  And then eight days later after March
11  22nd was the completion of the report.
12          And so I think it was simply scheduling,
13  because I'm very, very busy in my clinical practice.
14  And that likely was the only time that all three of
15  us could get together in that week timeframe that I
16  had to get information to complete my report.
17      Q    Okay.  And you said that you shared your
18  thoughts and recommendations and asked for their sort
19  of feedback on that.  What feedback did they give to
20  you during that conference call?
21      A    I'm sorry to jump on that.
22          But -- so not necessarily feedback but,
23  you know, These are my thoughts.  What are your
24  thoughts?  And so Yeah, those are great plans, and
25  then, These are our thoughts.  And then we were

81

1 basically saying the same thing from a neurological,
2 medical perspective, Dr. Nelson; behavioral,
3 supervision, intelligence, language, Dr. Settles's
4 perspective. And then that's what led for me to have
5 my more likely than not, medically reasonable
6 recommendations outlined here in the life care plan.
7    Q    And similarly to your calls with
8 Drs. Krigsman and Rotenberg, when you discussed
9 those -- you know, those therapies, those treatments,
10 those, you know, home health aides, things like that,
11 schools, with Drs. Nelson and Settles, was it also at
12 a level that did not include this duration, this many
13 days per week, you know, this sort of frequency and
14 duration, nitty-gritty details?
15    A    No, I think that's incorrect, because I'm
16 understanding your question if Dr. Nelson/Settles
17 conversation was consistent with treating providers,
18 and it was slightly different. We did get more
19 details, especially with Dr. Settles, regarding more
20 frequency, intensity of some of the behavioral
21 things, the home health aides, the supervisions.
22       You know, I had -- at this time recall
23 explaining to Dr. Settles about the Avondale House I
24 learned about and that being a preference for the
25 family. And that was something that she was in

82

1 agreement with. And then just looking at my Page 72
2 and 74 on some of these other recommendations
3 regarding rehabilitation services and nursing
4 attendant care, post acute day, neuro program,
5 special needs school, augmentative communication
6 device with the software and iPad, even essential
7 services and home modifications for safety, nursing
8 attendant care, we did talk in more detail regard
9 those specifics for Mr. Ethan Palmquist.
10    Q    Okay. And they are -- they're also
11 compensated expert witnesses in this case, right?
12    A    I guess you would have to ask them that or
13 counsel. I mean, I don't know. We don't talk about
14 those things.
15    Q    Well, they're not treating physicians.
16 Can you agree to that?
17    A    It's my understanding that they currently
18 are not treating physicians.
19    Q    Okay. In preparing your life care plan,
20 did you speak with Ethan's current pediatrician, I
21 believe it's Dr. Mohammad Albitar?
22    A    I reviewed his medical records and did not
23 see a need to speak to him, given my education,
24 experience, skill set, along with specifically
25 speaking with the specialists who are more managing

83

1 and prescribing those specific GI and neurological
2 medications, et cetera.
3    Q    Did you speak with Dr. Michael Watkins, a
4 neurologist who's provided care for Ethan?
5    A    No, ma'am, I did not.
6    Q    Did you speak with Dr. Monica Proud, also
7 a neurologist who's provided care for Ethan?
8    A    I did not.
9    Q    Dr. Nikogosian?
10    A    I recall reviewing his records, but I did
11 not speak to him. Again, similar manner, I was able
12 to intake the information needed, garner more
13 information from the treating neurologist and GI
14 doctor to formulate my opinions.
15    Q    Did you speak with Dr. Eyal Muscal? I'll
16 give you the spelling for that later. Sorry.
17    A    Similar answer. Given, you know, what
18 we're talking about, I did not see a need to speak to
19 any other treating providers or retained experts
20 other than the four that we've been discussing.
21    Q    Okay. And so the same would hold for
22 Dr. -- Dr. Filipek, the neurologist?
23    A    The same would hold true, yes, ma'am.
24    Q    And those are physicians that -- strike
25 that.

84

1       Those are, as you said, the treating
2 providers, retained experts, those were physicians.
3 Did you speak to any of Ethan's various therapists,
4 non-physician therapists that he's had over time?
5       MR. PARKER: I'm sorry. I object to the
6 first part of the question. The second part is fine.
7    Q    (BY MS. PALEY) Okay. And I believe maybe
8 one of those is actually not a physician but is a
9 Ph.D. So I may have -- I may have messed that up.
10 But let's strike that and I'll start again.
11       Did you speak to any of Ethan's various
12 non-physician therapists that he's had over time?
13    A    I did not, for a few specific reasons.
14    Q    What are those reasons?
15    A    Number one would be that, as a physical
16 medicine and rehabilitation physician, I'm
17 responsible for ordering therapy, from
18 speech-language pathology, physical therapy,
19 occupational therapy. Therapists cannot order it
20 themselves.
21       With my extensive training, experience and
22 skill set in my clinical practice, nearly daily I'm
23 reviewing the plethora of all three of those main
24 specialties on rehabilitative therapies. So I did
25 not feel a need, given the information at hand, as

85

1   well as speaking with the specialists that are
2   currently treating him.
3           And to clarify, another reason why I did
4   not call the physicians that treated him in the past,
5   because they were treating him in the past and it was
6   my understanding that they weren't actively treating
7   him. And those active physicians, I spoke to.
8           Another reason was scheduling and
9   timeframe. I did not have time, I think, in the week
10  to schedule that with treating therapists.
11  Q    Wouldn't there be some value in
12  understanding how Ethan had responded to, you know,
13  speech therapy, physical therapy, OT with
14  understanding the course of his progress in those
15  therapies by speaking with the providers?
16  A    So, again, given sort of my board
17  certification and specialty, it wasn't as pertinent
18  for me, given this totality of information at hand,
19  right? Thousands of pages of medical records,
20  approximately 50 pages is what the summary became,
21  and speaking with the family and my direct
22  observations and attempted examination with Ethan in
23  his home. And so it may be helpful for a physician
24  that's a general pediatrician or perhaps a
25  non-medical provider, like others in this room. I

86

1   did not feel it would be necessary at that time to
2   speak with them.
3   Q    So it's not necessary to speak with them
4   to understand the sort of course of his progress in
5   developing your recommendations for future care?
6   A    So I think basically it's the same answer
7   I just gave, because I was able to review a
8   significant amount of data, speak to current treating
9   physicians, use my own education, skill set and
10  experience to take a history from his mother, plus a
11  site face-to-face visit with direct observation.
12          And similar to questions a while back on
13  prescription of care or acute care management, these
14  therapists are not trained for future medical care
15  and recommendations like I am, as a physiatrist, as
16  is outlined in my life care plan, as is outlined in
17  the case management life care planning handbook.
18          And so I don't feel it is necessary,
19  again, with my skill set, to have that discussion in
20  the short, limited window to produce this thorough,
21  comprehensive life care plan.
22  Q    Now let's turn to your report, Page 63.
23  Now, you list -- 63 to 64. You list 13 diagnostic
24  conditions -- diagnostic conditions, right?
25  A    13, yes, ma'am.

87

1   Q    Okay. And is the assumption that all of
2   these were caused by heavy metal exposure? There's
3   language as they pertain to Mr. Palmquist's relevant
4   cause of injury.
5   A    I'm just waiting to make sure we're all on
6   the same page here. Page 63. In Section 4.1, yes,
7   ma'am, that is correct. A quotation pertaining to
8   Mr. Palmquist's relevant cause of injury followed by
9   my 13 diagnoses.
10  Q    Do you list these diagnostic conditions in
11  what you believe to be like a descending order of
12  importance?
13  A    Not necessarily in that order, but more
14  consistent with how I -- how I document things
15  typically on my list of impressions or assessments,
16  both in the hospital and/or in clinic, similar with
17  other specialties like -- you know, trauma surgery is
18  going to list their neurological complaints and
19  injuries, their cardiovascular complaints and
20  injuries. Similar with ICU doctors, kind of system
21  by system.
22          And so I typically start with the
23  neurological system because that's kind of my main
24  wheelhouse. And so the first few -- meaning four --
25  are directly related to that. And then Condition

88

1   Number 5 is secondary to those neurological
2   conditions as above. And then kind of just listing
3   them on to get to Number 13.
4   Q    So is autism not a neurological condition?
5   A    So Diagnostic Condition Number 11, I have
6   as autistic disorder.
7   Q    Uh-huh.
8   A    And so yes, it may be a neurological and
9   other system or body part-affected disorder, but
10  it's -- it's something that does not tell me and
11  other physicians directly what the diagnosis is
12  versus he has, let's say, Number 3. He has objective
13  evidence of complex partial seizures and bilateral
14  frontal temporal epileptogenic process.
15          And so I don't typically like to list
16  syndromes and constellation of symptoms. I like to
17  go into specific things, which are basically, you
18  know, the first 1 through 10, if you will, diagnoses.
19  Q    Okay. And so you're listing autism after
20  1 through 10 because it's a syndrome or
21  constellation?
22  A    That would be a very global, general
23  summary. I would -- I would agree with that.
24  Q    I'm looking for a chance to cut out a few
25  questions.

89

1    MR. PARKER: Sure. Of course.
2    MS. PALEY: Hence, the silence.
3    Q   (BY MS. PALEY) Just curious. I think I
4 forgot to ask about this specifically earlier. Did
5 you review and rely upon Ethan's perforin testing as
6 part of your analysis in this report?
7    A   So I did list that as a document I
8 reviewed. However, that doesn't necessarily lead to
9 my central opinions on Page 63 and all the future
10 medical care afterwards, because I'm -- I'm seeing,
11 diagnosing, observing, his function, diagnostic
12 conditions during this mid-March timeframe. So I'm
13 not relying upon that specific test that you're
14 describing.
15    Q   Okay. And just so I've got clarity, you
16 said, Doesn't necessarily lead to my opinions. But I
17 think by the end, you said you're not relying on the
18 perforin testing. I'll ask clearly so we can just
19 get that clear.
20    Are you relying on Ethan's perforin
21 testing to develop your opinions or your
22 recommendations of care in this case?
23    A   So, again, I'm not relying on just that
24 one thing, but we have to take the entire body of
25 data with this large amount of medical records and

90

1 laboratory studies to then lead us to the point that
2 we start on Page 63. Currently, as of the
3 publication March 30th, these are the specific
4 diagnoses and impairments.
5    Q   And so what's your background in perforin
6 analysis?
7    A   I do not have a background in perforin
8 analysis.
9    Q   Did you use the pattern recognition guides
10 and the perforin testing results to determine what
11 metals you think Ethan was exposed to?
12    A   So I don't think I can answer that
13 question fully because I reviewed the document of the
14 testing and moved on. So I did not rely upon it or
15 specifically use what you're describing as guides, as
16 we discussed earlier, to do an independent analysis
17 of his laboratory studies.
18    Q   So you did not rely upon it or
19 specifically use the perforin testing results as, you
20 know, interpreted by the guides as part of your
21 assessment here?
22    A   This is just one or three pieces of paper
23 out of thousands with a laboratory study result. And
24 so I'm not sure if you're asking me rely upon it
25 exclusively. But, again, it's the observations and

91

1 diagnosis of the current impairments that Mr. Ethan
2 Palmquist has, which I'm outlining, is the basis for
3 all my future medical care moving forward.
4    Q   Did it have any role in your opinion?
5 That's all I'm wondering. I know you -- I know you
6 looked at it. I know you looked at a lot of things.
7 And I'm just wondering if it had any weight in your
8 opinions.
9    A   I guess I would describe it as the weight
10 is consistent with the treating medical providers'
11 documents where they are utilizing it to help form
12 the diagnosis. And so, to me, it is consistent with
13 their medical records. I'm not sure how I can -- how
14 I can further answer the question though. I think
15 we've covered it.
16    Q   And do you have any sense of other
17 conditions or exposures that could increase perforin
18 levels?
19    A   At this time, I don't have an opinion on
20 that.
21    Q   Okay. So let's -- just a second. I may
22 be able to short-circuit some questions here, just
23 to -- if I get clarification.
24    You're not offering an opinion that any
25 specific baby food consumption caused Ethan's 13

92

1 diagnostic conditions; is that right?
2    MR. PARKER: Objection as to form. It has
3 been asked and answered.
4    A   I'm sorry, can you just repeat the
5 question, please.
6    Q   (BY MS. PALEY) Sure. Are you -- I know
7 that you are offering an opinion as to metals
8 generally. But are you offering an opinion as to
9 whether baby food consumption specifically caused any
10 of Ethan's 13 diagnostic conditions?
11    A   So I have not been asked to do that --
12    Q   Okay.
13    A   -- or retained to do that. And I would
14 utilize treating medical providers' opinions, as well
15 as other retained experts with a different experience
16 than I have, to answer that question. I don't have
17 an opinion on that right now.
18    Q   Okay. So, for example, when you've got
19 Condition 7 here, Crohn's disease, you know, we see
20 it in Ethan's records, you haven't studied whether
21 any, you know, children who are fed commercially
22 made -- US commercially made infant foods have
23 elevated rates of Crohn's disease as compared to like
24 children who eat homemade foods or baby foods made
25 from outside the US?

93

1    A    What was your specific question in that,
2    please?
3    Q    Yeah. Let's talk about Crohn's disease.
4    A    Got it.
5    Q    Okay. Have you done any analysis as to
6    whether children who eat commercially made US baby
7    food have elevated rates of Crohn's disease as
8    compared to other populations that don't eat that
9    food?
10    A    That is something that I have not been
11    asked to do. And so no, I would not have completed
12    that type of analysis. That is outside the scope of
13    what I've been asked to do for completion and
14    publication of this report.
15    Q    Okay. Let's talk about Diagnostic
16    Condition 10, autoimmune encephalitis.
17    A    Uh-huh.
18    Q    Now, this is -- so the laypeople, me, get
19    it. This is inflammation of the brain resulting from
20    some form of autoimmune reaction; is that correct?
21    A    That's a pretty good, general, correct
22    summary.
23    Q    Okay. And so, Doctor, I see in the
24    records, and your report specifically, a suspicion of
25    autoimmune encephalitis.

94

1    A    Uh-huh.
2    Q    Do you know whether it was ever firmly
3    diagnosed?
4    A    I would just have to review some of those
5    records. But I do recall there was a specific
6    antibody that was positive. And that's why I have
7    that in the diagnostic condition. And treating
8    physicians had given him that diagnosis as well,
9    contributing to his abnormal function in his brain.
10    Q    So let's look at Page 43 of your report.
11    A    Sure.
12    Q    And it's a September 26, 2021, entry. And
13    I'll read out loud the second sentence in that entry.
14    It's pretty long. So bear with me. Dr. Krigsman
15    reported Ethan underwent a lumbar puncture by
16    neurology to obtain CSF --
17         That's cerebral spinal fluid?
18    A    That's correct.
19    Q    -- for testing for cerebral folate
20    deficiency, antibodies and any evidence of autoimmune
21    encephalitis. Unfortunately, the laboratory did not
22    request the autoimmune encephalitis panel and, thus,
23    did not have that data. And the remainder of the CSF
24    was unremarkable.
25         Based on this September 26th, 2021,

95

1    record, do you have any -- any other records that
2    you've reviewed, do you have evidence that autoimmune
3    encephalitis was actually diagnosed?
4    A    So my -- if my memory serves me well, I
5    was looking at the following note on Page 43 as well
6    as Page 44, that there was some positive antibody
7    levels. And then he also had what's called IVIG --
8    intravenous immunoglobin -- in that treatment and
9    then did have some improvements.
10         And so without having all of those
11    specific records in front of me again, I do recall
12    that the treating physicians diagnosed him with that
13    and he underwent treatment for that.
14    Q    Well, no doubt he had IVIG. But let's
15    look at this next sentence after what I read. It
16    says, Dr. Krigsman noted that IVIG had been started
17    on the presumption of autoimmune encephalitis. Ethan
18    received two doses so far, and no significant effects
19    have been noted to date.
20         Do you have any later records that turn
21    that presumption into a firm diagnosis?
22    A    I think it's Dr. Muscal's record --
23    M-u-s-c-a-l -- on October 4, 2021.
24    Q    I'm looking at it.
25    A    Third and fourth line, starting on the

96

1    third line. Dr. Muscal states, Ethan appeared to
2    have some improvements since starting IVIG and appear
3    to have had better mood since the second infusion.
4         So that would be slightly different
5    summary compared to what you quoted on Page 43 from
6    Dr. Krigsman.
7    Q    So that goes to the no significant
8    effects. Do you have any medical records that show
9    that the presumption of autoimmune encephalitis
10    actually turned into a diagnosis?
11    A    I would definitely have to review them
12    again to answer that question, instead of flipping
13    through my medical record summary here --
14    Q    Okay.
15    A    -- and taking up too much time right now.
16    Q    Okay. But just like right here, right
17    now, nothing is -- nothing is coming to mind?
18    A    Well, those -- those things that -- that I
19    mentioned are coming to mind, as well as the antibody
20    earlier I mentioned, which is GAD. And that would be
21    on Page 41 from Dr. Proud, June 15th, 2021.
22    Q    And this is -- this is before the lab
23    failed to do the -- the panel, right? So this is
24    earlier. Autoimmune encephalitis still hadn't been
25    diagnosed?

97

1    A    That's not my understanding from reviewing
2  the June 15th record from Dr. Proud.
3    Q    So you believe, based on the June 15th
4  record, that autoimmune encephalitis had actually
5  been diagnosed even in the absence of the -- the
6  panel?
7    A    So I'm not exactly sure what you're trying
8  to ask me here.  And what I'm able to specifically
9  state is on Page 41.  The neurologist is saying on
10 June 15th that Mr. Ethan Palmquist had the lumbar
11 puncture to do a cerebral spinal fluid analysis.
12 There, what -- what I'm seeing later on is that there
13 is evidence of inflammation with elevation of the CSF
14 opening pressure.  And Dr. Proud states, Autoimmune
15 encephalitis panel serum showed only GAD positive
16 with mild elevation.
17       So I think that is the main data points on
18 the working diagnosis of autoimmune encephalitis.
19   Q    But then we see on September 26th that
20 actually, whoops, he underwent the lumbar puncture
21 but the lab did not do -- unfortunately, the
22 laboratory did not request the autoimmune
23 encephalitis panel, correct?
24   A    Well, I think having still a positive GAD
25 can lead to a physician making the determination of

98

1  that differential diagnosis perhaps even without that
2  confirmatory panel.
3    Q    You actually didn't speak to Dr. Proud,
4  right?
5    A    As we discussed earlier, I did not speak
6  to Dr. Proud.
7    Q    And it's Dr. Krigsman here who's noting
8  it's a presumption of autoimmune encephalitis but the
9  panel hadn't been done, right?
10   A    I think you're quoting the September 26
11 note from Dr. Krigsman?
12   Q    I am, yes.
13   A    I would agree that's what he states, and
14 that's why we try to be objective and exactly
15 document what is in the medical documentation records
16 from treating physicians.
17   Q    Okay.  Let's -- let's talk about your
18 clinical practice a little bit.
19   A    Sure.
20       MR. PARKER:  Is this a good time for a
21 break if you're --
22       MS. PALEY:  Yeah.  We -- yeah.
23       MR. PARKER:  Quick break.
24       MS. PALEY:  It's a change of subject.
25 That's fine.

99

1        THE VIDEOGRAPHER:  Okay.  The time is
2  10:26.  We're off the record.
3        (Recess from 10:26 a.m. to 10:43 a.m.)
4        THE VIDEOGRAPHER:  The time is 10:43.
5  We're back another record.
6    Q    (BY MS. PALEY)  Welcome back, Dr. Hyzy.
7  Hyzy, sorry.  Sorry.
8    A    Hyzy.
9    Q    Hyzy.  I was saying it in my head and it
10 came out wrong.
11   A    No problem.
12   Q    Let's talk a little bit about your kind of
13 day-to-day practice.  What percentage of your time do
14 you spend in clinical practice?
15   A    So the significant, overwhelming majority
16 is clinical practice, meaning both hospital and
17 outpatient clinic.  Last year, it was probably
18 95 percent with only 5 percent of my legal work.
19 This year, over the last three or four months, my
20 legal work is probably closer to 12 to 14 percent.
21 Over the last quarter, it's a little bit more.
22   Q    Okay.  And when you say med/legal work, is
23 that preparing life care plans?
24   A    That would be one part of it.
25   Q    Okay.  What other kind of med/legal work

100

1  do you do?
2    A    Independent medical examinations.  IME.
3    Q    IME.  All right.  In your clinical
4  practice, what conditions or injuries do you most
5  commonly treat?
6    A    Things affecting the neurological system,
7  acquired brain injuries, traumatic brain injuries,
8  strokes, brain tumors, seizures, spinal cord
9  injuries -- sorry, I realized I was going fast.
10 Spinal pain, spinal degeneration, radiculopathy,
11 things regarding the musculoskeletal system.  So that
12 would be different areas of joints, arthritis,
13 tendonitis.  Patients with functional decline from
14 aging, from diagnoses.  I treat patients that have
15 amputations.  I treat patients with weird types of
16 neuropathy, neurological disease, things like complex
17 regional pain syndrome, peripheral polyneuropathy.
18       So that is the general depth and breadth
19 of what most physical medicine and rehabilitation
20 folks see and treat.  And then I also have just
21 additional skill sets for procedural interventions, a
22 little bit more complex hospital-based trauma
23 management, and then this type of work as well,
24 offering my expert opinion.
25   Q    Okay.  And what percentage of your

101

1  patients -- just sort of estimating -- would you say
2  are pediatric patients?
3      A    Probably less than 5 percent on average
4  over the last five years.
5      Q    And what are the sort of most common
6  injuries you see among the pediatric patients?
7      A    It depends on which setting.  So if
8  it's -- if it's in the hospital setting, oftentimes
9  they buzz me typically from more, We don't know what
10 the diagnosis is.  Can you come in and review with us
11 and weigh in on diagnoses?  And then rehabilitation
12 and medical care or hospital is more kind of trauma
13 or acquired brain injuries.  So that would be like
14 partial drowning, lack of oxygen, things like that.
15 It can be infections.
16      In the clinic, though, it's more what
17 we've kind of been talking about, procedural
18 interventions, in my outpatient clinic.
19     Q    And what percentages of your patients
20 would you say have global neurodevelopmental delays?
21     A    That's going to be a very small percent.
22     Q    And you're a member -- are you a member, I
23 should ask, of the American Academy of Physician Life
24 Care Planners?
25     A    I am a member.

102

1      Q    Okay.  And are you aware that they've put
2  out a book on the tenets, methods and practices of
3  life care planning?
4      A    Yes.  That's part of my study to then, you
5  know, have the capacity to author life care plans,
6  along with reading the Life Care Planning and Case
7  Management Handbook, third edition, May '17
8  publication, I think.  On top of obviously the
9  extensive skill set I have in my internship, in
10 medical school, in residency, in fellowship and in
11 clinical practice.
12     Q    And I've -- the American Academy will be
13 happy.  I paid my dues to them by buying a copy of
14 their book.  And then they'll also be happy that my
15 duplicating department refused to scan the whole
16 thing because of copyright issues.  But they would
17 scan some chapters for me to use today.
18     MR. PARKER:  Okay.
19     Q    (BY MS. PALEY)  So I'm going to just
20 share --
21     A    Sure.
22     Q    -- a few -- we're going to look at a few
23 pages here.
24     A    Thank you.
25     Q    So everyone is being very respectful of

103

1  copyright, and it's a purchased version of the book.
2      A    Exhibit 8.
3      Q    Exhibit 8.
4          (Exhibit Number 8 was marked.)
5      A    Understood.
6      Q    (BY MS. PALEY)  Excuse me.  Correct.
7          Okay.  Does this book look -- I mean, it's
8  not the full book, but does this look familiar to
9  you?
10     A    Yes.  This looks like the first edition,
11 the exact same book that I have, as well as part of
12 what we discuss at the academy meeting.
13     Q    Okay.  And I will just show you here, I
14 brought the full book in case we need to look at it.
15          And if you look at page -- the third page
16 in -- it doesn't have a page number, it says
17 Copyright 2017.
18     A    Yes.  I see that.
19     Q    Okay.  So is the version of the book that
20 you would use as part of your life care planning
21 practice?
22     A    Yes, ma'am.
23     Q    Okay.  And let's look at the authors and
24 contributors.  And they're on, what does have a page
25 number, Page 2.

104

1      A    Yes.
2      Q    Okay.  So is it true that many of these
3  folks --
4      THE VIDEOGRAPHER:  One minute, please.
5      Did your mic come off or something?
6      MS. PALEY:  Oh.  It's on.  I bumped it as
7  I moved over to the book.
8      THE VIDEOGRAPHER:  I just noticed you got
9  real quiet real quick.
10     MS. PALEY:  Test, test.
11     THE VIDEOGRAPHER:  We're good now.
12     Q    (BY MS. PALEY)  Okay.  All right.  Let's
13 look at the authors and contributors on Page 2 of the
14 Physicians Guide to Life Care Planning.  Would it be
15 fair to say that many of these folks are also
16 involved in Physician Life Care Planners, LLC?
17     A    I don't mean to correct you.  I just want
18 to a hundred percent understand.  Physician Life Care
19 Planning, LLC is the company.  And that's the company
20 I'm working with that helped me do this plan,
21 correct?
22     Q    Correct.
23     A    All right.
24     Q    That's what I meant.  Sorry.  Physician
25 Life Care Planning.  I can re-ask the question if

105

1 that would be helpful.
2   A   Sure.
3   Q   So is it fair to say that many of the
4 folks who are involved in this book as authors and
5 contributors are also involved in Physician Life Care
6 Planning LLC or Physician Life Care Planning,
7 whatever the organization's tax status is.
8   A   So, you know, based upon you presenting me
9 this page with name recognition of a handful of these
10 physicians, and understanding the baseline context
11 that the company is physicians that do life care
12 plans -- that's the name of the company; so you have
13 to be a physician. This is the Exhibit 8, a,
14 Physician's Guide to Life Care Planning, then yes, I
15 recognize some of these physicians because this is
16 the tight-knit group of physical medicine and rehab
17 doctors that are physicians that do offer life care
18 plans. So it's all consistent.
19   Q   Okay. And in this tight-knit group -- I
20 know Todd Cowen works with PLCP, I think I've got --
21 is that correct?
22   A   I mean, that's my understanding.
23   Q   William Davenport?
24       MR. PARKER: For our court reporter --
25 just a second. I think she meant Todd Cowen,

106

1 C-o-w-e-n.
2       MS. PALEY: Yes, C-o-w-e-n. Sorry.
3       MR. PARKER: I'm enjoying this realtime.
4       MS. PALEY: It's great, isn't it?
5   Q   (BY MS. PALEY) Mr. William Davenport.
6   A   Yes.
7   Q   In fact, he prepared the present value
8 analysis for this report, right?
9   A   Yes. I know Mr. Davenport.
10   Q   And he's involved in Physician Life Care
11 Planning?
12   A   He's involved in the company, Physician
13 Life Care Planning, correct.
14   Q   Okay. Can -- we -- maybe we'll just save
15 a little time. Can you walk me through and tell me,
16 of the folks listed here, who you know has some
17 involvement in Physician Life Care Planning.
18   A   When you say "involvement," do you mean an
19 expert like myself that takes cases? Or do you mean
20 administrative involvement?
21   Q   Either or both.
22   A   Okay. So I've met Dr. Cowen at
23 conferences, and he's an expert, like myself, is my
24 understanding, to do life care plans. Dr. Davenport
25 is part of the company -- I'm sorry, Mr. William

107

1 Davenport is part of the company, Physician Life Care
2 Planning. He's not a physician. His qualifications
3 are outlined there for you. Dr. Joe Gonzales, MD, is
4 an expert that authors life care plans and part of
5 the company, Physician Life Care Planning. And then
6 I recognize a few other names. I've met Christopher
7 Leber in person at conferences. Sasha Iversen and
8 Jason Marchetti I've met via like a telemedicine type
9 of Zoom conference as well.
10       MR. PARKER: I object as to
11 responsiveness. To the extent -- she's not asking
12 you if you met them. She's asking you if they're
13 affiliated with PLCP.
14   Q   (BY MS. PALEY) This is a first. But yes,
15 that's my question.
16   A   As far as I know, everything I already
17 mentioned, those physicians -- Iversen,
18 I-v-e-r-s-o-n, Dr. Iversen, yes, she does life care
19 plans. Dr. Marchetti, M-a-r-c-h-e-t-t-i, yes, he
20 does life care plans. And so the really only
21 knowledge I have of those physicians are that they
22 are physical medicine and rehab doctors and they
23 offer life care plans. And I think and assume, but
24 don't want to speculate, that they do that
25 exclusively with Physician Life Care Planning.

108

1   Q   Okay.
2   A   I guess you'd have to ask them that
3 question.
4   Q   What about Dr. Angel Roman?
5   A   I've heard that name. I don't think I've
6 ever spoken to him. I do think he's affiliated with
7 Physician Life Care Planning, given these
8 credentials. And, you know, I understand I think
9 he's practicing in Texas.
10   Q   And are there any other individuals listed
11 on this page that you know have some affiliation with
12 Physician Life Care Planning?
13   A   The other names on this page I don't
14 recognize.
15   Q   Okay. And so I think you answered this
16 before, but I'll just -- because I don't remember it.
17 You've read this book?
18   A   Yes, ma'am.
19   Q   Okay. Were you ever tested on this book
20 as part of engaging with Physician Life Care
21 Planning?
22   A   No, ma'am.
23   Q   Okay. Is this essentially a guidebook
24 that's used as part of Physician Life Care Planning
25 work?

109

1  A  I think that's understood in the title,
2  right. A Physician's Guide to Life Care Planning.
3  So this is something that can help, a guide, for
4  physicians authoring life care plans.
5      Q  And where appropriate, has your report
6  used sort of language that's come from here to
7  explain different parts of your life care plan?
8  A  So not necessarily specific language, but
9  in my life care plan, on some of the initial pages we
10  do have some headings that have references back to
11  this specific book, along with the case management
12  life care planning handbook. And so those are the
13  two main things that I have read and used then to
14  have a transparent methodology to then kind of go
15  through this framework to then create my life care
16  plan.
17      Q  Okay. And I mean, do you -- do you
18  generally -- strike that.
19          Is there anything that when you were
20  reading this book you said, Huh, I don't really agree
21  with that, or, I think I have a difference of
22  opinion?
23      MR. PARKER: Object to the form only as to
24  "book" as opposed to Exhibit 8.
25      MS. PALEY: Well, we can -- we can enter

110

1  the book itself as an exhibit if you wish. It's --
2      MR. PARKER: I'm not requiring that. I
3  would just -- for clarity, you were talking about
4  Exhibit 8, which I think was a chapter of the book.
5      MS. PALEY: Yeah, several chapters, yes.
6      MR. PARKER: But if you want to ask the
7  question as to the book -- you don't need to make it
8  a exhibit, but just be sure to tell me the book.
9  That's all I'm saying.
10      MS. PALEY: I see. I said as opposed to
11  Exhibit 8. Thank you for the clarification. I
12  actually appreciate that, Charles.
13      MR. PARKER: I mean, for the first time
14  I'm going to let somebody answer a question about a
15  whole book.
16      A  What was your question, Ms. Paley?
17      Q  (BY MS. PALEY) Is there anything when you
18  were reading this book -- which I'm holding up,
19  Physician Life Care Planning book -- where you said,
20  I really don't agree with that statement in the book,
21  or, I have a difference of opinion with what's being
22  stated here?
23      A  I don't think I've ever came to that
24  conclusion or specifically -- your question was --
25  stated that or said that.

111

1      Q  Did you think that at any point?
2      A  You're asking me did I ever think that --
3      MR. PARKER: I will object to form as to
4  that, because we can't go into what he thought in the
5  past. I apologize.
6      Q  (BY MS. PALEY) Do you recall having any
7  differences of opinion with what was stated in the
8  book versus your sort of philosophical or
9  methodological approach to life care planning?
10      A  I think the answer is no.
11      Q  How many life care plans have you
12  prepared?
13      A  As of today, how many are fully published,
14  completed?
15      Q  Sure.
16      A  Approximately 100.
17      Q  And about how many do you have in the
18  works at varying stages of completion?
19      A  That's a tougher one to answer, but the
20  caveat is that some have been retained with deadlines
21  into the fall and winter. So there is no work on
22  them yet, right. But they're sitting there with a
23  deadline in the future. Another 25 perhaps.
24      Q  Have all of these life care plans been for
25  Physician Life Care Planning?

112

1      A  That's correct.
2      Q  Okay. And how did you become involved
3  with Physician Life Care Planning?
4      A  That's a great question. I am glad you
5  answered [sic], and I apologize for the length
6  perhaps of this.
7          So because trained in Texas, my
8  residency -- we touched on University of Texas. And
9  even before that, I had an internship that allowed me
10  to do a lot of different things: Organ
11  transplantations, surgeries in the middle of the
12  night, pediatric ER, pediatric surgery, all these
13  different subspecialities during my internship, plus
14  those same subspecialities are in medical school.
15          Once I became confident in my
16  interventional practice after my fellowship, I was
17  speaking to some of my mentors in Texas that trained
18  me. And they were saying, Well, you're getting back
19  into the hospital. We know your skill set. We know
20  that you would be a good person to take in complex
21  cases and review them. Have you ever heard of life
22  care planning?
23          And so at some point in late 2019 or early
24  2020, I was having these discussions with my mentors
25  because I was already giving some of my private

**113**

1  practice patients away to our junior doctors or the
2  fellows that were training that year, and I had a
3  little bit more time to develop some of my skills
4  that were on pause, my hospital skills.
5      So then I had discussions with the
6  Physician Life Care Planning team in San Antonio,
7  Texas. And then went through some training and, you
8  know, became an expert for them and started taking on
9  cases in 2020.
10     Q   So before 2019 or 2020, had you done any
11 work in the life care planning space?
12     A   Not me physically doing the work, but
13 there is publications in our journal, American
14 Academy of Physical Medicine and Rehabilitation
15 Journal. And so there was a little bit of knowledge
16 I had about this. And then if we break down little
17 aspects of the life care plan, you know, I was doing
18 clinical practice of medicine that encompassed all
19 this stuff. Just like yesterday, I had to do a peer
20 to peer with an insurance company director, getting a
21 patient from the hospital to acute rehab. You know,
22 that's kind of part of this projecting future medical
23 costs.
24     So to answer your question, I have not
25 ever authored a life care plan prior to starting with

**114**

1  Physician Life Care Planning.
2      Q   Okay. And what training was required to
3  become a physician life care planner with Physician
4  Life Care Planning?
5      A   Number one, you have to be a board
6  certified physical medicine and rehabilitation
7  specialist. So you have to complete the residency,
8  the four-year residency, and pass your boards. And
9  then you have to have an active clinical practice.
10 So that's baseline.
11     Specific training then was an initial
12 American Academy of Physician Life Care Planners
13 conference was recommended. Read the whole book, buy
14 the book that we're discussing, A Physician's Guide
15 to Life Care Planning. Then I reviewed, based upon
16 the recommendations, the other large main book, which
17 I have quoted on Page 3 here. And that's the Life
18 Care Planning Case Management Handbook. Then some
19 self-study regarding different things, reviewing
20 different types of redacted life care plans as
21 examples. And then starting my first case all -- I
22 think my first five cases all were discussed with
23 Dr. Gonzales, Dr. Joe Gonzales.
24     And so that was all in this first year of
25 2020 to get me up to speed on the framework,

**115**

1  methodology, cost analysis, transparency, et cetera.
2      Q   And part of how you've been able to do,
3  you know, a hundred or so of these in the last couple
4  of years is that you kind of have a template or a
5  framework that you use that comes from the Physician
6  Life Care Planning group, like -- I think they may
7  even have like legal protection over their framework.
8      Do you utilize that framework in your
9  planning?
10     A   Yeah. The Physician's Guide to Life Care
11 Planning book that we're mentioning kind of goes
12 through the framework as well as that initial, much
13 thicker, thousand-page textbook, case management life
14 care planning handbook. So the framework is based
15 upon that.
16     And then with Physician Life Care
17 Planning, we do have the framework that we kind of
18 outline here at the very beginning, you know, with
19 content, Section 1 through 8, et cetera. And so that
20 gives me a framework, just like how I have my
21 subjective, objective, assessment, plan framework or
22 different things that I would do on a new
23 consultation in a hospital. So that is the framework
24 for my life care plan for Mr. Palmquist.
25     Q   Believe it or not, I actually bought that

**116**

1  other book too. I didn't bring it today.
2      But do you see any tensions between the
3  life care planning process that's laid out in A
4  Physician's Life Care Guide to Life Care Planning and
5  the other textbook that you referenced a moment ago?
6      A   I'm sorry, what was the first part of your
7  question?
8      Q   Do you see any tensions between the life
9  care planning process that's laid out in The
10 Physician Guide to Life Care Planning and the other
11 textbook that you referenced having reviewed?
12     MR. PARKER: I would object to form. But
13 I find it such an interesting question, I want to see
14 what your answer is.
15     A   Okay. Great.
16     So interestingly enough, I did review this
17 textbook, the specific third edition, May '17,
18 acquired brain injury chapter, which is mostly
19 trauma, technically acquired, and any other insults
20 acquired, for this specific Ethan Palmquist case.
21 That's a statement. Back to answering your question.
22     I'm not exactly sure what you mean by
23 "tensions," because the large textbook I believe was
24 authored mostly by two Ph.Ds and then lots of other
25 reviewers and contributors. And A Physician's Guide

117

1  to Life Care Planning, smaller guidebook, as we're
2  discussing, you've provided -- or Exhibit 8 as a
3  partial copy of this, was mostly authored by
4  physicians, medical physicians, not Ph.D.s.
5      So that's -- that's my foundation, but I
6  still don't exactly understand how you want me to
7  answer "tensions." I don't understand that question.
8      Q   (BY MS. PALEY) I might come back to it,
9  but I'm probably going to move on now.
10     MR. PARKER: Okay.
11     Q   (BY MS. PALEY) Are there any medical
12  school classes in life care planning?
13     A   I don't recall having any.
14     Q   Is there a medical residency in life care
15  planning?
16     A   Residencies would be determined by the
17  American Board of Medical Specialties. And there is
18  no residency in life care planning because that is
19  not an isolated American Board of Medical
20  Specialties-designated physician specialty like
21  anesthesia, physical medicine and rehab, neurology,
22  neurosurgery.
23     Q   Okay. So I might know the answer to the
24  next one, then, but I'll ask, just to get your
25  understanding. Is there any medical fellowship in

118

1  life care planning available to MDs?
2      A   So there are certifications or courses.
3  But I define a medical fellowship as a postgraduate
4  medical year after you finish a residency. So I did
5  a fellowship in a interventional spine and pain
6  management.
7      THE REPORTER: In a?
8      THE DEPONENT: Interventional spine and
9  pain management.
10     A   Or a neurologist can do a fellowship in
11  pediatric neurology, or the neurologist can do a
12  fellowship in epileptology, et cetera.
13         And so I just want to answer your question
14  but really understand what we're talking about.
15  Because fellowships are additional years of training
16  where doctors -- whether you're seasoned and you go
17  back to training or you come straight out of
18  residency -- are still supervised by attending
19  physicians in a training program. That's what a
20  fellowship means to me as a board certified,
21  fellowship-trained physician.
22         But there's no medical fellowships, in my
23  opinion, that are outside of that realm I defined.
24  But yes, there are classes or courses a physician or
25  non-physician can take to learn about life care

119

1  planning.
2      MR. PARKER: Okay. Doctor, you're -- the
3  photographer, his video is getting a great shot of
4  your knee.
5      THE DEPONENT: Sorry.
6      MR. PARKER: And if a shorter answer can
7  do, it's okay.
8      THE DEPONENT: Gotcha.
9      MS. PALEY: I ask you not to coach the
10  witness, Charlie.
11     MR. PARKER: Oh, I was trying to help you.
12  I apologize. I wasn't trying to coach him.
13     MS. PALEY: Okay. Thank you.
14     MR. PARKER: That was an innocuous
15  question.
16     Q   (BY MS. PALEY) So is the short -- is the
17  short answer, There are classes but there's not a
18  fellowship?
19     A   I would agree with your short answer.
20     Q   Has -- have you had any involvement in
21  life care planning outside the -- like litigation
22  context, essentially?
23     A   I offer future medical recommendations
24  similar to a life care plan outside of litigation.
25  However, I've never been retained for or asked to

120

1  provide a life care plan outside of Physician Life
2  Care Planning, LLC.
3      Q   And have you received any sort of
4  litigation training or deposition training from
5  Physician Life Care Planning or the American Academy
6  of Physician Life Care Planners?
7      A   So there's discussions with physicians,
8  things like that, discussions with attorneys with how
9  to be cordial, professional, objective things like
10  that. To answer your question, yes.
11     Q   And you are being very cordial and
12  professional. So thank you.
13         And are you aware of anyone outside of
14  Physician Life Care Planning, PLCP, who cites the
15  American Academy of Physician Life Care Planners
16  guidelines, the tenets, methods and best practices
17  for Physician Life Care Planners -- sorry, that
18  sentence got very long. I want to restart it.
19         Are you aware of anyone outside the PLCP
20  who cites the guidelines in this book that we're
21  talking about here, A Physician's Guide to Life Care
22  Planning --
23     A   Uh-huh.
24     Q   -- anyone else from outside PLCP who has
25  cited these as part of like a peer-reviewed published

121

1  literature?
2      A    So I'm aware of other physicians that are
3  not part of Physician Life Care Planning, LLC, in San
4  Antonio, Texas, the group I'm involved in, that have
5  participated in conferences and they have referenced
6  this book. I've been involved in these conferences,
7  speaking to these physicians.
8      Q    Are you aware of any peer-reviewed
9  published literature that has referenced the book
10 that we're discussing?
11     A    I think it is referenced in some of the
12 PM&R journals, so the American Academy of Physical
13 Medicine and Rehab. I don't have that information in
14 front of me. So I think it is, but I'd have to
15 verify and get back to you on that.
16     Q    Okay. Let's look at your expert
17 appearances, Exhibit 3. I think we can probably work
18 through this one pretty quickly.
19     A    Sure.
20     Q    Now, I see nine depositions and one court
21 appearance. And I hear you had a deposition
22 yesterday. So you're at ten depositions and one
23 court appearance; is that correct?
24     A    One, two, three, four, five, six, seven,
25 eight, nine, ten. Correct.

122

1      Q    Maybe you can just -- we can walk through
2  these quickly and you can tell me what the injuries
3  were in these cases, if you recall.
4      A    Okay.
5      Q    So let's look at the first one. And I'll
6  just refer to it by the last name.
7      A    Okay.
8      Q    Reynolds.
9      A    Trauma, head fracture.
10     Q    Fahrenbruch.
11     A    Acquired hypoxic brain injury.
12     Q    Wells.
13     A    Motor vehicle collision, lumbar spine
14 radiculopathy.
15     Q    Shahbazian.
16     A    Trauma, laceration, complex regional pain
17 syndrome.
18     Q    Shrode.
19     A    Acquired hypoxic brain injury.
20     Q    Murray.
21     A    A peripheral nerve injury called atypical
22 facial pain.
23     Q    Schones.
24     A    Cervical spinal cord injury.
25     Q    Santella.

123

1      A    Traumatic brain injury.
2      Q    And was that like an acute injury? Sorry,
3  I'm not a doctor.
4      A    Mr. Santella? Is that what you mean?
5      Q    Yeah.
6      A    His was traumatic from a medical procedure
7  complication.
8      Q    Okay. Thank you.
9  Beard.
10     A    Cervical lumbar injuries, motor vehicle
11 collision.
12     Q    And the one that you did yesterday.
13     A    The one I did yesterday, I'm the treating
14 physician for injuries and impairments after a motor
15 vehicle collision.
16     Q    Okay. So for the deposition you did
17 yesterday, you did not prepare a life care plan as
18 part of that -- your work in that case; is that
19 correct?
20     A    That's correct. And not all the other
21 nine have been life care plans either.
22     Q    Okay. And which of them have been life
23 care plans? If we can run through them.
24     A    It might be easier to say which one
25 wasn't, if that's okay.

124

1      Q    Okay. Sure.
2      A    Mr. Beard was an independent medical exam.
3      Q    Okay. And then the one yesterday. Okay.
4  And so the other eight were life care
5  planning work, correct?
6      A    Correct.
7      Q    And then you have one court appearance.
8  Perng? It's very small?
9      A    Yeah. P-e-r-n-g.
10     Q    Okay.
11     A    So --
12     Q    Was that in the life care planning space?
13     A    Correct.
14     Q    Okay. And what was the injury there?
15     A    Multiple traumatic injuries from a motor
16 vehicle collision.
17     Q    Okay. Were -- I think it's safe to say
18 none of these related to metal exposure; is that
19 correct?
20     A    Some patients had surgery and they have
21 metal inside their body now.
22     Q    Did your opinions in any of these cases
23 relate to injuries that you believe to be caused by
24 metal toxicity?
25     A    No, ma'am.

125

1    Q    And were any of these for children?
2    A    The pediatric IMEs and life care plans I
3  have authored, I have not been deposed on or trial
4  on. All that stuff is scheduled, up and coming.
5    Q    Okay. So for the up -- for the up and
6  coming -- sorry. Strike that.
7         For the other life care plans that you've
8  done that either -- strike that again.
9         You said you've done about a hundred life
10 care plans, right?
11   A    I've completed approximately a hundred,
12 yes, ma'am.
13   Q    Okay. For those that were not covered by
14 the list of testimony you've already given, about how
15 many of those are for children?
16   A    I'm going to define "child" as under the
17 age of 18. And so I think I have anywhere between
18 six to seven life care plans and IME for children
19 under the age of 18.
20   Q    And what if you take out the IME? What
21 about just life care plans?
22   A    That would be one major one. So that
23 would be five to six.
24   Q    Okay. And of the other life care plans
25 that you've done that are not listed on the testimony

126

1  list, were any of those cases in which the injury is
2  autism?
3    A    No, ma'am.
4    Q    Okay. Crohn's disease?
5    A    No, ma'am.
6    Q    Global neuro developmental delay?
7    A    The other children do have that diagnosis
8  as well, depending on which one it was and their
9  specific injury.
10   Q    Were any of those other plans -- whether
11 for children or adults -- related to allegations of
12 toxic levels of metal exposure?
13   A    No, ma'am.
14   Q    Okay. In your life care planning -- or
15 now I should ask, for the life care plans that you
16 have in the hopper, you know, scheduled out through
17 the fall, to the extent that you know about the
18 injuries, do -- would any of these life care plans
19 likely address autism, Crohn's or metal exposure?
20   A    There are some pediatric cases in the
21 hopper, as you term it. So that, you know, means
22 cases that I've been retained on but have not started
23 on. No to Crohn's and heavy metal. Some of the
24 children I think will have some autism or global
25 neurodevelopmental delay diagnoses. I just have not

127

1  gone through all the records yet and produced my
2  plan. So I can't a hundred percent answer that.
3    Q    Fair enough.
4         And in your life care planning, have you
5  used the same essentially template that you used for
6  Ethan's report?
7    A    I prefer to call it more of a framework,
8  because it's not template that I fill in, right?
9  It's very unique per person, with the examination and
10 my diagnoses and the medical record.
11        The framework is similar because that is
12 the best practice, transparent, reproducible via the
13 two documents we discussed: The textbook and then
14 the guide.
15   Q    Okay. And within the framework -- I'll
16 use your language, framework -- are the sort of major
17 judgment calls that you make based on your analysis
18 of medical records and other materials, are they
19 essentially types of care potentially needed,
20 frequency and duration of care and cost of care?
21   A    In general, that's one part of my
22 framework.
23   Q    Okay. What are the other parts? I know
24 you have -- you do a summary of the medical records,
25 but --

128

1    A    Yes, ma'am. Basically under contents,
2  those sections. So overview of what it is: Medical
3  records summary, my examination. Then opinions,
4  which are diagnoses, impairments, disabilities and
5  duration of care, life expectancy.
6         Then what you just described, future
7  medical requirements, cost vendor analysis and then
8  total cost. And then last section would be exhibits
9  for Mr. Palmquist. They were the pictures that I was
10 able to take at his house after consent from his
11 parents.
12   Q    And would you say -- strike that.
13        At this point what -- roughly what
14 percentage of your income would you say comes from
15 life care planning?
16   A    So it's variable on the amount of clinical
17 work, but it would be somewhere, you know, in that
18 ballpark of 12 to 15 percent, depending on how many
19 procedures I do versus how much hospital call or
20 consults I do versus if I do eight life care plans a
21 month or five or ten.
22   Q    Okay. And I know you're a physiatrist.
23 We've talked about the sort of work you do. Just to
24 sort of round this out, you agree that you're not a
25 toxicologist?

129

1    A    Yes, ma'am.
2    Q    Okay. And you've probably been through
3  this before. But not an expert in, you know, metals
4  and metals toxicity?
5    A    Yes, ma'am.
6    Q    Not a child neurologist?
7    A    I do have significant experience and
8  training, both in medical school and residency on
9  doing rotations in pediatric neurology. But you're
10  correct, I'm not a pediatric neurologist because I am
11  a physiatrist.
12    Q    Okay. And the same for -- you can take
13  out the "pediatric." Just not a neurologist; you're
14  a physiatrist?
15    A    At times I have to do all the work the
16  neurologists do, for whatever reason. But that's
17  correct. That was not my residency training.
18    Q    And in terms of psychiatry, either
19  pediatric or child -- whichever the correct term
20  is -- not a psychiatrist for either kids or adults?
21    A    Also have lots of training in psychiatry
22  through medical school and residency. I am not a
23  psychiatrist, as you point out. That's correct.
24    Q    Okay. Not a gastroenterologist?
25    A    Thank goodness, no.

130

1    Q    Okay. Not a pediatrician?
2    A    No. Again, lots of pediatric training in
3  focused pediatric physical medicine and
4  rehabilitation, which includes a lot of general
5  pediatrics.
6    Q    Not a child development expert?
7    A    Outside my own two children, the answer is
8  no.
9    Q    Okay. Not an epidemiologist?
10    A    Agreed.
11    Q    Okay. Not an epileptologist? Which is
12  quite a mouthful.
13    A    Agreed.
14    Q    Okay. You know what, I'll split that up
15  because I essentially had two questions there. I'll
16  take out the "quite a mouthful."
17        Not an epileptologist?
18    A    I'm not an epileptologist.
19    Q    And not an expert in perforins?
20    A    That's correct.
21    Q    Let's talk a little bit more about the
22  process of putting together your life care plan. You
23  understand that the Palmquists have private health
24  insurance, right?
25    A    You can make the assumption. I did not

131

1  review those details. I don't think I've ever seen
2  their health insurance card ever.
3    Q    Actually, their health insurance card is
4  listed on your list of materials.
5    A    I forgot that.
6    Q    Which is what made me think that maybe you
7  knew that they were insured. I can try to find the
8  page, but -- let's see.
9        MR. PARKER: I agree they have some
10  insurance.
11    Q    (BY MS. PALEY) Page 53.
12        MR. PARKER: Perfect.
13    Q    (BY MS. PALEY) Okay. Page 53, Blue Cross
14  Blue Shield of Texas insurance card for Ethan
15  Palmquist. So --
16    A    Yeah. That was probably two seconds of
17  looking at that picture.
18    Q    Okay. But you -- and we -- I'll just ask
19  the questions.
20        MS. PALEY: You know, I know that,
21  Charlie, you may not like them, but it's fine. I
22  think we can get through them quickly.
23    Q    (BY MS. PALEY) Have you reviewed terms of
24  their health insurance?
25    A    No, ma'am.

132

1    Q    Have you determined what services or
2  providers are covered and at what costs?
3    A    No.
4    Q    Okay. So is it accurate to say your life
5  care plan doesn't reflect the Palmquists' likely cost
6  for care under their insurance coverage?
7        MR. PARKER: No objection.
8    A    I disagree. I think that's incorrect.
9    Q    (BY MS. PALEY) Dr. Hyzy, if you don't
10  know the terms of their insurance coverage, how can
11  you testify that your life care plan reflects the
12  likely costs of Ethan's care under their insurance
13  coverage?
14    A    That's a great question. I think I will
15  answer that in a second. I got the pages flipped
16  around here.
17        The reason why I say it does reflect their
18  possible coverage options is because of how we do --
19  how I did their cost vendor analysis based upon where
20  they live.
21        THE REPORTER: Cost of -- what was it?
22        THE DEPONENT: Cost vendor analysis.
23  Yeah, I'm sorry.
24    A    It's in here in one of the sections.
25        And so in my experience in my private

133

1  practice and in hospital, patients have coverage in a
2  geographical area based upon providers, the type of
3  insurance, et cetera.
4         And so pricing out things like -- I'm on
5  Page 86 -- medications is directly related to the
6  surrounding pharmacies in Pearland. Page 83, the
7  physician specialists are, again, directly related to
8  those providers, physicians in their geo ZIP code
9  around Pearland. So that's how I would answer that.
10        The cost analysis is based upon their
11 location, which typically includes providers in
12 network on their, as you mentioned, Blue Cross
13 insurance card.
14    Q    (BY MS. PALEY) When -- but you report the
15 UCR80s, correct, for some types of care?
16    A    I guess I would clarify, not necessarily
17 for some types of care but to price out the specific
18 care that is available via the database.
19    Q    And Doctor, you understand, as someone
20 with an active clinical practice, that the UCR80 does
21 not reflect necessarily, or even very often, what an
22 insured individual will pay out of pocket under any
23 given insurance plan, correct?
24    A    The UCR 80th percentile, as I describe on
25 77, 78, would be those charges that we priced out

134

1  given the geographical location for 80th percent of
2  all charges submitted in that area. So those are
3  submitted charges.
4         There's nowhere that I recall or I'm
5  seeing that I am stating UCR80 is a patient-specific
6  co-pay or deductible.
7     Q    And that's not really all I'm getting at.
8  The UCR80s are not meant to reflect what you believe
9  the Palmquists would pay out of pocket necessarily
10 under their -- sorry, under their current insurance.
11    A    These are two separate things, Ms. Paley.
12    Q    Okay. When you provide the UCR80s in your
13 life care plan, are you stating to a reasonable
14 degree of medical certainty that you believe that
15 those UCR80 charges from providers would accurately
16 reflect the out of pocket for an insured individual
17 under the Palmquists' insurance?
18        MR. PARKER: Object as to form.
19    A    So I'm not exactly sure how to answer
20 that, because this is the usual, customary,
21 reasonable 80th percentile of submitted billable
22 charges. This is not what you're describing as, what
23 I mentioned earlier, co-pays or deductibles with
24 health insurance. And that is not the methodology
25 for -- for life care planners, whether they're

135

1  physicians or non-physicians, because I can't
2  speculate the same health insurance network benefits
3  and other versions of those -- those things that may
4  or may not be available and accessible to the family
5  or any patient at any time.
6     Q    (BY MS. PALEY) Exactly.
7         So submitted billable charges are not the
8  same as what a patient might pay out of pocket.
9  That's the simple proposition I was just trying to
10 get at.
11    A    Well, no, that's different.
12        MR. PARKER: Objection as to form.
13        Go ahead.
14    A    That's not my understanding, Ms. Paley, of
15 your question. Because I thought the first question
16 you said, What would they pay with their insurance?
17 And then I thought you just said now, What do they
18 pay out of pocket.
19    Q    (BY MS. PALEY) And I'm sorry. I meant
20 those to be the same thing. The submitted billable
21 charges are not meant to reflect what a patient with
22 the Palmquists' insurance would pay after their
23 insurer negotiates rates and the insurer takes on a
24 portion of the charges and then the patients pay the
25 remainder.

136

1         MR. PARKER: I object as to form.
2     A    Ms. Paley, I think it's speculative
3  because there's so many nuances in health insurance
4  and there's a lot of variables. And I've previously
5  been instructed by a judge not to discuss insurance
6  in my sworn testimony, specifically at trial. So I'm
7  not really sure how much I can share with my thought
8  process other than what we've already stated, UCR80
9  billable charges.
10        If a patient had no health insurance and
11 they want to pay cash for procedures, these are the
12 reasonable, usual and customary fees that would be
13 self-pay options, but insurance is variable on
14 numerous levels.
15    Q    (BY MS. PALEY) Okay. And we're not in
16 front of that judge. So here, you know, I get to ask
17 questions. You get to answer them.
18    A    Okay. I wasn't sure about that then.
19    Q    Yeah. And I think we're actually saying
20 the same thing. Those UCR80s are not meant to be
21 specific to what any one person would pay under any
22 one particular insurance program. Is that --
23        MR. PARKER: Objection as to form.
24    A    I don't want to speculate about other
25 people. So I could use my health insurance example.

137

1  I have a $8,000 deductible. And that means I am
2  paying these prices at UCR80 until I meet 8,000. And
3  then my UnitedHealthcare takes over for my little
4  percentage changes.
5      That's my experience with every other
6  commercial insurer like Blue Cross, Aetna, Cigna in
7  my private practice and hospital billing.
8      Q   (BY MS. PALEY)  And in doing the
9  Palmquists', you know, cost analysis here, life care
10 planning cost analysis, you didn't specifically look
11 to say, Okay, with Blue Cross Blue Shield of Texas,
12 what's their deductible?  You know, Are they in a
13 high-deductible plan?  What are they going to pay?
14 You set aside their insurance, and you just look at
15 the UCR80s or your cost vendor survey, right?
16     MR. PARKER:  Objection as to form.
17     A   Ms. Paley, I outline that starting in
18 Section 6. And what you're describing, I've outlined
19 in detail. And that would be the best practice,
20 tenets, methods, transparent, reproducible
21 methodology to then utilize cost vendor analysis to
22 create a price on his future medical care.
23     We do not rely upon insurance benefits,
24 Medicaid, Social Security, disability, getting
25 Medicare early or commercial payors. That's not

138

1  reproducible, transparent methodology that myself,
2  physicians or non-physician life care planners
3  ascribe to, to my knowledge.
4      Q   (BY MS. PALEY)  All I was interested in
5  that whole time, trying to get -- and I'm sorry it
6  took me so long to get to it -- is we do not rely
7  upon insurance benefits, Medicaid, Social Security,
8  et cetera. So that's all. I didn't want to, you
9  know, bring up a -- didn't want to send us down a
10 rabbit hole.
11     MS. PALEY:  So let me look at my notes
12 here. Just a second. We're coming close to 11:45,
13 which is what we talked about in terms of a break.
14     MR. PARKER:  Sure.
15     MS. PALEY:  I may be able to get through a
16 little bit more before that.
17     MR. PARKER:  You want to take a break now?
18     THE DEPONENT:  Let's push through. Can
19 you wait 15, 20 minutes to eat?
20     MR. PARKER:  Either way. But if she was
21 at a stopping point and wanted to review her notes,
22 it was getting to the place before the crowd, I
23 thought that maybe advantageous.
24     THE DEPONENT:  Understood.
25     MS. PALEY:  Okay --

139

1      MR. PARKER:  I'll give you the choice.
2      MS. PALEY:  Give me three more minutes and
3  then I think we can be at a somewhat logical stopping
4  point.
5      MR. PARKER:  Okay.
6      Q   (BY MS. PALEY)  So the UCR80, that's the
7  80th percentile of what's submitted as a usual and
8  customary charge, right?
9      A   Generally I think you can describe it as
10 that.
11     Q   Okay. And is that sort of akin to a list
12 price or a sticker price that is before any
13 negotiated discounts between insurers and -- and
14 healthcare providers?
15     MR. PARKER:  Again, object as to form.
16     A   I can't speculate on specific contracts
17 with specific payors and insurance. I can tell you
18 yes, in my private practice, every single payor
19 source, we do have a different contract with,
20 depending on volume, et cetera.
21     Q   (BY MS. PALEY)  And that's great. Based
22 upon your private practice experience is very
23 helpful.
24     And so is it correct that you didn't
25 undertake any efforts to spot-check whether the UCR80

140

1  rates, how they compared to the negotiated rates that
2  the Palmquists' insurers paid?
3      MR. PARKER:  Objection as to form.
4      A   I don't think I have any ability to,
5  quote, spot-check, end quote, what you're describing.
6      Q   (BY MS. PALEY)  Okay. Because you haven't
7  looked at all of their medical billing or the terms
8  of their insurance, right?
9      MR. PARKER:  Objection as to form.
10     A   I don't think it's that simple, Ms. Paley.
11 It would have to be -- I would have to be employed by
12 Blue Cross as an insurance reviewer to actually have
13 all of that information. I have zero access to their
14 specific healthcare insurance plan, benefits,
15 et cetera.
16     Q   (BY MS. PALEY)  But even as to what you
17 would have access to via discovery in this case, you
18 haven't looked into the terms of coverage of the
19 Palmquists' insurance, right?
20     MR. PARKER:  Objection as to form.
21     A   I think -- I think I answered that where I
22 don't have access to that and I have not, quote,
23 spot-checked, end quote, these UCR80 versus
24 insurance.
25     Q   (BY MS. PALEY)  Okay. We can do -- let's

141

1  do just a very quick exhibit.
2      MR. PARKER: Sure.
3      MS. PALEY: And then I think we can get
4  out.
5      Q   (BY MS. PALEY) I'm going to mark as
6  Exhibit 9 -- these are just a small selection of
7  Ethan's records from Texas Children's.
8      (Exhibit Number 9 was marked.)
9      Q   (BY MS. PALEY) And if you'll look to
10 Page -- on the bottom right corner, it's 8 -- 7085 to
11 7086. And do you see that this appears to --
12     THE VIDEOGRAPHER: Stand by. I think
13 we're good. I'm going to change that mic during
14 lunch.
15     MS. PALEY: Okay. Sorry. It's every time
16 I reach over the table. Yeah.
17     Q   (BY MS. PALEY) 7085 to 7086, does this
18 appear to be some medical billing related to a spinal
19 puncture that Ethan had in May of '21?
20     A   Yeah. Page 7085, Texas Children's
21 Hospital, it's listed as her mom, Sarah Palmquist
22 first, then Ethan. Admission 5/26/21. And then it
23 has numerous things billable on this page.
24     Q   And about three-quarters of the way down,
25 there's spinal puncture, therapeutic, drain with

142

1  fluoro or CT guide.
2      A   Yes. I see that.
3      Q   Okay. So let's look at Page 7086. And do
4  you see the section Payments and Adjustments?
5      A   I see.
6      Q   Okay. All right. So before we get to the
7  payments and adjustments, like you said, there are
8  many items listed under Charges. And the total
9  amount is a little north of $17,000; is that right?
10     A   On Page 7086, above that -- yes, 17,000.
11     Q   Okay. And if these --
12     MR. PARKER: Let me -- I object as to
13 form.
14     Q   (BY MS. PALEY) Okay. If these amounts,
15 if the dollar figures in the amount column in the
16 Charges section, if they were at the UCR80 level,
17 would you include those amount -- and you believed
18 Ethan needed this care going forward, would you
19 include those amounts in your life care plan?
20     MR. PARKER: Objection as to form.
21     A   Ms. Paley, I don't exactly understand what
22 you're asking me here.
23     Q   (BY MS. PALEY) Well, if -- if Texas
24 Children is billing to Sarah Palmquist at the UCR80
25 level, just -- you're an expert, so you can make --

143

1  we can do hypotheticals. You know, assume with me
2  that these are at the UCR80 level. Okay. If that
3  were the case, would you include -- and you believed
4  that Ethan needed this care going forward, would you
5  include these amounts as part of your life care
6  plan --
7      MS. PALEY: Objection as --
8      Q   (BY MS. PALEY) -- if they were UCR80?
9      MR. PARKER: Sorry.
10     MS. PALEY: Go ahead.
11     MR. PARKER: Objection as to form.
12     A   So I think there's -- there's difficulty
13 with me speculating and doing a hypothetical exercise
14 right now, because I have objective evidence and
15 research in my published life care plan.
16     With that being said, if we were -- if I
17 was going to price out a spinal tap with anesthesia
18 and the medications and everything all inclusive and
19 the surgery center fee or hospital fee and I used
20 UCR80th percentile, then placement of this ZIP code
21 where they live would include Texas Children's and
22 other hospitals around the area. And the number
23 would be the number that the database gives me.
24     And I can't speculate if that's exactly
25 the same, different, compared to what you're showing

144

1  me here in this exhibit.
2      Q   (BY MS. PALEY) And I'm not asking you to
3  say whether these are UCR80 or not. I'm just trying
4  to understand sort of your methodology and say if
5  these were UCR80s --
6      A   Okay.
7      Q   -- if Texas Children billed at UCR80s for
8  their geographical area and you thought that this was
9  care that Ethan needed going forward, say he needed,
10 you know, a spinal tap every other year for some
11 reason -- just this is our hypothetical -- then would
12 you use these amounts in your life care plan,
13 assuming they are UCR80s?
14     MR. PARKER: Objection as to form.
15     A   I think my answer is the same. I mean, I
16 can't -- I can't do the assumption hypothetical. I
17 don't feel comfortable with that. If -- if a
18 UCR80th percentile charge from my database, which I
19 use, via the methodology, exactly what I did, in the
20 published report matches up exactly this number from
21 this document and exhibit, then that matches up. But
22 there's no way I would be able to postulate if it is
23 or is not the same number.
24     Q   (BY MS. PALEY) And I'm not asking you to
25 postulate. I'm just saying you're an expert. So I

145

1  can ask you hypothetical questions.
2      A   Okay.
3      Q   That's the way it works.  And I'm just
4  saying, if these are UCR80s, you'd use them, right?
5          Assume with me they're UCR80s.  You'd use
6  them in your life care planning, right?
7          MR. PARKER:  Objection as to form.
8      A   So it's not always specific UCR80 either.
9  If there was a specific vendor, Texas Children's
10 Hospital, that provided us with an upfront cost of
11 specific charges, then I could also use in my life
12 care plan, as I explained, in the methodology a
13 specific location, vendor cost for whatever specific
14 future medical requirement it is.
15     Q   (BY MS. PALEY)  I understand, sir.
16     A   Okay.
17     Q   But what I'm saying is, in the instances
18 where you use these UCR80s -- assume these are
19 UCR80s -- I think this is pretty -- this is like just
20 a little quick threshold question.  You would use
21 them, right?  If these accurately reflected UCR80s,
22 you would use them?
23     MR. PARKER:  Objection as to form.
24     Q   (BY MS. PALEY)  Okay.  Let's -- I'm sorry.
25 Go ahead.

146

1      A   I think I've answered it.  That -- my best
2  answer is what I've been stating, because I'm a
3  little bit, again, confused on hypotheticals and
4  postulations and assumptions.  And I don't want to
5  misspeak regarding what you're asking me.
6      Q   Okay.  Let's look at the Payments and
7  Adjustments section.  You see that these are -- there
8  are three Blue Cross Blue Shield insurance payments,
9  correct?
10     A   Okay.  So same page, date, 6/3, 6/25,
11 6/30, all 2021, I see three line items, insurance
12 payments.
13     Q   Okay.  And those are like around $8,000 or
14 so out of the 17.
15         Do you -- if you were using UCR80s or the
16 amounts charged by a specific healthcare provider
17 that the Palmquists wanted Ethan to go to, your --
18 your life care plan wouldn't make any effort to the
19 reduce the life care plan projected amount by what
20 this Texas Blue Cross Blue Shield payment would be?
21     MR. PARKER:  Objection as to form.
22     A   Right.  I'm not understanding how I would
23 reduce the Blue Cross Blue Shield Texas payments.  I
24 don't understand your question.
25     Q   (BY MS. PALEY)  All I'm asking -- okay.

147

1  Do you see there's an administrative write-off?  It
2  doesn't say -- it doesn't say "Insurance," it says
3  "Account." Last entry.
4      A   I see that, yes.
5      Q   Okay.  Your life care plans wouldn't
6  reduce the life care plan projected amount by any
7  kind of noninsurance-related administrative
8  write-offs, would they?
9          MR. PARKER:  Objection as to form.
10     A   So that would not be the methodology that
11 we ascribe to as life care planners, physicians or
12 non-physicians for completion of this, kind of for
13 those reasons that I alluded to earlier on access to
14 healthcare, benefits of healthcare, specific details
15 of Ethan Palmquist is a minor and his parents'
16 employability, insurance benefits, et cetera.
17     Q   (BY MS. PALEY)  Okay.  So the sort of
18 Payments and Adjustments section of something like
19 this is -- would have no relevance to your life care
20 planning practice.  Is that fair enough?
21     MR. PARKER:  Objection -- objection as to
22 form.
23     A   The methodology and the process is not
24 including these things that you're describing.
25     Q   (BY MS. PALEY)  Okay.  That's all.

148

1          MS. PALEY:  I think -- give me one
2  second -- this is probably a good breaking point.
3          Okay.  Let's take our break.
4          MR. PARKER:  Great.
5          THE VIDEOGRAPHER:  The time is 11:47.
6  We're off the record.
7          (Lunch recess from 11:47 a.m. to
8          12:57 p.m.)
9          THE VIDEOGRAPHER:  The time is 12:56.
10 We're now back on the record.
11     Q   (BY MS. PALEY)  Okay.  Welcome back,
12 Doctor.  I want to talk a little bit about your
13 methodology, on Page 75 of your report, to the extent
14 that will help guide the conversation.
15     A   Okay.  I'm there.
16     Q   Okay.  I want to talk about the survey
17 method, the survey method, the sort of bullet point 1
18 or Item Number 1 that you have.  This is where the --
19 if the family has a specified caregiver or provider,
20 you use the pricing from that provider; is that
21 correct?
22     A   That an example, yes.
23     Q   Okay.  Do you make any effort to determine
24 whether the provider's charges are reasonable or
25 aligned with something like a UCR80?

149

1    A    Well, the effort is based upon my
2    experience looking at charges. And then I think in
3    this specific instance, with like Avondale House,
4    there were not a lot of other options I could price
5    out in that specific geographical area.
6        Q    But generally, in terms of how you apply
7    this cost methodology -- methodology, this cost
8    analysis, do you make an effort to crosscheck the
9    family's provider of choice against other similar
10   options, if available?
11   A    Specifically, yes. Especially in this
12   situation. I was able to basically do a Google
13   search and try to look at things within a
14   hundred-mile radius that would be comparable. And I
15   think I found things in Atlanta and New Jersey,
16   Dallas. So nothing close.
17       Q    Are you speaking specifically about
18   Avondale House?
19   A    Yes.
20       Q    Okay. Do you make any effort to assess
21   the quality of care being provided by the provider
22   chosen by the family?
23   A    Help me understand which provider or what
24   you mean specifically.
25       Q    In general, when -- under Section 6.1.1.1

150

1    of your survey method, when a family has a chosen
2    provider for care, I know you used that provider's
3    costs as part of your survey methodology. Before
4    using that provider's cost, do you make an
5    independent assessment of the quality of care given
6    by that provider?
7    A    In this life care plan, I think the only
8    applicable future medical recommendation is at
9    Avondale House, and I reviewed their website. And I
10   did speak with Dr. Lisa Settles briefly about that.
11   That would be the extent of my review of that
12   specific vendor.
13       Q    And I reviewed their website too. I
14   didn't see any cost information on it.
15       How did you get the cost information from
16   Avondale House?
17   A    I delegated to my staff. I asked them on
18   the phone to call them. And these are the potential
19   three options. Please get the number and report
20   back.
21       Q    And here it was the potential one option,
22   right, Avondale House?
23   A    Yes.
24       Q    Okay. Survey Method 2, in the absence of
25   specific providers being specified, this is where the

151

1    UCR80 comes into play, correct?
2    A    Yes.
3        Q    Okay. So 80 and UCR80 stands for 80th
4    percentile; is that right?
5    A    Yes.
6        Q    So just by definition, the 80th percentile
7    is above the average or the mean, right?
8    A    It's not quite like that. It's defined as
9    80 percent of all charges submitted. But the average
10   or the mean would be closer to 80 percent if charges
11   are higher compared to those 20 percent charges.
12       So I can't a hundred percent say average
13   or mean.
14       Q    So -- but it is certainly higher than the
15   50th percentile, correct?
16   A    It's not -- the 50th percentile number, in
17   my opinion, is higher. It's, again, the conglomerate
18   of the billable charges of 80 percent in that
19   geographical region, are this average number. So it
20   may or may not be compared to 50 percent of those
21   potential care options in that same area.
22       Am I answering your question?
23       Q    So if you -- just to make sure. I mean,
24   as percent -- percentiles, you take the care
25   providers, you array them -- not you, but Context 4

152

1    Care arrays them from lowest to highest, and then the
2    80th percentile would be along that array from lowest
3    to highest, the one at approximately the -- you know,
4    if you have a hundred care providers, it would be the
5    one at the 80th highest price; is that right? Just
6    how math works.
7    A    In general, that's my understanding. I
8    don't think it's that simple, because it's taking all
9    of those billable charges and creating that average
10   to get to the 80th percentile billable charges, is my
11   understanding.
12       Q    Okay.
13   A    It's not saying this is the 80th most
14   expensive price, period.
15       Q    Okay. And we can look at what Context 4
16   Care says about the 80th percentile if we need any
17   clarification, right?
18   A    (Nodded head.)
19       Q    Okay. But you just -- you don't use a
20   mean or, you know, an arithmetic average for your
21   price?
22   A    That's correct.
23       Q    Okay. If you said to Physician Life Care
24   Planning, Hey, I want to use the 50th percentile in
25   my life care plans, would they say, Sir, Doctor, we

153

1 are not working together anymore?
2    A    That's a theoretical question that's never
3 been addressed. So I can't answer that.
4    Q    And you -- in your discussion of physician
5 life -- or in your learning about Physician Life Care
6 Planning, have you ever -- strike that.
7         You received a UCR data from the Context 4
8 Healthcare organization?
9    A    Correct.
10   Q    Is this an organization that you trust?
11   A    I do.
12   Q    Had you heard about them before you
13 started working for -- doing projects for Physician
14 Life Care Planning?
15   A    Maybe briefly in residency, but not in the
16 detail of how I demonstrate this cost analysis today.
17   Q    Okay. And their -- is part of what makes
18 their data reliable, they're using a very large
19 database?
20   A    I would agree.
21   Q    Okay. And that size gives -- well, strike
22 that.
23        Large samples can help minimize the
24 effects of outliers; is that right?
25   A    Generally I think so.

154

1    Q    Okay. And UCR amounts -- usual, customary
2 and reasonable; is that what it stands for?
3    A    That's correct.
4    Q    So their amount -- sorry. They're the
5 fees that doctors list on invoices to say patients or
6 insurers, if they're submitting things to insurers,
7 correct?
8    A    I'm sorry, can you just maybe even slow
9 down one more time exactly what you're asking me.
10   Q    Sure. A usual, customary and reasonable
11 amount, UCR, would be what is submitted on a medical
12 invoice, correct?
13   A    In general, it could be that. But we're
14 not sure -- I'm not sure if you mean submitted to the
15 patient or insurance or self-pay option, et cetera.
16   Q    Okay. Well, let's -- let's just -- I want
17 to move past this pretty quickly.
18   A    Yes.
19        MS. PALEY: Are we on Exhibit 9 -- 10? I
20 apologize, do you --
21        MR. PARKER: I think we're on 10.
22        MS. PALEY: Okay.
23        MR. PARKER: 9 is last up on my deck.
24        MS. PALEY: Okay. So I'll do this as
25 Exhibit 10.

155

1        (Exhibit Number 10 was marked.)
2    Q    (BY MS. PALEY) Let's just look at this
3 quickly. I'm going to avoid stepping up and ruining
4 the next mic. Okay. Does this appear to be a
5 document from Context 4 Healthcare?
6    A    Yes, ma'am.
7    Q    And it says, Usual, customary and
8 reasonable healthcare fee data?
9    A    Yes.
10   Q    Okay. Could you turn to Page 2.
11   A    Yes.
12   Q    And the left column, penultimate
13 paragraph, in the last sentence there. It says, Our
14 UCR data offerings make certain that payors have the
15 most accurate and comprehensive fee information
16 necessary --
17        THE REPORTER: Okay. You have to slow
18 down, I'm sorry.
19        MS. PALEY: I'm sorry.
20   Q    (BY MS. PALEY) Our UCR fee data offerings
21 make certain that payors have the most accurate and
22 comprehensive fee information necessary to reprice
23 claims in today's complex healthcare.
24        Do you have any disagreement with how
25 Context 4 Healthcare describes their UCRs here?

156

1    A    I've never actually read that specific
2 sentence before on their website. I have no reason
3 to disagree what they're publishing here on this
4 four-page Exhibit 10 summary that you've presented.
5 Yes.
6    Q    Okay. And on the Page 2, top right
7 column, it says, Billions of healthcare procedure
8 charges are collected semiannually at the provider
9 level before the claims are ever touched by the
10 payor.
11        And is that part of what makes their data
12 reliable to you, billions of claims?
13   A    Yes. As kind of we touch on, 77 and
14 Page 78 in my life care plan, why it's the largest
15 database and reliable with over 1 billion claims.
16   Q    And these claims are -- it's, quote,
17 Before the claims are ever touched by the payor.
18        What would you understand that to mean?
19   A    What we were discussing previously. If
20 there's a billed charge with a set fee schedule,
21 depending on specific insurance or healthcare access
22 options, there may or may not be -- may or may not
23 be, I apologize -- a fee reduction or set contractual
24 agreement with the health insurance and whatever
25 provider is billing for whatever hospital-based

157

1 treatment, office-based treatment, et cetera, imaging
2 studies.
3 Q Okay. And in the third bullet point on
4 this Page 2, it says, Context's UCR fee data is
5 arrayed in percentiles from the 25th through the
6 95th, giving you the ultimate in flexibility.
7 Have you ever taken a look to see just
8 what other percentiles are available through Context
9 4 Healthcare?
10 A I have seen numbers from 40 to 80 percent.
11 And our methodology for 80 percent is sort of
12 explained in this report. I'm happy to dive into
13 that, if needed.
14 Q And in your practice, do you have any
15 sense of what -- like on average --
16 MS. PALEY: And if we need to take a break
17 for water -- okay.
18 Q (BY MS. PALEY) In your practice, do you
19 have a sense of what percentage, on average, of a
20 billed amount would be actually collected?
21 A Are you asking me in my private practice?
22 Q In your private practice, yeah.
23 A It's extremely variable on the payor. So
24 we collect a hundred percent of self-pay if we're out
25 of network for a certain insurance company. And then

158

1 it just depends on, again, the set contracts for
2 procedures and office visits, along with the type of
3 procedure.
4 So I get pretty close to that 80 to a
5 hundred percent mark for like single-level spine
6 procedures. But if I do a second-level and
7 third-level at the same time, I'm getting less each
8 level at the same time during the procedure as the
9 example I'm most used to, which would be spine
10 injections, spine procedures.
11 Q Okay. And so if you don't have a -- let's
12 look back at your report. We were on Page 75 talking
13 about your methodology. In the absence of a
14 specified care provider from the family or where UCR
15 data isn't available, then you turn to essentially a
16 phone and internet survey method; is that correct?
17 A Yes.
18 Q Now, the report here says that you use at
19 least three providers.
20 It's actually at most three providers,
21 isn't it?
22 A No. At times it's been more, and at times
23 we can't get three so it's been just one, depending
24 on the specific nuance of what it is.
25 Q Are there any cases with Ethan's life care

159

1 plan where you have more than three providers?
2 A I'm sorry, just so I understand. When you
3 say "providers," you mean specifically the physician
4 services, so actual healthcare providers? Or
5 anything?
6 Q I mean any time where you're using this
7 sort of third -- third paragraph of your methodology
8 to source data. When you're using that, you know, a
9 phone survey, internet survey.
10 A Yeah.
11 Q Are there any times when you use more than
12 three providers in Ethan's life care plan?
13 A So with the medicines, I'm averaging
14 generic and brand name. So there can be more than
15 three data points that then are averaged. So three
16 pharmacies, each pharmacy, brand, generic, that's six
17 data points for that specific providers that you're
18 mentioning. Other than that, I don't think I have
19 any more than three.
20 Q And for some of them, is it as little as
21 one? For instance, the CBD/THC provider in the
22 medicines.
23 A I believe that was the only option for him
24 for that, based upon the medical need and the
25 environment in Texas per the prescribing physician,

160

1 Dr. Rotenberg.
2 Q Okay. So essentially, there were not
3 additional -- strike that.
4 I get what you're saying.
5 Now, are you offering the opinion -- the
6 opinion from a statistical perspective, that
7 averaging a sample from three providers will lead to
8 a reliable estimate of average prices in -- for a
9 service in a geographical region?
10 A Yes.
11 Q Okay. How did you identify the providers
12 for, say, you know, pediatric dentistry? We'll bring
13 that up as an example. How did you specifically
14 identify the providers that you surveyed?
15 A This was delegated to my staff to start
16 with his specific ZIP code in Pearland and then look
17 at the specific options for pediatric dentists. And
18 then based upon who answered the phone and provided
19 information with that geographical reference, once we
20 have three, we document three and then that's what I
21 published in my report.
22 Q Okay. Did you provide any guidance or
23 does anyone at PLCP -- sorry, PLCP, provide any
24 guidance to these folks to make the phone calls about
25 finding providers --

161

1    MR. PARKER:  Bless you.
2    Q    (BY MS. PALEY) -- who are close to the
3 Palmquists' home?  I know you mentioned Pearland.
4 But do you try to find three providers that are close
5 to the Palmquists' home?
6    **A    Yes.  So I determine a hundred-mile radius**
7 **from their -- their actual address to give us enough**
8 **access to healthcare.  And so that's the first**
9 **direction.  The second direction is, what can we find**
10 **in this specific subspecialty, pediatric dentistry,**
11 **close to home?  And then that's where these three**
12 **different options came from.**
13    Q    And the Palmquists live in the Houston,
14 area, right?
15    **A    Houston suburb.  I believe the city is**
16 **Pearland.**
17    Q    Okay.  And a hundred miles away from
18 Houston is -- a hundred-mile radius is quite far,
19 isn't it?  Lake Tejas I believe is about 98 miles,
20 Google told me, from Houston.
21    MS. PALEY:  Charlie's looking at me.
22    MR. PARKER:  Well, I apologize, but the
23 hundred-mile radius from Pearland would encompass the
24 greater Houston area.  And that's where all the
25 providers are coming from.

162

1    Q    (BY MS. PALEY)  But the hund- -- let's
2 strike that, and I'll start again.
3        100 miles will take you far beyond the
4 metro Houston area, right?  If you're using a
5 hundred-mile radius from Pearland?
6    **A    Typically, it could be a hundred miles I**
7 **think all the way to the north end of what's The**
8 **Woodlands, perhaps.  Because they're on the south end**
9 **of Houston, in their suburbs.**
10    Q    And did you make any attempt or provide
11 guidance to the folks who did do these phone calls to
12 find providers who were close to each other in any
13 way?
14    **A    Close to each other.  Not necessarily**
15 **close to each other.  But we start with their**
16 **location, the Palmquists' family home, and then work**
17 **out until we're able to find the specific vendors or**
18 **providers I'm recommending.**
19    Q    And just -- I really want to understand
20 this process.
21    **A    Okay.**
22    Q    Do you -- how do you find those providers?
23 Is it a phonebook?  Is it a Google map that shows
24 you -- you know, you type in pediatric dentistry, and
25 it shows you all the providers in an area, then you

163

1 can zoom out?  How do you find these people to call?
2    **A    We have a running list in the company,**
3 **because there's been over a decade of this work in**
4 **Texas.  And so there's a lot of these providers**
5 **already on that list.  And then they verify with my**
6 **geographical zip or a hundred-mile radius call,**
7 **access, confirm and then present to me, and I approve**
8 **or refute.**
9    Q    Who puts together that list?
10    **A    It's a running list in the company.  So**
11 **it's all of the different vendors and team members**
12 **and case managers over the last decade, plus.**
13    Q    How often is that list updated?
14    **A    I don't know.**
15    Q    Is there any effort to make sure that that
16 list is comprehensive to include all providers in the
17 greater Houston area?
18    **A    So that's kind of where the phone surveys**
19 **come in, to make sure that those providers are still**
20 **available, practicing, et cetera.  So I guess that's**
21 **how it would be updated.  Because as we're doing life**
22 **care plans, we have to actually put in the specific**
23 **vendor for each plan.**
24    Q    Now, see, you may be able to identify if
25 an office is closed.  But how do you make sure to

164

1 affirmatively identify new offices that have opened
2 or new locations for offices that have expanded?  You
3 know, you have two offices.
4    **A    Uh-huh.**
5    Q    How -- how is that list maintained to be
6 an accurate representation of the care providers in a
7 particular field in the greater Houston area?
8    **A    I'm not exactly sure, because I don't do**
9 **that type of rote task with that -- maintaining of**
10 **that list in the company.**
11    Q    Okay.  And so this list is available for
12 you or for other Physician Life Care Planners who are
13 working with PLCP whenever putting together life care
14 plans that involve someone in the Houston area?
15    **A    I typically don't access the list because**
16 **that's what our staff is trained to do with this**
17 **vendor survey.  And so it's my understanding that it**
18 **is available with either the employees from the**
19 **company or the physician experts that are working**
20 **with the company, then create kind of this type of**
21 **cost data, vendor survey example.**
22    Q    And when putting together this survey, did
23 you endeavor to include the Palmquists' current
24 provider even if they hadn't specifically said, you
25 know, We absolutely want to stay with this pediatric

165

1  dentist, for example?
2      A    I wasn't informed about that specific
3  patient preference from the mother, Dr. Sarah, or
4  father, Mr. Grant.  So there wasn't a specific effort
5  to do that.
6      Q    Okay.  So the -- there's no slot held for
7  the current provider, you know, as one of the three?
8  Just generally.
9      A    Are we only speaking about the pediatric
10 dentist?
11     Q    No.  Just as a general methodology.  I'm
12 trying to -- when I say "pediatric dentist," I'm just
13 trying to use as an example.  But when you call for
14 any -- any sort of care provider where you're doing a
15 survey, if the family hasn't specified that they want
16 to keep their current provider -- they haven't said
17 anything bad about them; they just haven't
18 specified -- do you include the current provider as
19 one of the three options?
20     A    I mean, that's possible in the
21 methodology, specifically in this plan.  It's only
22 dentists and pediatric dentists that we called on,
23 because the other medical physicians are part of the
24 UCR80 database.  So it's only addressing the two
25 dentists, depending on the age.

166

1      Q    Well, I'm actually not just speaking about
2  the medical providers.  I'm also speaking about
3  nursing and home healthcare and pharmacies.  For
4  whatever providers where you did a -- where PLCP, on
5  your behalf, conducted a phone survey --
6      A    Uh-huh.
7      Q    -- was there any effort to include the
8  Palmquists' current provider as one of the three
9  options?  I'm just -- I just want to know what the
10 process is.
11     A    It is an option if they tell me that.  But
12 that wasn't communicated.
13     Q    Okay.
14     A    And I don't actually think we have that
15 ability, because of my understanding of what his care
16 is currently.  And then the methodology to make it
17 more simplified with UCR80 and then the specific
18 pharmacies are listed and, you know, everything else
19 moving into the next future medical requirements
20 sections are listed as well.
21     Q    Oh, and I understand who you called.  I
22 just want to understand the process for deciding who
23 to call.  That's all.
24         So I know that you don't do the rote, you
25 know, calling of care providers, pharmacies, home

167

1  health agencies, what have you.  But do you know what
2  instructions those who -- are given to those who
3  specifically do do those calls?  Do they have a
4  script that they follow?
5      A    I'm not sure if they have a script.  The
6  instructions are based upon their training in the
7  company as well as my instructions.  And basically
8  they call to ask about the specific type of follow-up
9  office visit, medication, or for therapy.  The hour,
10 60 minutes is what -- you know, what I'm having on
11 most of my therapy on behalf of Physician Life Care
12 Planning.  And then if there's more information, it's
13 on behalf of Dr. Hyzy.
14         And then typically most different vendors
15 are pretty easy to work with to get that information,
16 and then we present and publish it.
17     Q    So is it -- but is the request, say, I'd
18 like your usual and customary cost?  Or is it, I'd
19 like the cost that you would give to a cash payor?
20 Or is it something else?  What's the specific request
21 for the dollars?  How do you -- how is it described
22 to the vendors?
23     A    That's a good question.  I think, you
24 know, the UCR80 data is only being pulled from
25 Context 4 Healthcare.  So when we're calling specific

168

1  vendors, could we use Page 92 as an example?  Page 92
2  is occupational therapy and speech therapy.  And so I
3  think each case manager and vendor team member, they
4  all have a little bit different vernacular.  But on
5  Page 92, they're -- I understand that they've been
6  taught to ask for the self-pay cost or the cash rate
7  for these types of evaluations.
8          Because, again, I cannot rely upon
9  commercial insurance, Medicare, Medicaid, disability.
10 There are so many variables.  We have to have a
11 consistent methodology of, What does it cost for the
12 self-pay option?  And then that's how we -- like on
13 Page 92, we'll have three vendors, get the numbers,
14 average, and that's what I'm using for my total cost
15 analysis in the average.
16     Q    Okay.  Now, the life care plan that you've
17 prepared here, it has a span of approximately
18 70 years.  Have you prepared any other life care
19 plans that have time horizon --
20         (A discussion was held off the record.)
21     Q    (BY MS. PALEY)  So I'll reread the last
22 question.
23         Have you ever prepared another life care
24 plan that has a span of, you know, about 70 years, as
25 was Ethan?

169

1     A    Yes.
2     Q    How many of those?
3     A    Those would be the other pediatric ones we
4  mentioned earlier.  And somewhere around Ethan's age,
5  I think I have two or three that would be below the
6  age of seven.  So then that would lead to an
7  additional 70 years, more or less, of a life
8  expectancy as well in those cases.
9     Q    Okay.  And in Ethan's plan, for each of
10 the medications that he's on, you predict use for the
11 duration of his lifetime, correct?  For each of the
12 medications that you list in this life care plan.
13    A    Can you just give me a second to reference
14 that?
15    Q    Sure.
16    A    Okay.  I am on Page 154.
17    Q    Yes.  And so for each of the --
18 Medications 1 through 3 are different doses of the
19 same CBD/THC tincture, correct?
20    A    That is correct.  And that does total
21 70 years.  And then the remainder of the medications
22 are all for the remainder of his life span of
23 70 years.
24    Q    So I'm just trying to understand, how can
25 you, to a reasonable degree of medical certainty,

170

1  given all the complications of Ethan's care, emerging
2  medicine, assert that, you know, 69, 70 years from
3  now, Ethan will more likely than not need a specific
4  medication, a specific number of times a day?
5     A    Those are great questions.  And we touched
6  on speaking to the treating gastroenterologist and
7  neurologist on these questions.  GI medicines,
8  seizure medicines, which include the CBD.  And we're
9  all three of us in agreement that they're recommended
10 for life.  The specific dose increase of the CBD is
11 based upon his age and his weight's increasing.  So
12 that then leads me to have the higher dose, which I
13 think you see as Item Number 3.
14        And then some of the other medicines --
15 Catapres, Lamictal, Risperdal, Intuniv -- given those
16 medicines for not only seizures but other behavioral
17 problems, those also were discussed, Dr. Rotenberg
18 and I, and for life.  And I would agree.  And then I
19 use his current regimen and frequency, then discussed
20 with the doctors and what I think his life
21 expectancy.  Then that's how essentially we have the
22 summary chart 154 on the 70 years of duration.
23    Q    Did you undertake any independent analysis
24 of the doses that Ethan is currently receiving for
25 each of these medications compared to the doses that

171

1  are indicated in the prescribing information for
2  these medications for a child of Ethan's size and
3  age?
4     A    I did not review specifically the
5  prescribing information.  I don't think that exists
6  for 1 through 3.  4 through 10, I'm pretty familiar
7  with these.  I did review the specific doses.  That's
8  in my examination section.  And I may have reviewed,
9  on like Medscape or Drugs.com, dosing and frequency
10 to make sure I heard Sarah right, I documented,
11 dictated it right and there wasn't a transcription
12 error, right?  Like 0.4 milligrams versus
13 400 milligrams.  So I think I did briefly do that
14 reference, but I didn't see any alarm because I'm
15 pretty familiar with the majority of these medicines.
16    Q    And when you say "alarm," did that mean
17 alarm as in didn't see anything where the dose seemed
18 too high?
19    A    It could be too high or, again, you know,
20 sometimes when you hand-fill out or type something 4
21 could turn into 40, right?  Things like that.  So
22 that would be an alarm to me is that, I'm used to
23 this medicine being 4 milligrams, now it's 400.
24        An example, HUMIRA, if they listed HUMIRA
25 daily, I know it's not daily.  So that would be

172

1  another alarm.  I need to verify then current dosing
2  via medical records or treatment providers,
3  et cetera.
4     Q    And did you specifically analyze whether
5  any of Ethan's dosing is below what is recommended by
6  the prescribing information?
7         MR. PARKER:  Object as to form of that.
8     A    I think I answered that.  I didn't review
9  the specific --
10    Q    (BY MS. PALEY)  Okay.
11    A    -- prescribing information.  That's
12 typically a few pages per drug based upon multiple
13 factors.  So the general doses I think I reviewed
14 consistent with my experience and what I did look at
15 plus the medical records describing doses -- dosages
16 of prescribed medications.
17    Q    Okay.  Give me just a moment.
18    A    Yes.  I don't think I answered one of your
19 questions earlier.  I'm sorry.
20    Q    Let's -- I want to use the pediatric
21 dentist as an example again to ask a question.  When
22 you're deciding the frequency with which Ethan would
23 need certain types of care, did you specifically
24 evaluate how frequently a neurotypical person would
25 use -- need that type of care and subtract it from

173

1 what you thought Ethan might need to determine the
2 difference or the delta between Ethan's needs and
3 what a neurotypical person may need?
4     A   So in general, that is part of my
5 methodology. So pediatric dentist I think is
6 specifically what you mentioned, right?
7     Q   Yeah. And we have for three times a year,
8 I believe we have.
9     A   You know, two to three times a year is
10 pretty standard, in my experience with my children or
11 any other child. And specifically with his
12 neurocognitive issues and his inability to do
13 self-care, I decided on three to make sure that he
14 has enough care to prevent complications, right? He
15 doesn't get any care, he doesn't brush his teeth, the
16 next thing you know, we have a tooth infection,
17 extraction, et cetera. So I think three was
18 extremely conservative.
19         I very well could have put, you know,
20 closer to five on that. So that's kind of how I use
21 my methodology, experience, training and the current
22 observation or exam of the child and the family.
23     Q   Okay. But in putting three, it's not that
24 you were thinking, He needs five, but most kids get
25 two, so I'm going to take five minus two and say the

174

1 difference is, because of his -- you know, because of
2 his illnesses, he needs three extra trips to the
3 dentist? That wasn't the process, right?
4     A   That's not the process.
5     Q   Okay.
6     A   His parents do a good job of attempting to
7 help him. But I don't think he has the best hygiene.
8 Clearly he's bitten nonfood items. He's eaten dirt.
9 So I think three a year is pretty conservative to
10 have that preventative model of care to make sure he
11 doesn't have complications regarding his dentition.
12     Q   And for other types of care, say, adult
13 dentistry, trips to the pediatrician, trips to the
14 general practitioner as an adult, was it the same
15 process? You just assessed what you thought might be
16 reasonable for Ethan but didn't then subtract the
17 number of visits that a neurotypical person might
18 have to get your final frequency?
19     A   Those are good questions. So, you know,
20 the whole methodology has -- has all that intake,
21 what's the history, observation. That's very, very
22 important. How many visits is he currently seeing
23 per year, these doctors? Then the projection, when
24 he becomes an adult -- which we can call 18 or 21, I
25 used 21 in this instance, because most pediatric

175

1 dentists and pediatricians will see patients to age
2 21 in my experience. And then, yes, in addition to
3 one primary care doctor visit a year, I'm
4 recommending these additional three visits a year,
5 right, so he has a quarterback to help him with all
6 these different things.
7         And then the specific frequency on other
8 things, like the neurologist, gastroenterologist, you
9 know, those are more based upon medication
10 management, laboratory. You have to follow up with
11 patients four times a year is still pretty
12 conservative. Every three months you're seeing a
13 specialist. So that's the general methodology, based
14 upon my experience and then Ethan's specific
15 situation today.
16     Q   In selecting the care providers who are
17 listed in any of the surveys, did anyone make an
18 analysis of whether it was likely that the Palmquists
19 might go to that specific care provider, given, say,
20 the distance from the home and other factors?
21     A   Not yet. That's always after I finalize
22 my plan and provide it to the law firm and the family
23 as kind of what we discussed initially as an outline
24 for the family and case management. Then they can
25 have those discussions. And then of course if we

176

1 need to make amendments, supplements down the road,
2 we can do that.
3     Q   So within your life care plan here, if
4 some of those providers were 39, 40 miles away from
5 the Palmquists' home, that would be -- under your
6 methodology, that would be okay?
7     A   That would be okay, especially given some
8 of the unique specialists that I think will benefit
9 him and his family. And the more subspecialized we
10 go in medicine, the less of us there are, right? So
11 that means there's less density in a given
12 metropolitan.
13     Q   But what if it's just like a dentist or a
14 pediatrician? Would you still be okay with it being,
15 you know, 39, 40 miles away from the Palmquists'
16 home?
17     A   Again, it depends on the patient
18 preference. And then they're going to use my
19 examples as a guide. Some dentists may not be
20 comfortable with an adult with special needs, and
21 they may not have that experience or certain things
22 for twilight sedation or nitrous in their office,
23 et cetera.
24         And so, again, that's given to the patient
25 for them to choose. I can't have a back and forth

177

1  with the family in the middle of my production.
2  That's not the methodology. I don't think that's
3  focused, objective and transparent.
4      Q   And you actually brought up a good
5  question -- or a good issue. Some providers may not
6  be comfortable providing care to a special needs
7  child or a special needs adult.
8      A   Uh-huh.
9      Q   In doing the survey, did the folks who
10 made the calls to the care providers specifically
11 indicate that they were asking about whether -- or
12 what the price of care would be for a child or an
13 adult with Ethan's profile?
14     A   All pediatric dentists are trained in
15 this, in my experience, and have typically office
16 sedation or surgery center privileges to do that. So
17 that -- that was not inquired. The adult dentist
18 would be the only one I'm thinking that in your
19 question is applicable. And no, we're not providing
20 the nuances of a diagnosis to the vendor when we're
21 asking for, you know, the average 40-minute consult
22 self-pay fee.
23     Q   Okay. Thank you.
24         And let's see. Just sticking on -- let's
25 keep with our pediatric dentist for a moment. Let's

178

1  look at Pages 81 to 83. And, again, this is just an
2  example. I think probably because it was the -- one
3  of the first ones -- yeah. It's the first one on
4  your cost vendor survey.
5         With the pediatric dentists on Page 81 of
6  your report --
7      A   Yes.
8      Q   -- the costs vary from $99 to $350; is
9  that right?
10     A   That's what I see, yes, ma'am.
11     Q   And when there's about that 3.5X, you
12 know, three and a half times difference between the
13 costs, did the folks who made those calls
14 double-check to make sure they were really being
15 quoted prices for the exact same services?
16     A   I don't know if they double-checked as in
17 called them back and asked them the same question
18 twice. So I'm not sure.
19     Q   And when the costs vary this much, you
20 know, about three and a half times, does that ever
21 like raise a red flag for you that perhaps you need a
22 larger sample in order to understand what the real
23 average in the area is?
24     A   Not with this, at all, actually, because
25 three is a very good methodology to average.

179

1  Especially with non-physician life care planners,
2  they're not always even giving specific vendors.
3  They're just kind of saying it could be 99 up to
4  $400, when I've reviewed others.
5         And then an example here in the Denver
6  metropolitan is a $300 MRI, and I've seen charges up
7  to 2200; exact same MRI, same machine. It's just
8  different area, different company.
9         So these variations seem very normal to
10 me, given the experience, the amount of life care
11 plans I've already authored, reviewing lots of data,
12 hospital billing, clinic billing, procedural billing,
13 et cetera.
14     Q   And is there any effort to sort of dig
15 into these particular organizations a little bit and
16 make sure that they provide quality care?
17     A   So, again, if they're a pediatric dentist,
18 they have additional training in pediatrics, and I
19 don't see it necessary to do that. That would be,
20 again, here are options. Once the life care plan is
21 produced, the family or case managers can use that as
22 a guide, and then they could do their own individual
23 research to determine if they would like to move
24 forward with that specific vendor.
25     Q   And does the same apply to all the other

180

1  vendors who you contacted, not just the pediatric
2  dentists?
3      A   No, ma'am. And I would just say no
4  because the dentist is really the only other one for
5  healthcare provider. The rest of the physicians,
6  psychologists are the more average, conservative,
7  Level III, Level IV consult codes. And then specific
8  testing diagnostics are UCR80 data as well so we
9  didn't call them. And then the pharmacy aspirin are
10 pretty straightforward on their -- their pricing.
11 Moving --
12     Q   Well, actually I think you might have
13 misunderstood because I said for any of these vendors
14 where you used your survey method and called vendors.
15     A   Yeah.
16     Q   So that would include occupational
17 therapy, home healthcare, speech therapy, coverage
18 like that.
19     A   I understand.
20     Q   Visiting nurses. Did you make home
21 health -- did you make any effort to evaluate the
22 quality of care for the various options that you
23 include in your life care plan?
24     A   That's not part of my methodology. And in
25 my experience, they are able to evaluate both adults

181

1  and children at home.  And so I did not feel the need
2  to, again, validate or independently me call them to
3  discuss this.  We reserve that for the family or the
4  client or the patient, because we're listing good
5  options and they are able to decide on which vendor
6  they would like to go have that care with.
7      Q    Let's -- let's move on to another care
8  provider as an example where you use the UCR80s.  On
9  Page 82, you include a recommendation for a
10 behavioral psychologist, 45 minutes.  And then on
11 Page 108, we can see how you operationalize this in
12 terms of duration and frequency of care.  Page 108 is
13 probably the more informative one here for our
14 discussion.  It's Item 9, behavioral psychologist,
15 45 minutes.
16     A    Uh-huh.
17     Q    And if I understand this correctly, the
18 recommendation here is that starting now at age 7,
19 Ethan have weekly visits, one visit per week to a
20 behavioral psychologist for the next 14 years.  So
21 until he's about 21 years old.  Am I reading that
22 right?
23     A    Yes, ma'am.
24     Q    Okay.  And did any of Ethan's doctors
25 specifically make this recommendation, either in your

182

1  conversations with Drs. Krigsman or Rotterman
2  [sic] -- I believe I got that wrong -- or in the
3  medical records?
4      A    I think it's Roten- --
5      Q    Roten- --
6      A    Rotenberg.  It's not Rotten.  It's
7  Rotenberg, a neurologist.  I briefly touched on this
8  with Dr. Rotenberg because he will need that.  And
9  then this also I think I discuss with Dr. Lisa
10 Settles, the doctor of psychology, for ongoing
11 behavioral assessments with the behavioral
12 psychologist to optimize his care.  And so that's
13 kind of where we have the listing and the frequency
14 here.
15     Q    Okay.  Is there any specific discussion of
16 that in your report other than those two lines where
17 you say, I spoke with Drs. Krigsman and Rotenberg and
18 they agreed with me?  Is there any other more
19 detailed discussion that provides the rationale for
20 your evaluation here?
21     A    Not with the treating physicians' verbal
22 discussion like doc to doc, peer to peer.  Only in
23 explaining the methodology on the future medical
24 requirements, I believe going back to Page 5.  And
25 then in my experience when we sit down like this in a

183

1  deposition is -- is the ability for me to then
2  explain the rationale, given my experience, training
3  and the medical practice side of things.
4      Q    Okay.  But the -- the rationale itself is
5  not spelled out in the report somewhere?  I didn't
6  miss it?
7      A    That's correct.  We don't typically do
8  that in the methodology.  That would then make this
9  closer to 400 pages.
10     Q    Okay.  And so I can ask you questions here
11 today, but if I just had the report I wouldn't
12 understand necessarily the rationale for any -- any
13 particular form of care or the frequency or duration?
14     A    I think the family would.  A general
15 pediatrician would.  The treating GI and neurologist
16 would.  Other physiatrists or pediatric PM&R doctors
17 would.  Non-medical professionals, like attorneys,
18 likely would not.  Case managers likely would because
19 they're dealing with that.
20     Q    And how would you specifically -- how did
21 you specifically land upon, you know, 45 minutes for
22 the behavioral psychology meetings?  I see it's
23 like -- it's two -- two units.  You've got a
24 30-minute unit and a 15.
25     A    Uh-huh.

184

1      Q    What was your specific rationale for
2  coming up with 45 minutes?
3      A    Typically it's 30, 45 or 60.  So
4  60 minutes is going to be more time.  60 minutes is
5  going to be more expensive.  I don't think 30 minutes
6  would be enough to maintain observation and/or the
7  ability to do treatment with him and his parents.  So
8  45 minutes is a conservative option because it's not
9  60, but it's still enough time for the behavioral
10 psychologist to identify problems and then
11 suggestions, treatments, strategies, homework for the
12 parents, come back, we'll see you next week and
13 reevaluate.
14     Q    And does Ethan currently see a behavioral
15 psychologist?
16     A    I think he has in the past.  I'm not sure
17 if he is currently today.
18     Q    And have you found any like literature in
19 the peer-reviewed literature that -- or medical
20 guidelines for treating children with autism that
21 says that, you know, treatment with the behavioral
22 psychologist is -- is understood to be effective in
23 children with Ethan's profile?
24     A    Number one, I don't think there's a lot of
25 children that have the plethora of diagnoses that

185

1    Ethan has.  So there's a paucity of peer-reviewed
2    literature in that space, given the unique case.  And
3    there's also, in my opinion, ethical concerns with
4    doing studies on children with these amount of
5    diagnoses.
6         In general, I think psychologists, general
7    pediatricians and pediatric neurologists would all
8    agree with me on behavioral psychology as an option
9    to help then improve the quality, life and function
10   of his family and Ethan himself.
11   Q    Okay.  But is -- is that a no, that you
12   haven't -- you know, you haven't found or cited
13   peer-reviewed literature that supports the idea of
14   having a child with, say, severe autism receive
15   weekly treatments with a behavioral psychologist?
16   A    I haven't been asked to do the
17   peer-reviewed literature search, so I haven't
18   searched for it or found it.  So I haven't looked.
19   And so I'm unable to tell you if it exists or not at
20   this time.
21   Q    Okay.  Let's just very quickly go through
22   this.  This is Exhibit 11.
23        (Exhibit Number 11 was marked.)
24        MS. PALEY:  Sorry, Charlie.  I got it
25   stuck on the back of your iPad.

186

1    Q    (BY MS. PALEY)  This is from, you'll see
2    at the bottom left, the Journal of the American
3    Academy of Child and Adolescent Psychiatry.
4    A    Uh-huh.
5    Q    Do you see that?
6    A    Yes.
7    Q    So these are the folks who would include
8    behavioral -- well, psychiatry here, but sort of
9    behavioral care for children or for children and
10   adolescents, right?
11   A    Yes.
12   Q    Okay.  And the top of it says, AACAP,
13   American Academy of Child and Adolescent Psychiatry,
14   official action, right?
15   A    Yes.  That's what I'm reading.
16   Q    And it's a practice parameter for
17   assessment and treatment of children and adolescents
18   with autism spectrum disorder.
19   A    That's what it says, yes.
20   Q    Okay.  Can you turn to Page 244 and 245 of
21   this article.
22        MR. PARKER:  What page again?
23        MS. PALEY:  244 and 245.
24   Q    (BY MS. PALEY)  And do you see on the
25   bottom right of 244, there's a header that says

187

1    Treatment?  Its recommendation for the clinician:
2    Should help the family obtain appropriate,
3    evidence-based and structured educational and
4    behavioral interventions for children with ASD.
5         Do you have any disagreement with that
6    recommendation?
7    A    Can -- can I have about five minutes to
8    read through this article off the record, please?
9    Q    Sure.  I think off the record makes good
10   sense, because then we can open the doors and get a
11   little fresh air in here.
12        MS. PALEY:  Does that work for you,
13   Charlie?
14        MR. PARKER:  Sure.  It works.
15        THE VIDEOGRAPHER:  Okay.  The time is
16   1:47, and we are off the record.
17        (Recess from 1:47 p.m. to 1:59 p.m.)
18        THE VIDEOGRAPHER:  The time is 1:59.
19   We're back on the record.
20   Q    (BY MS. PALEY)  Okay.  Welcome back,
21   Doctor.  Let's look again at Exhibit 11, I believe it
22   is, the AACP official action practice parameter for
23   the assessment and treatment of children and
24   adolescents with autism spectrum disorder.
25   A    Yes.

188

1    Q    You just spent a couple minutes looking at
2    this, correct?
3    A    Yes.
4    Q    So before I introduced it to you, you
5    hadn't seen this document?
6    A    Correct.
7    Q    Okay.  We are looking at Page 244,
8    right-hand column under Treatment.  And there's a
9    recommendation for the clinician should help the
10   family obtain appropriate, evidence-based and
11   structured educational and behavioral interventions
12   for children with ASD.
13        Would you agree that that's an appropriate
14   recommendation for how a clinician should help the
15   family when a child has ASD?
16   A    Yes.
17   Q    On 245, the section on Treatment and
18   Recommendation Number 4 continues.  And do you see we
19   have four sections:  Behavioral, communication,
20   educational and other interventions?
21   A    Uh-huh.  Yeah.
22   Q    Based on the headers?
23        In the Behavioral section, this section
24   discusses that ABA, or applied behavioral analysis;
25   is that right?

189

1    A    **Behavioral paragraph, opening sentence**
2    **ABA, yes.**
3    Q    Okay.  And then the paragraph goes on to
4    discuss sort of some of the evidence that supports
5    the usefulness of ABA and ABA techniques in an
6    academic setting essentially; is that correct?
7    A    Yes.
8    Q    Okay.  Do you have any dispute with the
9    recommendations there?
10    A    No.
11    Q    Okay.  Section -- the next section is on
12    communication and discusses a speech-language
13    pathologist and treatment with speech-language
14    pathologist.
15         Do you have any dispute with the
16    recommendations there?
17    A    No.
18    Q    Okay.  And then the next section is
19    Educational.  And it says, There is a consensus that
20    children with ASD need a structured educational
21    approach with explicit teaching.
22         Do you have any dispute with that
23    statement?
24    A    No, ma'am.
25    Q    Okay.  And then Other Interventions.  It

190

1    says, There is a lack of evidence for most other
2    forms of psychosocial intervention, although
3    cognitive behavioral therapy has shown efficacy for
4    anxiety and anger management in high-functioning
5    youth with ASD.
6         Does that sentence provide any sort of
7    support for a recommendation of behavioral --
8    treatment with a behavioral psychologist in children
9    with ASD?
10    A    **So cognitive behavioral therapy, in my**
11    **experience, could be a behavioral psychologist**
12    **administering the CBT or a speech-language**
13    **pathologist specifically trained in cognitive**
14    **behavioral therapy.  And so at times, the behavioral**
15    **psychologist may be involved in testing.  And I think**
16    **that's also on Page 244 of these -- this document,**
17    **practice parameter, as I'll call it.**
18    Q    But this mentions CBT in youths with high
19    functioning -- high-functioning youths with ASD.
20    Ethan is not in the high-functioning category; is
21    that correct?
22    A    **I would not put him in the**
23    **high-functioning at this time.**
24    Q    Okay.  Do you see -- having spent a few
25    minutes with these practice parameters, do you see

191

1    any specific recommendations in here that would
2    support a finding that a child of Ethan's profile
3    would benefit from weekly meetings with a behavioral
4    psychologist until, you know, age 21 or so?
5    A    **Sure.  That's a great question.  I think**
6    **on Page 244 under Recommendation 3, second column to**
7    **the right, second paragraph from the end, it starts**
8    **with, Psychological assessment, including measures of**
9    **cognitive ability and adaptive skills as indicated**
10    **for treatment planning.**
11    Q    Anything else there?
12    A    **So that -- that paragraph, when I read**
13    **that, would -- you know, would also help me**
14    **understand -- all the way down through that last**
15    **subheading, Recommendation 3, before we get to**
16    **treatment Recommendation 4, that would, again, give**
17    **me an idea about, in general, there is some**
18    **recommendations here for psychological assessment and**
19    **not just a master's level psychologist but**
20    **specifically a behavioral psychologist, as I**
21    **recommended, that I think is optimal care.**
22         **Then I think also everyone that reads my**
23    **report or hears me testify should understand that I**
24    **am not doing a prescription for care like a medical**
25    **guideline or practice parameter.  The life care plan**

192

1    **is to achieve four clinical objectives, which we**
2    **outlined in the life care plan.**
3    Q    And psychological assessment, that doesn't
4    mean weekly intensive meetings with a behavioral
5    psychologist?
6    A    **Well, I think it's up to debate on**
7    **interpretation.  In general, an assessment would be**
8    **less frequent than -- than once a week, yes.  I**
9    **think, again, my thought process is if we look at the**
10    **four clinical objectives of the life care plan, then**
11    **weekly behavioral psychologist is going to help him**
12    **and the family deal with some of these neurocognitive**
13    **disorders, which then, again, specifically addresses**
14    **my four objectives, which is different than a**
15    **treating physician and a prescription for care.**
16    Q    So I'll admit, I struggle a little bit in
17    understanding the difference between what you're
18    recommending and what a prescription for care is.
19    Because it seems --
20    A    **Uh-huh.**
21    Q    -- that what you're saying here is Ethan
22    needs this.  And if I were his treating physician, I
23    would prescribe, you know, this care.
24         But that isn't what you're saying.  And I
25    just -- I want to understand, where is the gap

193

1  between what you recommend and what would make it a
2  prescription for care. Because there seems to be
3  some gap in here, and I'm just not getting it.
4      A   Sure. Yeah. On Page 252 at the end, I
5  think it's important to also add to this discussion
6  on Page 252 of this article, the very last paragraph
7  before References states parameter limitations.
8  AACAP practice parameters are developed to assist
9  clinicians in psychiatric decision-making, period.
10  These parameters are not intended to define the sole
11  standard of care. As such, parameters should not be
12  deemed incluses -- inclusive -- excuse me -- of all
13  proper methods of care or excluses -- exclusive of
14  other methods of care directed at obtaining the
15  desired results, period. The ultimate judgment
16  regarding the care of particular patients --
17      THE REPORTER: Okay.
18      THE DEPONENT: Sorry. I apologize. Do
19  you want me to start over?
20      THE REPORTER: The ultimate judgment.
21      A   The ultimate judgment regarding the care
22  of a particular patient must be made by the clinician
23  in light of all the circumstances presented by the
24  patient and his or her family.
25      MS. PALEY: But -- not to sound -- but

194

1  move to strike as nonresponsive.
2      Q   (BY MS. PALEY) My question was a little
3  more specific, not about behavioral psychology
4  specifically.
5      A   Okay.
6      Q   But when you talk about your
7  recommendations are not a prescription for care, but
8  you're saying more likely than not Ethan needs these,
9  I'm trying to understand what the difference is
10  between those two things.
11      A   Okay. So I think the prescription for
12  care is when you're managing a patient acutely with
13  four-week, six-week, 12-week follow ups and involving
14  the patient or family, depending on the age and
15  decision-making. And on Page 252 here, it specifies
16  parameter limitations that these are for
17  decision-making, not solely standard of care
18  inclusive or exclusive, now I'm paraphrasing.
19      Q   So is a prescription for care a specific
20  set of recommendations in an acute care setting? You
21  used the word "acute."
22      A   Acute care setting is hospital, skilled
23  nursing, et cetera, or outpatient established care
24  setting. Acute as in less than three months. So you
25  prescribe something and you follow up on that

195

1  prescription intervention.
2      I think the global answer here is on
3  Page 1 and 2 initially of my life care plan. My --
4  my simple goal and what I've been asked to do here is
5  to answer the three basic questions of life care
6  planning to achieve my clinical objectives. And
7  that's the whole premise of the methodology in this
8  plan, which is different than I prescribe somebody,
9  post acquired brain injury, TBI, cognitive behavioral
10  therapy, and I want it two to three times a week for
11  six weeks, report back at six weeks and then we may
12  or may not change medicines or intervention. That's
13  a prescription for care.
14      But the life care plan is not a
15  prescription for care.
16      Q   Can the life care plan, by definition, not
17  be a prescription for care because it has a 70-year
18  horizon?
19      A   No. It's I think by Definition Number 1
20  not a prescription for care because we haven't
21  established a therapeutic relationship as a
22  patient/physician. Number 2, it's a guide for family
23  case managers, providers and others. And then
24  Number 3, with our life care plans, I'm not following
25  up at my four-week, six-week, eight-week, 12-week

196

1  intervals, which is very, very common when you're
2  actively treating a patient or prescribing care when
3  you have a therapeutic relationship established.
4      Q   If you did have a therapeutic relationship
5  established with Ethan and you were talking with his
6  parents, would you say, Hey, I -- I think this is
7  precisely the care he needs for the next 70 years of
8  his life?
9      A   That's generally what I would engage in an
10  open discussion with them, with the feedback on their
11  thoughts. This is what I recommend, the behavioral
12  therapy, the behavioral psychology, what are your
13  thoughts. And if I was engaged in a therapeutic
14  relationship, we have the informed decision-making
15  together process and then the prescription for care.
16      Q   So if -- if Ethan's parents were, you
17  know, awarded a damages amount that was based on, you
18  know, Dr. Davenport's extrapolation of your nominal
19  care figures -- he does a present value analysis --
20  if Ethan's family were awarded the amount requested
21  in the present value analysis and then his family
22  decided not to pursue some of this care or to pursue
23  a little bit less of the care -- say, behavioral
24  psychologist every other week -- then the result
25  would be that they would -- they would keep whatever

197

1  that -- they would keep whatever that award was and
2  just not have to spend it on the, you know --
3        MR. PARKER: Objection as to form.
4      Q   (BY MS. PALEY) -- care.
5      A   I -- I think I understand your question,
6  but I really don't want to speculate on what may or
7  may not happen or may or may not do. I think the
8  best way to adjudicate this specific recommendation
9  is, you know, I have a follow-up with the family and
10 then produce an amendment in the future, because --
11 and then we'll have the opportunity to discuss the
12 specific care. And then ultimately it wouldn't be
13 for me to decide that care. It's for the parents and
14 family to decide that care as well.
15     Q   Okay. So is this sort of an outer bound
16 and they may decide that they need less, but you've
17 tried to provide this sort of most robust or complete
18 set of recommendations possible?
19     A   Definitely not complete and robust,
20 because there's definitely things that I didn't
21 consider adding for more cost or duration. But I
22 would describe it, again, as preventative, optimal
23 for the three main questions that we answer as a life
24 care planner to achieve then the objectives.
25        And that's why this document is lengthy

198

1  and it's not a prescription for care.
2      Q   So would you agree that when assessing
3  future care needs, it's inappropriate to simply
4  extrapolate out current patterns in medical care or
5  medications or medication use for the remainder of a
6  person life, try to make some adjustments -- it's
7  appropriate to make adjustments over time based on an
8  understanding of how their needs may change?
9        MR. PARKER: Objection as to form.
10     A   Can you just reread the question, please.
11     Q   (BY MS. PALEY) Sure. Would you agree
12 that in attempting to assess future care needs, it's
13 inappropriate to simply extrapolate out current
14 patterns of medical care or medication use for the
15 remainder of a person's life?
16        MR. PARKER: Objection as to form.
17     A   No. I think that's an incorrect statement
18 because, again, it's this totality of information in
19 this very long document. Plus, then you also have to
20 consider what our experience is as these children
21 become adults and then we care for them as adults and
22 the training of myself, our board certification for
23 future care needs.
24        And so it is appropriate, in my opinion,
25 to utilize current medication frequencies, current

199

1  care and anticipate the future care, which is in
2  addition to what he currently has and then what
3  follows is, is my report.
4      Q   You said, Our board certifications for
5  future care needs. What board certification is that?
6      A   I'm sorry, I might have been speaking too
7  fast. So physical medicine and rehabilitation
8  specialists like myself and our board certification
9  in that specialty. So we have significant amount of
10 training. It's four years of residency directly in
11 this space. Functional rehabilitation, medicine,
12 surgery, procedures of disabilities, neurological
13 system, very applicable to Ethan, how he transitions
14 into adulthood for, what I'm recommending,
15 approximately 70 years.
16     Q   Well, would you agree that the fact that a
17 person is taking a particular medication at a given
18 time, at the time a life care plan is formed, does
19 not mean that he or she will be required to take that
20 same medication for the rest of his or her life?
21     A   No. I do not agree with that statement
22 because we can't just use a general "a person" or "a
23 patient." Specifically for Ethan, I did my due
24 diligence speaking to the treating physicians and
25 garnered recommendations on the duration of the main

200

1  medications being prescribed. And so the treating
2  physicians were recommending those medications for
3  the rest of his life.
4        I think also in addition it's important to
5  note that there may be a new prescription brand name
6  in the future at a higher cost. Sometimes we may
7  change, obviously, the medications years from now;
8  but that, then, requires new data years from now that
9  I don't have today. And so this allows us to get a
10 number on the total medication cost based upon the
11 current situation at hand, the treating physicians,
12 their recommendations and his current medications.
13     Q   My question was actually just a little bit
14 narrower. And I'm going to ask it again using a
15 slightly different -- like pronouns, I guess maybe.
16        The fact that the subject is taking a
17 particular medication at the time of the interview
18 and examination for a life care plan does not mean
19 that the subject will be required to take the same
20 medication for the rest of his or her life. Do you
21 agree with that?
22     A   Again, that may be applicable for some
23 patients. But in my review and production of this
24 life care plan with Ethan and speaking with the
25 treating physicians, I would not agree that statement

201

1  is as black and white applicable for Ethan today.
2      Q    Okay.  I was just speaking more generally.
3  I wanted to understand your -- your approach to a
4  certain -- you know, to the methodology of putting
5  together a life care plan.
6          Would you agree that when formulating
7  recommendations for future medications, a physician
8  life care planner should ensure that a strong medical
9  rationale for each particular medication exists?
10     A    Yes.  I think that we've covered that with
11 the treating physicians, as well as my ability to
12 make that independent analysis given my
13 qualifications.
14     Q    Okay.  Let's talk a little bit about some
15 of the medications that you include in your life care
16 plan.  And I hope we can move through these
17 relatively quickly.  That's my aim.
18         Look at your life care plan, Page 85.  And
19 do you see Page 85 is where you begin your cost
20 survey for medications?
21     A    Yes, ma'am.  I'm there.
22     Q    Okay.  And that runs through Page 90.  All
23 right.  A couple of questions about the process that
24 you used or the methodology that you used here.  I
25 see that for -- for medications other than the

202

1  CBD/THC tincture, you included three pharmacies and
2  in some instances a brand and a generic from each of
3  the three pharmacies.
4          So question for you:  If Ethan's family
5  always used generic prescription medications when
6  available -- I'm not saying they did.  But if they
7  did, would that have any effect on the cost estimate
8  in your life care plan?
9      A    I just don't think that is reasonable
10 to -- to change the cost analysis.  It's speculative
11 and could be misleading, because medication costs may
12 change depending on access to healthcare insurance.
13 Or, again, there might be a brand name option only.
14         So if -- if a patient chose to only do
15 that, then they may have less expense regarding
16 generic, but that's not the methodology that I
17 ascribe to or reproduce or transparent.  So that's
18 kind of where these generic brand name averages will
19 come from.
20     Q    Well, I think that wasn't quite an answer
21 to my question.  The question was very simple, yes or
22 no.  If Ethan's family always used a generic
23 medication when generics were available, would that
24 have any effect on the estimates in your life care
25 plan?  The answer may be no, but I just want to

203

1  understand.
2      A    I -- you know, I have a difficult time
3  answering that simply yes or no because I think it's
4  misleading and speculative because we can't -- we
5  can't do that to a family or a patient because there
6  are so many other factors involved.  And at times
7  pharmacies don't even have generic options, and they
8  have brand name only because of supply chain
9  problems, because of formulation differences.
10         Brand names have a tighter formulation.
11 Generic have 5 percent fluff room on the specific
12 drug.  So sometimes even generics don't work as well
13 as the brand name.  So I can't agree with that
14 because it's not something that is in my methodology
15 or I think is the best optimal care for Ethan.
16     Q    So I'm very specifically asking you not
17 what you think is appropriate or what we should do to
18 the family.  I'm asking you if Sarah Palmquist and
19 Grant Palmquist said to you, We always use generics
20 if a generic is available, if they said that, would
21 that affect your process?  It sounds like the answer
22 is no.  But I just want to understand.
23     A    So --
24     Q    If they said, We always use generics
25 would that affect your process?

204

1      A    So they did not say that to me.  And so I
2  think it's a tough, misleading question because we're
3  speculating on if they would or would not.  And I
4  think I describe the methodology and process that I
5  go through this first and then it gets presented to
6  the family and then they would have the ability to
7  discuss with whoever they want generic or brand name.
8          I just can't -- I can't tell you the
9  answer is yes.  That's more of a hard no because of
10 everything I've been describing in my answers.
11     Q    So it's a hard no?  Is that --
12     A    For all those reasons I outlined
13 previously.
14     Q    Okay.  And if one of the prescriptions
15 that Ethan takes is slated to go generic soon, would
16 that have any effect on your cost estimates for the
17 next 70 years?
18     A    Perhaps.  Again, it's going to, then, be
19 an average of the brand name and generic.  And in my
20 experience, that's very important because we have to
21 have access to the brand names for quality control
22 purposes.
23     Q    Okay.  Would it be appropriate to update a
24 life care plan if a major drug -- strike that.
25         If one of the drugs that Ethan used does

205

1  go generic in the next, say, year or so, would it be
2  appropriate to update the life care plan to reflect
3  that mix of brand and generic availability?
4      A   I think if the family had that clinical
5  question, I would be available to update that. But I
6  also would have to have -- I would also have to have
7  another clinical reason, most likely, to update that,
8  given the time involved and cost on the family and
9  counsel, law firm and the amount of time it would
10 take me to -- to update a life care plan.
11     Q   So if one of the drugs that Ethan used
12 goes generic, you know, say about a year from now,
13 would that mean that at that point in time your life
14 care plan would not accurately reflect the market
15 prices for that drug?
16     A   I wouldn't agree with that because it
17 still would accurately reflect the market. It just,
18 in addition, there would be potentially a brand name
19 option. And, then, again, there's patient autonomy
20 and choice on using the brand name or generic, or
21 there isn't patient autonomy and it's what the
22 treatment provider is prescribing.
23     Q   But if your methodology is to average
24 brands and generics and if a generic comes onto the
25 market, just -- no judgment, it's just that your life

206

1  care plan will be out of date at that point because
2  it won't follow your methodology of averaging brands
3  and generics.
4          MR. PARKER: Objection as to form.
5      A   Again, I think there's the situation that
6  we would consider an amendment or supplement just
7  kind of like here where I say that this was complete
8  at the time, so March 30th, with information at hand.
9  And we can always consider to update it.
10         It may or may not be clinically
11 significant for the patient and his family.
12     Q   (BY MS. PALEY) And if Ethan's family
13 routinely used the same pharmacies to fill their
14 prescriptions --
15     A   Okay.
16     Q   -- and, again, I'm not saying that they
17 did -- but in your practice for preparing life care
18 plans -- strike that. I'm going to start a little
19 more generally.
20         In your practice of preparing life care
21 plans, if a family routinely uses the same pharmacies
22 to fill prescriptions, would your cost survey make
23 sure to include those pharmacies as part of your cost
24 survey?
25     A   Potentially, yes, we could include that

207

1  specific pharmacy. I don't recall asking Dr. Sarah
2  which pharmacy she used. And in general, in my
3  experience, the big commercial providers like the
4  Krogers and Walgreens and CVS all have relatively
5  similar prices. And so to get averages, I think it's
6  more important to get at least those three pharmacies
7  to then average.
8      Q   And if Ethan's family routinely -- sorry,
9  strike that.
10         If a -- in your methodology for putting
11 together life care plans, if a family routinely used
12 online pharmacies to fill prescriptions, would you
13 make sure to include those online pharmacies as part
14 of your cost survey?
15     A   Yes. I think if we had that discussion
16 upfront on specifically how that was being prescribed
17 and dispensed, I would consider that in the future.
18     Q   Did you -- did you have that discussion
19 with Sarah Palmquist here?
20     A   I don't recall Dr. Sarah Palmquist telling
21 me anything about that specific type of online
22 pharmacy dispensing medications for Ethan.
23     Q   Did you -- did you ask her what pharmacies
24 they use?
25     A   It might have been in the conversation at

208

1  the house, but I don't recall the specific name or
2  location of which pharmacy.
3      Q   So is it you did ask her but you don't
4  recall which one? Or you don't know if you asked
5  her?
6      A   I don't recall the specific discussion we
7  had. I know I didn't document a specific pharmacy.
8      Q   Okay. And did you ask her about their use
9  of generics when available?
10     A   I don't -- I mean, some of his medicines
11 are not available generic, and so I don't think we
12 had that discussion.
13     Q   That's why I threw in "when available."
14     A   Yeah, I don't -- I don't think we had that
15 discussion.
16     Q   Okay. And if -- again, this -- if a
17 family routinely used -- filled 90-day scripts rather
18 than 30-day scripts, would your cost survey use
19 90-day scripts, to be consistent with the family's
20 practice?
21     A   I would -- I would consider that as an
22 update in the future if that was their hundred
23 percent directive on 90 days.
24     Q   Did -- did you ask the Palmquists whether
25 that was the case with them or not?

209

1    A    No. I don't think we discussed that
2  three-month supply.
3    Q    And are there any factors regarding how
4  Ethan's family handles filling prescriptions that
5  would have had any effect on the cost estimate that
6  you put together here?
7    A    So I understand your question as, is there
8  any specifics the family fills prescriptions that had
9  impact on my cost analysis?
10    Q    Yeah. Are there any factors about --
11  regarding how they fill prescriptions -- whether it's
12  where they go, how frequently they filled them, what
13  have you. Are there any factors regarding how the
14  family fills prescriptions that could have had some
15  influence on your cost analysis?
16    A    I don't think there's any other factors
17  that they informed me of or that you and I have not
18  already discussed.
19    Q    Okay. And did -- let's see. Let's talk
20  briefly about the CBD/THC tincture.
21    A    Uh-huh.
22    Q    Now, this is showing my wild lack of
23  knowledge about modern nonprescriptive pharmacology.
24  But is the 5 milligrams per 1 milliliter -- two
25  questions. One, is the recommended dose here

210

1  1 milliliter? I could not tell from the report.
2    A    Are we on Page 85?
3    Q    Page 85, yeah.
4        MR. PARKER: I object to the form of the
5  question. This is prescribed -- this is a
6  prescription.
7        MS. PALEY: Okay. Sorry about that.
8        MR. PARKER: Texas, you have to be
9  prescribed. We have medical marijuana by certain
10  certified doctors, et cetera.
11        MS. PALEY: Understood. I'm in Virginia.
12  We have the same -- my misspeaking.
13    Q    (BY MS. PALEY) So this just generally
14  reflects my wild lack of knowledge about CBD and THC
15  generally.
16        MR. PARKER: Well, if you want to know, I
17  can tell you about it.
18        MS. PALEY: I may ask you afterwards.
19    Q    (BY MS. PALEY) The 5 milligrams per
20  1 milliliter, that's on -- that's a dosage strength,
21  right? That's how much drug you have in 1 milliliter
22  of liquid?
23    A    That's correct.
24    Q    Okay. Is the recommended dosage for Ethan
25  here, is it 1 milliliter?

211

1    A    Again, I'm just going -- making sure we're
2  on the first one, where it says Number 60?
3    Q    Yes.
4    A    Okay. So this first dose is 1 milliliter
5  two times a day.
6    Q    Okay.
7    A    And that's how we get 60 doses per month.
8    Q    And then for the next dose -- well, I
9  should say all three of these doses have the same
10  concentration, correct? 5 milligrams per 1
11  milliliter?
12    A    That's correct.
13    Q    Okay. And you increase the number of
14  doses per month to reflect Ethan becoming larger, in
15  effect, correct?
16    A    Older, larger and potential for tolerance
17  from the lower dose.
18    Q    Okay. And once he gets up to 180 doses
19  per month, that's about six doses per day; is that
20  correct? Just 180 divided by 30.
21    A    Yes.
22    Q    Is the recommendation still to have
23  CBD/THC tincture twice a day and just have three
24  doses each time?
25    A    Generally speaking, yes.

212

1    Q    And at this dosage level, would that be --
2  would that be enough to create what the layperson
3  might call kind of a high?
4    A    Typically not. Because this is a CBD
5  product for some of his issues with aggression and
6  his, you know, global term seizure disorder. And so
7  the CBD is helping that. And we're not getting -- I
8  think you mentioned, quote/unquote, high, because
9  it's a tincture concentrate and he's not smoking
10  marijuana, getting high from a hundred percent THC.
11  It's a medical CBD grade.
12    Q    Okay. And I see that it says CBD/THC
13  tincture.
14    A    Sure.
15    Q    And it's actually the THC I was interested
16  in. That's -- that's what is in like marijuana that
17  one would smoke, right?
18    A    Yeah. Yes. And I think the THC is such a
19  small component, but we would have to specifically go
20  to this vendor, Texas Original Compassion and
21  Cultivation, to get the breakdown. But in my
22  experience in multiple states that do medical
23  marijuana, this is not getting high type of tincture
24  because of the CBD/THC combination.
25    Q    Okay. And have you ever prescribed a CBD/

213

1 THC tincture to a minor?
2 **A No.**
3 Q Okay. And have you ever been asked to by,
4 say, a parent?
5 **A I don't think a parent has ever asked me**
6 **to prescribe that. In adults, we've had discussions**
7 **of these types of tinctures or CBD products readily**
8 **available to help with whatever the diagnosis may be.**
9 Q Would you have any concern with
10 prescribing CBD or THC to a minor in your medical
11 practice?
12 **A I would not have concerns after I went**
13 **through the specific like state training to do that,**
14 **because I'm not trained right now to prescribe THC,**
15 **medical marijuana. But CBD is readily available**
16 **without a prescription. Given the limited research**
17 **that I've reviewed, I don't have concerns that this**
18 **type of product in Ethan's type of diagnoses would**
19 **have significant detrimental effects.**
20 Q Okay. But you haven't gone through
21 whatever the state training is to actually be able to
22 make such a prescription; is that --
23 **A That's correct.**
24 Q Do you ever prescribe CBD/THC tinctures to
25 your adult patients? And that may be that you don't

214

1 because you haven't gone through the training. I'm
2 not sure if it's separate for adults and children.
3 **A Yeah, I think I answered that one already.**
4 **So we can make recommendations for the CBD, because**
5 **you don't need a prescription. But then I do not**
6 **prescribe medical marijuana, THC, just to make sure**
7 **that distinction is clear.**
8 Q Okay. Understood. Okay.
9 In making your recommendations in this
10 life care plan, did you speak to Dr. Proud, who's the
11 one who originally prescribed this CBD/THC tincture?
12 **A No, ma'am.**
13 Q Okay. Have you spoken to anyone about the
14 potential risks of lifelong use of a product use --
15 lifelong daily use of a product that contains THC?
16 MR. PARKER: I object to the form of the
17 question.
18 **A I spoke to the treating neurologist,**
19 **Dr. Rotenberg. And he did not have any concerns**
20 **about the daily use and the specific titration**
21 **schedule on increasing dosage and daily use, is what**
22 **we discussed. And the specific vendor, because he is**
23 **apparently licensed to prescribe and recommend this,**
24 **is -- the discussion I had with him as the treating**
25 **provider. And that was the extent of our discussion.**

215

1 Q (BY MS. PALEY) Did you specifically
2 discuss the idea of lifetime use of a THC-containing
3 product with Dr. Rotenberg?
4 **A Yes. Dr. Rotenberg was recommending to**
5 **continue this product for life to decrease**
6 **breakthrough seizures.**
7 Q And Ethan has what you might call like
8 decreased self-regulation compared to neurotypical
9 individuals; is that correct?
10 **A Can you help me understand what you mean**
11 **by "decreased self-regulation"?**
12 Q Well, as I understand it, he will undress
13 himself in front of strangers, sometimes engage in
14 acts that might be a little uncomfortable for folks
15 to see. That's one example of what I might call a
16 decreased self-regulation.
17 **A Okay. So I would agree with that, you**
18 **know, kind of global term where he's unable to**
19 **regulate his emotions, his physical behavior,**
20 **psychological behavior, all of those things, yes.**
21 Q Okay. And have you specifically
22 considered the potential long-term health
23 consequences of things like potentially increased
24 appetite with use of a THC product in an individual
25 with decreased self-regulatory capacities?

216

1 MR. PARKER: Objection as to form.
2 **A So -- so yeah. I mean, we always consider**
3 **risk/benefits of medicines. In speaking with the**
4 **treating neurologist who's treating the seizure**
5 **disorders with the CBD/THC tincture, there didn't**
6 **seem to be any concern that was brought up or**
7 **discussed between us.**
8 **I think it's also key that it's the**
9 **combination product, CBD, THC.**
10 Q (BY MS. PALEY) Did you -- did you
11 specifically discuss the idea of potential appetite
12 enhancement with Dr. Rotenberg?
13 **A In my experience, the CBD products does**
14 **not -- do not enhance appetite, similar to what**
15 **you've described as getting high or smoking weed.**
16 **And so I don't think we discussed specifically**
17 **appetite regarding Ethan.**
18 Q Would you agree that chronic THC use is
19 also associated with things like impaired attention
20 and memory issues?
21 MR. PARKER: Objection as to form.
22 **A I mean, I would have to review some data**
23 **on that. There, again, is paucity of data that I'm**
24 **familiar with, given the controlled nature of this**
25 **via the DEA classification. So I would just need to**

217

1  review some of that data to then agree or disagree
2  with your question or comment.
3      Q    (BY MS. PALEY) Okay. But you didn't --
4  you didn't review the data in preparing his life care
5  plan?
6      A    Given prescribed by the treating
7  physician, I didn't feel it was necessary to do that
8  literature search. And I was not asked to do that,
9  so I did not.
10     Q    Let's look at the next item in your
11 medications list. Catapres or clonidine. It's an
12 antihypertensive.
13     A    Yes, ma'am. Clonidine.
14     Q    Oh, sorry. That's right, clonidine.
15     A    C-l-o-n-i-d-i-n-e.
16     Q    Okay.
17     A    Generic. And then brand name is
18 C-a-t-a-p-r-e-s.
19     Q    And you have here a prescription for 15
20 pills per month; is that correct?
21     A    Yes.
22     Q    Okay. Now, your report says on Page 59
23 that you believe Ethan would use this, quote, a few
24 times a year.
25          Help me understand the difference between

218

1  needing something a few times a year and having a
2  prescription that provides you with a pill every
3  other day.
4      A    Sure. Yeah, let me just review.
5          Okay. So on Page 59 at the late
6  February '22 or early March of 2022, his mother had
7  reported that they were using it a few times a year
8  at that time that I did the current intake of
9  medications.
10         After visiting with him in the house and
11 discussing with his mother that it does work to help
12 decrease his hyperactive behavior or aggressive
13 behavior, I thought it was appropriate to increase
14 the frequency of that medication.
15         Generally, it's listed as a
16 antihypertensive, but that's not what it's used for
17 for Ethan.
18     Q    So even if it's not used as an
19 antihypertensive, it would still have that blood
20 pressure-lowering effect, correct?
21     A    You know, actually the reason why we use
22 it for some of those kids with aggressive behavior,
23 ADHD or social anxiety is because it doesn't lower
24 blood pressure but it lowers the sympathetic storm of
25 adrenalin, and that's going deep, deep into

219

1  pharmacology on how the medicine works. So typically
2  with patients that have this aggressive behavior, it
3  does that instead of lower their blood pressure.
4      Q    And have there been studies that
5  demonstrate that somehow it doesn't lower their blood
6  pressure?
7      A    That's my kind of clinical experience.
8  I'm not familiar with any studies I could quote you
9  at this time.
10     Q    So based on your discussion with Sarah
11 Palmquist, you understand that Ethan would, under
12 these recommendations, essentially use clonidine for
13 sedation about 15 times a month, not a few times a
14 year?
15         MR. PARKER: Objection as to form.
16     A    That's right. Not just sedation but
17 decreasing his aggressive behavior, which, you know,
18 when I was there, was hitting me, hitting his
19 5-year-old sister, hitting Mom, you know, things like
20 that. Throwing toys, throwing books. So that's
21 where the logic is on increasing the frequency, based
22 upon prior use and success, along with mechanisms of
23 pharmacology, current behavior and discussions with
24 the family.
25     Q    (BY MS. PALEY) So has any -- have any of

220

1  his treating physicians currently prescribed
2  clonidine with the frequency with which you recommend
3  it here?
4      A    I don't think so.
5      Q    Okay. So let's just look quickly at the
6  prices here. You have prices for clonidine of brand
7  and generic from Kroger in Pearland, Walgreens in
8  Pearland and Walmart in Pearland; is that correct?
9  Pages 85 to 86.
10     A    Yeah, I'm sorry. I got some of the pages
11 mish-mashed here. But yes, that's correct what we
12 have here.
13     Q    Okay. And when -- when the person who did
14 this cost survey made that call -- or person or
15 persons who did that cost survey made the calls to
16 the pharmacies --
17     A    Uh-huh.
18     Q    -- do you know what they asked for
19 specifically?
20     A    Yes.
21     Q    What -- how did they go? What did they
22 say?
23     A    My instruction is sort of as it's listed
24 under the first bullet. This is the medicine. This
25 is the dose. This is the number of the pills. What

221

1  is your price for generic, price for brand name?
2     Q    And that's priced to a cash payor?
3     A    Yes.
4     Q    Okay.  And by averaging, let's see -- by
5  averaging the prices together, you get about $29.51
6  per script; is that right?
7     A    Per month or per script, yes.
8     Q    Okay.  Now, if -- just simple math.  If
9  you had averaged just the generic prices, it would be
10  something closer to, say -- I mean, I'll just do a
11  quick here -- like $7 or so.  You've got a 6, a 12
12  and a 4 essentially.  99¢, but...
13    A    Roughly.  That's quick math.  So sure.
14    Q    Okay.  So if your methodology were to use
15  average generic pricing, you'd have $7 a month.
16  Using the methodology you used, it's $29 a month; is
17  that right?
18    A    The methodology, yes, is $29.51 a month.
19    Q    Okay.
20    A    And then roughly those numbers you're
21  describing would be the generic-only price average.
22    Q    Okay.  Now, let's look at the next one,
23  Lamictal.  That's an antiseizure medication, right?
24    A    Yes.
25    Q    And, again, you use the brand and generic

222

1  from three different stores:  Kroger, Walgreens and
2  Walmart in Pearland; is that correct?
3     A    Yes.
4     Q    Okay.  And here we see that the brands can
5  be up to $1,918.99 per month; is that right?
6     A    Yes.
7     Q    In fact, the -- of all three of the
8  brands, one is about 19, one is about 1600 and one is
9  about 1700.
10    A    Yes.
11    Q    Okay.  And we see -- we see much lower
12  prices with the generics, right?  We see about 75,
13  191 and 164.
14    A    Yes.
15    Q    Is that right?
16         Okay.  So and, in fact, the sort of
17  highest price brand and the lowest price generic,
18  they actually exist at the same store, at Kroger,
19  right?
20    A    That's what is documented here.  That's
21  very well possible.  Again, from supply chain
22  suppliers of medications from different
23  pharmaceutical companies.  Not uncommon in my
24  experience.
25    Q    Okay.  And your average price for

223

1  averaging the brands and generics is 958.06?
2     A    Yes.
3     Q    Did -- did you ever, just out of
4  curiosity, average what the generics might be on
5  their own?
6     A    That's not something I do on my
7  methodology, so I have not done that.
8     Q    Okay.  And if I wanted to know what the
9  lifetime -- so we could avoid doing the math here, I
10  just want to map something out.  If I wanted to know
11  what the lifetime savings could be from using instead
12  of your average of all the brands and generics, just
13  using the average of the generics, could I take your
14  average minus the generic average and see what that
15  difference is per month to figure out a monthly
16  difference?
17    A    I think if you want to do arithmetic, you
18  can do that.  But that's not what I'd recommend in
19  the life care plan methodology or how physicians
20  would prescribe medicines.
21    Q    Well, what do you mean by it's not how
22  physicians would prescribe medicines?  Many
23  physicians prescribe generic medicines, don't they?
24    A    So -- not necessarily.  When we prescribe
25  medications, it just depends.  If we're doing

224

1  something and I check brand name only or specific
2  medication as prescribed, that denotes more of a
3  brand name for different reasons.  And the primary
4  reason is development of the drug and quality
5  control.  Brand names have tighter quality control.
6  Generics have more fluff and fillers and less quality
7  control.  And we see breakthrough seizures sometimes
8  on generic Keppra versus brand name Keppra or
9  Lamictal.
10         And so that's a good exercise in math, but
11  that's not necessarily, you know, what I would do at
12  all for the methodology for my life care plan.
13    Q    But you have no idea if the Palmquists are
14  using brands, generics, a mix or what, right?
15    A    That is why the methodology is the average
16  of the two.
17    Q    But is that correct?  You have no idea if
18  they're using brands, generics or a mix?
19    A    Well, it's not that I have no idea,
20  because some of the medicine are brand name only.  So
21  that answers that question.  Regarding something like
22  this, an antiseizure medicine, Lamictal available for
23  brand or generic, I did not ask them specifically.
24  And at times patients don't even know specifically if
25  it's brand name or not, unfortunately.

225

1    Q    Well, Dr. Palmquist is a pretty
2  sophisticated individual, correct?  She understands
3  if she's using brand or a generic?
4    A    I'm not going to make a speculative
5  presumption.  I'm happy to follow up with her on that
6  and then report back with an update or amendment in
7  order to answer your question in the future.  But I
8  can't speculate what she's doing or not doing.
9    Q    Okay.  We may -- we may follow up on that.
10  And I won't suggest that you disagreed with her being
11  a sophisticated individual.  Just a joke.  Just a
12  joke.
13    A    Sure.
14    Q    But if I wanted to do the math and I
15  wanted to understand -- you know, if we can walk
16  through this, this may actually save us a lot of
17  time.  If I wanted to do the math and understand what
18  could the price savings be of using generics,
19  understanding that there's variability in generic
20  pricing --
21    A    Yeah.
22    Q    -- could I figure out the generic average,
23  subtract that from your blended average and see what
24  the savings would be per month?
25    A    I mean, I think that's -- that's an

226

1  exercise in arithmetic.  It's not, again, something
2  that I -- I would recommend as author of this life
3  care plan.  And doesn't also account for new
4  medicines in the future, which will be brand name
5  only for ten years at higher cost.
6        And so the other reason and logic for this
7  methodology of averaging is a placeholder for a
8  medicine cost.  Because as we go into the future,
9  these costs will go up.  So that's kind of the way I
10  would answer that question.
11    Q    Well, these costs going up, that's what
12  Mr. Davenport takes care of, right?  By using various
13  inflation rates to predict future drug costs based on
14  government data on inflation?
15    A    That's not what I meant.  I'm sorry.
16  Costs going up, if there's a new brand name medicine
17  that controls things better -- let's say seizure,
18  Lamictal -- the brand name, roughly ten years
19  minimum, we can use 1900, 1600.  There's no generic
20  equivalent for ten years.
21        So medication costs are going up.  All
22  brand name and new medications are increasing.  We
23  can also look at the Humira in here and that expense
24  because it's brand name only.  So it's an arithmetic
25  exercise, but it's not necessarily applicable for me

227

1  to give a total number of lifetime costs of
2  medications because there's going to be replacement
3  of medications, perhaps.  And, again, there are
4  placeholders per my methodology based upon the fact
5  at hand when I publish a report.
6    Q    And I'm not actually asking if you would
7  agree is that it's an appropriate thing to do or
8  whether -- I'm not asking whether you would do it.
9  I'm just asking if mathematically the way to
10  understand what the difference is is to take your
11  blended average for brand and generics, subtract the
12  average for the generics and see what the difference
13  is?  I'm not asking if you would endorse it.  I'm
14  just asking if that's got the math right.
15    A    I think if you want to do that math
16  exercise, you know, you're free to do that.  I just
17  wouldn't want to be misleading that that then somehow
18  would change the overall need for this child to be
19  taken care of with medications.
20    Q    And I'm not suggesting that.  I'm just
21  asking about the math.
22        So I take it that you haven't extrapolated
23  out to see what the lifetime savings could be for
24  Lamictal if the family used brands -- sorry, if the
25  family used generics under your cost survey, correct?

228

1    A    It is correct that that is not part of my
2  methodology.  And that has not been published in my
3  report because I have not done that for all the
4  reasons we've been discussing.
5    Q    Would you be surprised if the savings for
6  just using generic pricing was about $684,000 in
7  nominal value?
8        MR. PARKER:  Objection as to form.
9    A    I'm not surprised by the cost of
10  medications anymore, because it is something
11  ridiculous in America with one pharmaceutical company
12  I know of having $28 billion in one quarter in sales.
13  So I wouldn't be surprised about that number at all.
14    Q    (BY MS. PALEY)  You wouldn't be surprised
15  if the savings could be $684,000 just by using the
16  generic?
17        MR. PARKER:  Objection as to form.
18    A    Again, same answer.  Not surprised, given
19  the cost of healthcare medications right now.
20    Q    (BY MS. PALEY)  How often, when you
21  prescribe, do you say "brand only"?  I forget what
22  the shorthand is for like "no generic replacement,"
23  but whatever that is.  How often do you say that?
24    A    "Dispense as written" would be the
25  shorthand perhaps.

229

1    Q    Dispense as written.
2    A    Some of my controlled substances
3  prescriptions in the past had a "brand name only" on
4  the DA script, excuse me.  Now electronic
5  prescriptions, there's checkboxes to do all that
6  stuff.  Again, it just depends.  I mean, it's
7  physician recommendation, what's available at the
8  pharmacy, what's on formulary at the hospital.
9  There's so many factors involved.  So it just depends
10 on all those factors on what I'm prescribing and
11 what's available.
12   Q    But when you -- that's -- how often do you
13 specifically, on average, write "dispense as
14 written"?
15   A    You know, I'm not sure.  I haven't really
16 recorded that.
17   Q    Okay.
18   A    I don't know.  I mean, it's definitely
19 happening.  It's not more than 80 percent of my
20 prescriptions.  But it's definitely occurring in
21 specific instances, especially when patients report
22 better success with certain medication.
23   Q    And your -- oh, sorry.  Were you speaking?
24   A    I was just letting the fire truck noise
25 finish.  But all I was saying is medications, and

230

1  then the fire truck noise.
2    Q    Understood.  When -- when doing your cost
3  survey for medications, you specifically include like
4  national-level retailers who are sort of available
5  for filling scripts around the country, right?  You
6  use local -- local outlets, but you're using
7  national-level retailers, right?
8    A    That's correct, as documented and
9  discussed with the specific Kroger, Walgreens,
10 Walmart, et cetera.
11   Q    Okay.  Have you ever looked at an online
12 retailer like Amazon pharmacy?
13   A    I have never used Amazon pharmacy.  I
14 don't think it's been around very long, and so I've
15 never specifically looked at that retailer.
16   Q    Okay.  Let's look at Amazon pharmacy for
17 Lamictal.
18   A    Sure.
19        (Exhibit Number 12 was marked.)
20   Q    (BY MS. PALEY) This is Exhibit 12.  I
21 apologize, it's getting really hot in here again.
22   A    No apology, since we're at my office, but
23 not specifically in my office.
24   Q    Okay.  So looking at this, do you see
25 just -- I printed this out from my computer screen.

231

1  Do you see at the top it says, Search Amazon
2  pharmacy?
3    A    Yes, I see that.
4    Q    And then a little ways -- about a third of
5  the way down the page, it says, Lamotrigine?  Is that
6  how you say it?
7    A    Yes.
8    Q    And then it says, Tablets, generic for
9  Lamictal.
10        Is that the generic of what you have
11 included in your life care plan, Lamotrigine generic
12 for Lamictal?
13   A    On the surface, that's what these letters
14 and words are on this paper.  But I can't verify, you
15 know, Amazon pharmacy.  It appears to be reliable.
16   Q    Okay.
17   A    But I've never used it before.
18   Q    Do you -- do you have any reason to
19 suspect that Amazon pharmacy would send out
20 counterfeit drugs or anything like that?
21   A    My concern for bias is that, Number 1, it
22 says, Prime membership.  So apparently you have to be
23 a Prime member to get this $76.  Number 2, that's
24 about roughly a dollar and a half more expensive than
25 the Kroger Pearland generic.

232

1        And Number 3, my biggest concern is that
2  it's understood by physicians that certain large -- I
3  use Walmart as an example; perhaps Amazon is doing
4  this -- is going to discount medicines to get you in
5  the store on the website to buy other things.
6    Q    Well, Doctor, you include Walmart as one
7  of your options for Lamictal, right?  I mean, you
8  don't have anything against using large retailers?
9    A    So -- so to be transparent, that's why the
10 Walmart Clonidine is $4 on generic.  That's a $4, get
11 you in the door.  They're losing money on that
12 medicine so you can then buy something else from
13 Walmart.
14        Now, again, with transparency,
15 methodology, reproducibility, it's important at times
16 to include those low costs so we get a good average
17 of what's available in the market.
18   Q    Okay.  And you don't -- you don't include
19 this low cost from Amazon in your cost survey.  Just
20 a factual question there.
21   A    That is a fact.
22   Q    Okay.
23   A    We did not include Amazon.  That's not
24 something that I've ever done, and I would not move
25 forward to routinely do that in the near future.

233

1    Q    And you've mentioned, it sounded like, it
2 was more expensive.  Let's look at what I printed out
3 here.  This is a hundred milligrams a day.  That's
4 the dose Ethan is taking, right?
5    A    Yeah.
6    Q    And it says three tablets per day, right?
7 That's the highlighted -- it's a little hard to see
8 here, but it's three tablets a day is the button that
9 was selected.  Do you see that?
10    A    Yeah, I see that.
11    Q    Okay.  And then the supply is actually a
12 90-day supply.  Do you see that?  That's the button
13 that's selected?
14    A    I do see that.
15    Q    Okay.  And so that's a three-month supply,
16 right?
17    A    That would -- yeah, that would denote here
18 under three months.
19    Q    Yeah.  So if it's about $76 for -- for
20 three months, that's about $25 a month, right?  A
21 little more?
22    A    Roughly.
23    Q    Roughly.  Okay.  And so that $25 a month
24 compared to the lowest generic price you have for
25 Lamictal -- what's the lowest generic price you have

234

1 for Lamictal?
2    A    It looks like it's the Kroger at 74.99 --
3    Q    Okay.
4    A    -- a month.
5    Q    Sorry.  I did not mean to cut you off.
6        So the Amazon price is about a third of
7 the lowest generic price that you have?
8    A    That's what this Exhibit 12 is showing.
9    Q    Okay.
10    A    I --
11    Q    And so if you -- I'm not saying you have
12 to just take the Amazon price.  But if you included
13 the Amazon price in your average, it would bring down
14 the average, right?
15    A    It would, if the medicine was comparable.
16 But I don't know where they're sourcing this drug
17 from.
18    Q    Do you have any specific reason to believe
19 it's not comparable?
20    A    I'm not familiar with Amazon pharmacy.  I
21 don't think it's been around a long time.  I'm not
22 sure how to submit a prescription there.  So I think
23 there are some concerns.
24        And then, again, different medications
25 from different manufacturers have different types of

235

1 densities and quality control.  And so I'm not
2 certain if it is a hundred percent comparable to the
3 brand name, number one.  And in my experience, a
4 bigger Walgreens, Kroger pharmacy is a little bit
5 more consistent with their supply chain.
6    Q    Do you have -- did you do any work to
7 understand the sourcing of the generic Lamictal from
8 Walmart or Walgreens or Kroger when putting together
9 this cost survey?
10    A    Not specifically for this.  But in my
11 career I have looked at different US pharmaceutical
12 companies making drugs in the States for some big
13 commercial retailers like Kroger and Walgreens.
14    Q    And have you specifically determined that
15 for Lamictal, Kroger and Walgreens and Walmart have
16 adequate sourcing to meet your requirements to be
17 comfortable with the generics?
18    A    I did not do that for this report.
19    Q    Okay.  Did you do that for any of the
20 drugs in this report?
21    A    I did not.
22    Q    Okay.
23    A    The ones that have both options available.
24    Q    Okay.
25    A    That wasn't applicable for like Humira.

236

1    Q    Thank you.  And let's -- it's always --
2 it's good to have more data points, right?  Like one
3 of the reasons why you like the U -- the Context 4
4 Healthcare is that they have a lot of data points;
5 they have billions of data points, right?
6    A    I think data points can be helpful with a
7 strict methodology that's reproducible.  And at times
8 erroneous data points, outliers -- and this is
9 defined as an outlier, this Amazon price being so
10 much lower than the rest of it -- can be confusing.
11    Q    How do you know if it's an outlier if your
12 sample only had three pharmacies?
13    A    Well, I think that that's pretty clear;
14 that you're mentioning a third of the cost.  And so
15 that would be a far outlier compared to the three
16 pharmacies that we -- that we sourced for comparison.
17    Q    And you just looked at those three, right?
18 You didn't look anywhere else?
19    A    Correct.
20    Q    Okay.  Let's look at Exhibit 13.
21        (Exhibit Number 13 was marked.)
22    Q    (BY MS. PALEY)  Now, I do apologize for
23 the print quality here, but this is printed from one
24 of my -- from my browser.  Exhibit 13, do you see
25 that this is from a website, GoodRx?  Do you have any

237

1  familiarity with GoodRx?
2      A   I do.
3      Q   Okay.  Have you ever filled a script
4  through GoodRx?
5      A   Personally, I don't take any prescription
6  medicines, so no, I've never filled a prescription
7  with GoodRx.
8      Q   Are you comfortable if your patients want
9  to fill a prescription with GoodRx?  Do you have any
10 concerns about that?
11     A   Well, I don't think they fill it with
12 GoodRx.  I think they take a little discount card and
13 show up at the pharmacy.
14     Q   Okay.  So GoodRx actually lets you go to
15 your local pharmacy with a discount card and get
16 prescription medications for lower prices than you
17 might be able to get them without the discount card;
18 is that right?
19     A   Compared to insurance, co-pays or cash
20 rate options.  In general, I think that -- that is a
21 good understanding of how that GoodRx card works.
22     Q   Okay.  Did you ever warned any patients
23 away from, you know, getting a GoodRx card?
24     A   No, I have not.
25     Q   Okay.  Do you have any concerns with

238

1  patients using GoodRx cards?
2      A   I don't have any concerns with them using
3  a GoodRx card.  It's just not something that we are
4  employing and I'm employing into my methodology to
5  price out the cash or self-pay option for
6  prescription medications in this report.
7      Q   Okay.  And if someone goes and fills a
8  prescription with a GoodRx card, they are -- they're
9  a cash payor, because they're not using their
10 insurance at that point, right?
11     A   I'm not sure.  I think it's potentially
12 variable.  I'm not sure since I personally have never
13 done it, like I mentioned.
14     Q   Okay.  So let's look quickly here.  Do you
15 see it says, First, match your prescription, and I
16 typed in --
17         THE REPORTER:  First what?
18     Q   (BY MS. PALEY)  First, comma, match your
19 prescription.
20     A   Match, M-a-t-c-h.
21     Q   Correct.
22     A   Correct.
23     Q   And do you see it says, 100 milligrams
24 Lamotrigine, 90 tablets?
25     A   Yes.

239

1      Q   Okay.  And that 90 tablets, that would be
2  what you recommend for Ethan on a monthly basis,
3  right?
4      A   Yeah.
5      Q   Taking it three times a day?
6      A   Correct.
7      Q   Okay.  And so -- and the -- it says, Next,
8  pick a pharmacy to get a coupon.
9          Do you see I typed in here, Pearland,
10 Texas, zip 77581?
11     A   Yes.  I see that.
12     Q   Okay.  So this is providing pharmacy
13 information for pharmacies in Pearland, Texas.
14         THE DEPONENT:  The button -- the button,
15 I'm sorry.  Green button.
16     Q   (BY MS. PALEY)  Okay.  And so, Doctor, do
17 you see -- what's the price for the -- I don't know
18 how people say it, HEB or HEB grocery store?
19     A   Yeah.  I see HEB $12.46, among all the
20 other vendors as well.
21     Q   Uh-huh.  And what's the price at Costco?
22     A   Costco is $10.97.
23     Q   And you can fill scripts at Costco without
24 being a Costco member, right?
25     A   I don't know.  I don't do that.

240

1          MR. PARKER:  Objection to form.
2          MS. PALEY:  He doesn't have to know.  It's
3  okay.  You can.
4      Q   (BY MS. PALEY)  And then Randall's.
5  Randall's is a pharmacy or supermarket?  Do you know?
6      A   I believe it's both.
7      Q   Okay.  And what's the price at Randall's?
8      A   $9.18.
9      Q   So just here -- and I understand
10 that there are other prices as well, prices up to
11 111.09 and as low as 9.18.  Just -- you didn't -- you
12 didn't look at this pricing available through GoodRx
13 as part of your cost survey, right?
14     A   We never do, in a life care plan following
15 the specific methodology to -- to then try to price
16 this out as a discounted rate.  And there's numerous
17 reasons why.  And I think I've pretty much mentioned
18 the majority of them at this time.
19     Q   And PLCP, they're the ones who put
20 together the methodology?
21     A   No.  The methodology is formulated from
22 initially the case management and life care planning
23 handbook, along with the Guide to Physician Life Care
24 Planning book that we discussed.  And then I have --
25 I have the ability to deviate, but I always want to

241

1 be able to explain the methodology, have it
2 reproducible, be able to get the exact same cost
3 priced out and have it transparent. And those
4 reasons, along with all the other specific reasons we
5 talked about on specific medications, I do not use
6 GoodRx for this cost analysis.
7    Q   Okay. But if -- if you were to use these
8 prices available at local pharmacies in Pearland for
9 lamotrigine, then do you agree that the average price
10 in your life care plan would go down?
11    A   Well, I'm not going to use them in my life
12 care plan. If a patient or the mother of a minor
13 chooses to then acquire medications through GoodRx,
14 that would be their choice. And that, yes, clearly
15 would be a lower cost compared to the options that we
16 have sourced in the life care plan consistent with
17 our methodology.
18    Q   And when putting together this life care
19 plan, you don't say to the family like, Now you can
20 only go to the pharmacies that I included in my
21 methodology. They have complete freedom to go and
22 search for options such as these half-dozen or more
23 options available in Pearland through the GoodRx
24 program?
25    A   Both of your statements or questions are

242

1 correct.
2        MS. PALEY: Okay. All right. Should we
3 take just a little stretch break?
4        MR. PARKER: I think we would like that.
5        MS. PALEY: Okay.
6        THE VIDEOGRAPHER: The time is 3:09.
7 We're off the record.
8        (Recess from 3:09 p.m. to 3:25 p.m.)
9        THE VIDEOGRAPHER: The time is 3:25. We
10 are back on the record.
11    Q   (BY MS. PALEY) All right. Welcome back,
12 Doctor.
13        Just to maybe save us a little time here,
14 I was asking you about lamotrigine -- I might have
15 butchered that.
16    A   Lamotrigine.
17    Q   Lamotrigine.
18    A   I understand exactly what you mean, yes.
19    Q   Lamotrigine. And availability through
20 various retailers such as Amazon or using GoodRx
21 coupon cards to fill it at local pharmacies in
22 Pearland. If I were to ask you the same questions
23 about any of the other medications Ethan asks [sic],
24 would the answers be effectively the same? You
25 haven't considered those sources, and you don't

243

1 believe that those sources are appropriate to
2 consider under your methodology?
3    A   Yes. Thank you for summarizing.
4    Q   Okay.
5        MR. PARKER: That was a wonderful question
6 and answer.
7        MS. PALEY: Exactly what Charlie wants.
8 Charlie wants to get back to his ranch. And it is
9 Friday afternoon, which I understand is hard.
10    Q   (BY MS. PALEY) Quick few questions about
11 Humira and then we can move on from the drugs.
12    A   Yes.
13    Q   Humira is under your plan -- well, not
14 under your plan. Humira is not available in generic
15 form right now, right?
16    A   It's my understanding.
17    Q   And Humira is right now a fairly expensive
18 drug and actually the single largest cost driver of
19 the pharmacy part of your life care plan, right?
20    A   Yes.
21    Q   Around $6.4 million in your nominal
22 values, right?
23    A   Yes.
24    Q   Okay. Do you have any sense of when a
25 Humira generic or -- pardon me -- biosimilar may be

244

1 available in the market?
2    A   I think that might be a question for
3 Dr. Krigsman, the treating gastroenterologist. My
4 sense is minimum of ten years before that's
5 potentially allowed for -- the FDA would allow a
6 generic option solution to be produced or sold.
7    Q   And so at the point at which a generic
8 option or solution or biosimilar option or solution
9 is produced or sold, then would it be appropriate to
10 sort of update the understanding of costs based on,
11 using your methodology, a blend of generic and brand
12 costs?
13    A   I think that would be reasonable at that
14 time.
15    Q   Okay. Let's look at Exhibit -- I think
16 15? Do you have 14 --
17    A   13 I think is GoodRx.
18    Q   14. Okay. Then Exhibit 14.
19        (Exhibit Number 14 was marked.)
20        MS. PALEY: Sorry. That really did not
21 fly.
22    Q   (BY MS. PALEY) All right. Do you see
23 Exhibit 14 is an FDA news release?
24    A   I do.
25    Q   And do you see it says, FDA approves

245

1  Cyltezo, the first interchangeable biosimilar to
2  Humira?
3      A   Yes.
4      Q   And do you see that the date on this is
5  October 18th, 2021?
6      A   Yes.
7      Q   All right.  Do you see at the bottom of
8  this page, in the last sentence it says, Cyltezo,
9  what it's indicated for, and that includes, at the
10 end of the sentence, Pediatric patients 6 years of
11 age or older with Crohn's disease?
12     A   Yes.
13     Q   So Cyltezo, according to this FDA news
14 release, would be approved to treat Ethan's Crohn's
15 disease as an interchangeable biosimilar to Humira;
16 is that correct?
17     A   I mean, that's what it's stating on this
18 news release with -- where is the source?  Is it --
19     Q   At the end, you can see Inquiries, and
20 it's to an FDA employee and consumer line is
21 888-InfoFDA?
22     A   So FDA.gov.
23     Q   Yes.  FDA.gov is the source.
24         Can you look on Page 2 of this document,
25 Doctor?

246

1      A   Uh-huh.
2      Q   And see on the fourth line down, do I read
3  correctly when I say, Patients can expect the same
4  safety and effectiveness from the biosimilar as they
5  can from the reference product?
6      A   That's what it states.
7      Q   Okay.  So do you have any specific reason
8  for concern if Ethan were to use Cytelzo as a
9  biosimilar to Humira?
10     A   My -- my two concerns would be,
11 number one, there may be or must be a reason the
12 treating gastroenterologist hasn't switched him.  My
13 second concern is that it states in the third
14 paragraph that it's to be injected under the guidance
15 of a physician.  So I would need to know exactly what
16 frequency -- once a month, once every two weeks --
17 and does that actually mean in an office under the
18 guidance of a physician or not.
19     Q   Well, Doctor, I'll represent that the FDA
20 has approved it.  It's not -- it's not available at
21 pharmacies quite yet, but -- so that's why -- just to
22 clarify, that's why, you know, there's no way for
23 Ethan to take this right now.  But it's been approved
24 by the FDA.
25     A   Okay.

247

1      Q   So do you -- if -- if Ethan's treating
2  gastroenterologist said it was appropriate for him to
3  take Cytelzo as a biosimilar that the FDA says, From
4  which patients can expect the same safety and
5  effectiveness as the reference product, Humira, would
6  you have any concerns with that?
7      A   If the treating gastroenterologist
8  recommended or prescribed it, then -- then no, I
9  would not have any concerns.  I still would just want
10 to review administration route and clarification
11 under -- quote, Under the guidance of a physician,
12 end quote.
13     Q   And what -- why is that important to you?
14     A   Well, because at times, certain medicines
15 have to be administered in an office, monitored;
16 certain subcutaneous injections or IV administration.
17 And so if it is that guidance of physician in office
18 being monitored with vital signs or whatever
19 timeframe, then that maybe would create a logistic
20 concern where it's not going to be prescribed because
21 of that and having to get Ethan to that office.
22         So, you know, those are just logistic
23 concerns that typically I would defer to the treating
24 gastroenterologist to discuss and/or determine if
25 he's going to switch the medicine.

248

1      Q   And you understand that when generics or
2  biosimilars come on the market that, on average, you
3  know, prices come down, correct?
4      A   I mean, I don't know if this is a generic,
5  because it sounds like it has a brand name to me and
6  it's a different company.  So I don't know if this is
7  actually a generic.  So I'm not sure if I can answer
8  that question right now.
9      Q   I actually said generic or biosimilar.
10         But let me point you to the second
11 paragraph on Page 2, last sentence.  Do you see the
12 FDA says, Biosimilar and interchangeable biosimilar
13 products may cost less than the brand name medicine?
14         Did I read that correctly?
15     A   I'm sorry, where are you again?
16     Q   Second page, second paragraph.
17     A   Okay.
18     Q   Last sentence.
19     A   Biosimilar and interchangeable, biosimilar
20 products may cost less than the brand name medicine.
21     Q   Do you have any reason to, you know,
22 understand that in this case, for whatever reason,
23 Cyltezo certainly would not cost less than Humira?
24 Any data that would suggest that?
25     A   No data, just what you told me.  If it's

249

1  not available right now, but it got approved
2  **October 15th, 2021, I would want to know why it's not**
3  **available. And then for the discussion, what would**
4  **be the cost if it was available.**
5      Q    When preparing the -- the life care plan
6  cost analysis for Humira, did the individuals who
7  called the pharmacies have any discussion with the
8  pharmacies regarding manufacturer coupon programs or
9  rebate cards that are available to consumers to
10  reduce their out-of-pocket costs for expensive drugs
11  like Humira?
12      A    **We typically do not employ that in the**
13  **methodology, similar to the GoodRx. So we get an**
14  **understanding of the full cost of the medicine.**
15      Q    Okay. So if there -- if there are coupon
16  cards that will make Humira as low as $5 a month out
17  of pocket for a patient, that's not included in your
18  methodology. You used the 7600 or so dollar list
19  price from the pharmacy?
20      A    **That's correct.**
21      Q    Okay. Let's talk about rehabilitation
22  services. We can look back at your report. Now,
23  Page 213 I believe has a summary of the recommended
24  rehabilitation services included in your report.
25          Do you see that?

250

1      A    **Yes. Thank you.**
2      Q    Okay. And I will say your report format
3  is nicely organized, and it made it easy to go
4  through. So thank you for that.
5          All right. Page 213, rehabilitation
6  services costs. Let's look at Item 8. Item 8 is
7  listed as occupational therapy home health.
8      A    **Uh-huh.**
9      Q    Now, home health is also listed somewhere
10  else here. I take it when it says, Occupational
11  therapy home health, that means it's an OT person
12  coming to the Palmquists' home to provide
13  occupational therapy services. Is that a correct
14  understanding?
15      A    **Yes.**
16      Q    Okay. And looking over across the page on
17  Item 8, the occupational therapy, you have that
18  beginning at age 7, right?
19      A    **Uh-huh.**
20      Q    The quantity is one unit, right?
21      A    **Yes.**
22      Q    And that's one unit per day, correct?
23      A    **Yes.**
24      Q    Okay. For 11 years?
25      A    **Correct.**

251

1      Q    Okay. Now, that one unit per day, that's
2  365 days a year or 366 days a year if there's a leap
3  year?
4      A    **Correct.**
5      Q    Okay. So that includes every weekend?
6      A    **Yes.**
7      Q    It includes every holiday?
8      A    **Yes.**
9      Q    It includes Christmas Day even?
10      A    **For the purpose of this report, yes.**
11      Q    Now, do you have any support from any
12  practice guidelines or any medical literature
13  demonstrating that patients with autism or with
14  Ethan's presentation derive effective -- strike that.
15          Do you have any support from any practice
16  guidelines or medical literature demonstrating the
17  effectiveness of daily, 365 days per year, for years
18  on end, occupational therapy in children with autism?
19      A    **The sort of thought process here is the**
20  **current kind of situation at home and optimization of**
21  **occupational therapy at home, along with the**
22  **discussion I had with Dr. Settles on more intensive**
23  **daily therapy, even on the weekends, to avoid a**
24  **change in his schedule.**
25          **The specific questions on literature,**

252

1  **guidelines, I do not have those guidelines**
2  **demonstrating recommending daily occupational**
3  **therapy.**
4      Q    And do you have any support from Ethan's
5  providers -- not from Dr. Settles, who is an expert
6  in this case, but from Ethan's providers --
7      A    **Uh-huh.**
8      Q    -- that would support the claim that Ethan
9  needs an hour of occupational therapy every day of
10  the year including Thanksgiving, Christmas, every
11  weekend?
12      A    **I did not discuss those with the two**
13  **treating providers that I did contact, but we can**
14  **always send them my report and then ask them if they**
15  **support my recommendation.**
16      Q    Okay. And have you looked in the medical
17  records to determine how often Ethan was receiving
18  occupational therapy or how often -- or how often --
19  the frequency with which his providers suggested he
20  should receive occupational therapy?
21      A    **I believe I had reviewed that. I'm not**
22  **sure exactly where that is along with his mom,**
23  **Dr. Sarah, telling us his frequency.**
24      Q    And we can save some time here if I either
25  go through the report or I could ask you here. Would

253

1  you be surprised to know that every reference in your
2  report to occupational therapy is for occupational
3  therapy two times a week?
4      **A    What do you mean reference in my report?**
5      Q    Sure.  Let's look at Page 13 of your
6  report.  And I'll just let you know, here is my
7  process.  I looked for every time "occupational
8  therapy" or "OT" came up to see what has he received
9  or what have his providers suggested he receive.
10     **A    Got it.**
11     Q    So Page 13, the March 1, 2018, entry that
12 starts with, Ethan underwent a speech therapy
13 revaluation.  There's a second undated bullet under
14 that that begins, Records indicate Ethan had a
15 follow-up consultation with Dr. Megson?
16     **A    Yes.  The undated bullet underneath the**
17 **bolded March 1, 2018, is trying to tell me, the**
18 **reader, it's actually on the same date as March 1st,**
19 **2018 above.**
20     Q    That's what I figured it probably was.
21         And do you see in that paragraph, it
22 says -- it starts to list, Dr. Megson noted Ethan was
23 receiving, and it includes a list of therapies and
24 occupational therapy, OT, two times per week?
25     **A    Yeah.  I see occupational therapy, OT two**

254

1  **times per week, comma, and behavior therapy three**
2  **days per week based upon his telephone follow up**
3  **March 1st, 2018.**
4      Q    Okay.  Now, let's look at Page 26 of your
5  report, December 30th, 2019.
6      **A    Okay.**
7      Q    Ethan underwent an occupational therapy
8  revaluation at River Kids Pediatric Home Health.
9         Do you see that?
10     **A    Yes.**
11     Q    And do you see the third line down it
12 says, He was provided a treatment plan which included
13 therapy two times per week for six months?  Do you
14 see that?
15     **A    Yes.**
16     Q    Okay.  That's another reference to OT -- a
17 recommendation of receiving it twice a month,
18 right -- or sorry, or twice a week, right?
19     **A    Yeah.  Almost two and a half years ago,**
20 **that was a recommendation.**
21     Q    Okay.  Let's look at Page 28,
22 January 27th, 2020.  And do you see about five lines
23 down, Dr. Dillon stated Ethan remained on
24 occupational therapy and physical therapy two times a
25 week and remained on ABA?

255

1      **A    Yes.**
2      Q    Okay.  Can you point me to anything else
3  in these records where Ethan's providers have
4  recommended OT anything more than twice a week?
5      **A    I can't point to any of that prescription**
6  **for care for occupational therapy more than two times**
7  **a week.  And I obviously had a different methodology**
8  **as a life care planner for my recommendations than**
9  **his treating physicians.**
10     Q    Okay.  Let's see.  And for the
11 occupational therapists, the cost survey includes
12 providers who are -- several providers who are more
13 than 30 miles away from the Palmquists' home.  Did --
14 in -- in calling the OT providers who are included in
15 the survey, did the individuals who made those calls
16 indicate where the therapy would need to be provided?
17     **A    I'm not sure.  I'd have to reach out to**
18 **them to ask them, my staff, if they specifically**
19 **address location in Pearland.**
20     Q    And the -- I'll just note, the providers
21 who are farther away from the Palmquists' home have
22 much higher costs.  So I wanted to understand whether
23 any part of those higher costs came from the fact
24 that this would require significant driving by the
25 therapist.

256

1      **A    That's a good question.  I'm not sure.  In**
2  **my experience, there's a listed -- like the first**
3  **one, the specific address is probably their corporate**
4  **headquarters, but that doesn't necessarily mean that**
5  **an occupational therapist is personal home,**
6  **headquarters, then to the client's home.**
7          **In my experience, the home health**
8  **therapists are kind of around all of their clients or**
9  **patients, and then they actually go home.  That's**
10 **here in Denver.  So we would have to follow up with**
11 **these companies and/or ask them that specific**
12 **question.**
13     Q    And when calling these providers on the
14 phone, was there the specific request as to whether
15 they could provide OT 365 days of the year?
16     **A    I don't think that was requested either.**
17     Q    Okay.  Let's talk about speech therapy.
18     **A    Uh-huh.**
19     Q    Speech therapy, the cost survey numbers on
20 Page 93 and Page 213 has your chart as to recommended
21 frequency.
22     **A    Yes.**
23     Q    So you're recommending, is it 60-minute
24 speech therapy sessions?
25     **A    Yes.**

257

1   Q   And this is also provided in the home?
2   A   Yes.
3   Q   Okay.  And this is also another therapy
4 that you're recommending 365 days of the year or 366
5 in the leap year?
6   A   Yes.
7   Q   Okay.  And do you have any practice
8 guidelines or medical literature demonstrating that
9 that is recommended -- that frequency is recommended
10 for children with Ethan's presentation?
11   A   I do not.
12   Q   And do you have any recommendations from
13 Ethan's providers that he receive daily speech
14 therapy?
15   A   I do not.
16   Q   Okay.  And similarly for speech therapy,
17 was there any effort to find providers near the
18 Palmquists' home specifically?
19   A   Just kind of what we identified here,
20 which are similar -- similar companies like home care
21 options in Pearland, Texas, et cetera.
22   Q   And so in terms of the home care
23 providers, does the same sort of methodology apply to
24 how the occupational therapy provider costs were
25 sourced as speech therapy, home health, et cetera?

258

1   A   Same methodology --
2   Q   Okay.
3   A   -- for sourcing those costs.
4   Q   Okay.  You're saving yourself a lot of
5 questions by -- by explaining that.  Thank you.
6       Okay.  Let's speak briefly about the --
7 the special school needs -- actually, behavioral
8 therapy --
9   A   Uh-huh.
10   Q   -- Number 4.  This is another therapy
11 where you have Ethan receiving daily therapy one hour
12 a day, 365 days of the year?
13   A   That's correct.
14   Q   So we have three therapies that
15 Ethan is supposed to -- under your life care plan,
16 receive, every day, correct?
17   A   That's correct.  I don't think he will be
18 able to get any of this therapy at ABA or the special
19 needs school.  So that's where the kind of at-home
20 therapy comes in play.
21   Q   Would the behavioral therapy also be
22 provided in the home?
23   A   I think there's options on that.  If there
24 would be a specific therapist willing to come home,
25 that perhaps would be an option -- come to their home

259

1 or other locations where family members,
2 transportation allowance, home healthcare aides,
3 parents would drive him to that behavioral therapy.
4   Q   And you say that you don't think he'll be
5 able to get any of this therapy -- the behavioral
6 therapy, the speech therapy or the occupational
7 therapy -- in the special needs school.  Did I
8 understand that correctly?
9   A   Yes.  Typically it's nowhere near the
10 amount of therapy that I'm recommending he receive.
11 It may be one hour a week perhaps.  That would be
12 something that we would just need to review with like
13 Avondale House specifically.
14   Q   And what is the -- that's actually my
15 question.  What is your basis for saying that their
16 curriculum would not include a sufficient amount of
17 behavioral, occupational and speech therapy if you
18 haven't specifically spoken with Avondale House about
19 their curriculum?
20   A   Speaking with Dr. Sarah/Mom about their
21 curriculum and then reviewing their website on kind
22 of this adolescent special needs school age and then
23 what they offer and then moving into the adult
24 program as well.
25   Q   Okay.  The website actually doesn't say

260

1 one way or another what's included within the
2 curriculum, right?  They don't include like, Here's
3 what a daily life -- daily life in an Avondale
4 student would be, right?
5   A   Well, I think there's some information on
6 what it's like there.  But, again, in my experience,
7 I don't see the specific rehabilitative therapists
8 going to that type of school.  That's something in
9 addition outside of the home, et cetera.
10   Q   You don't normally act as a coordinating
11 care provider for children with autism, right?
12   A   That's correct.
13   Q   Okay.  And you have no specific
14 information to say whether Avondale does or does not
15 include a sufficient amount of those therapies?
16   A   Just what we discussed on the website
17 review, I did not see that they are offering those
18 specific therapies directly.
19   Q   But the website didn't say what they were
20 or were not offering, right?
21   A   You know, I don't recall were or were not
22 offering.  I just don't remember seeing that it was
23 there.  So that's something we can follow up on.
24   Q   Okay.  All right.  We can -- just a
25 second.

261

1    All right.  Let's mark as Exhibit 15.
2 This is Avondale House, Our Services.
3    (Exhibit Number 15 was marked.)
4    Q    (BY MS. PALEY)  Now, there's the Avondale
5 House residential program, the program for young
6 adults and then there's the school, right?
7    A    Yes, that's my understanding.
8    Q    I'll represent this is the printout from
9 the school.
10   A    374.
11   Q    And Exhibit 15 is right in front of you
12 now.  Are you trying to get those pages in order?
13   A    Yeah.  I'm sorry.
14   Q    Okay.  All right.  Exhibit 15.  Do you see
15 this is Avondale House, the School at Avondale House,
16 top center of the page?
17   A    Yep.
18   Q    Okay.  And it says Our Services.  Okay.
19   A    Okay.
20   Q    Do you see that?
21   A    Yep.
22   Q    Flip over to the second page.  You see
23 information about like number of students,
24 student/teacher ratio, approved by the Texas
25 Education Agency.  Second paragraph.  It says, With

262

1 certified teachers, licensed specialists,
2 well-trained paraprofessionals, a low
3 teacher-to-student ratio and state-of-the-art
4 classroom, our educational program is tailored to
5 meet the specific individual needs of each student,
6 correct?
7    A    Yes.
8    Q    Okay.  And then it goes on to say, the
9 second sentence in the next paragraph, Each student
10 receives education and training according to the
11 individual -- to the child's individualized education
12 and behavior improvement plans.
13      Did I read that correctly?
14   A    Yes.
15   Q    Okay.  Does this say one way or another
16 whether the students do or don't receive behavioral,
17 occupational and speech therapies?
18   A    My interpretation of this would be that
19 there are not OTs, PTs or behavioral therapists
20 working with or treating in the middle of this
21 Avondale House school or school day program.
22   Q    Okay.  But you didn't call them to find
23 out?
24   A    No, I did not.  I delegated that to my
25 staff for the cost analysis piece of it.

263

1    Q    And did you ask your staff to specifically
2 determine what therapies or services were provided by
3 Avondale House?
4    A    No, because we used other things we were
5 describing as specific vendors or the UCR data for
6 the Section 7.45, Rehab Services.
7    Q    Okay.  How long is the school day at
8 Avondale?
9    A    I'm not sure.
10   Q    Okay.
11   A    It could be probably anywhere from eight
12 to 12 hours.
13   Q    Okay.  So eight to 12 hours.  And then you
14 recommend three hours a day of therapy for Ethan.
15      So is that between 11 to 15 hours a day of
16 structured school and therapy?
17   A    That sounds about right.
18   Q    Okay.  And then in addition to those daily
19 therapies, you also include, with some regularity,
20 additional things like behavioral psychologist,
21 family counseling and other activities that would
22 require Ethan to be involved in a program for a few
23 hours a week, right?  That was a bad question.
24      In addition to the 11 to 15 hours a day of
25 scheduled school and therapies that you have here,

264

1 are there other treatment recommendations in your
2 life care plan that Ethan would undertake at this
3 time, before age 18?
4    MR. PARKER:  Objection to form.
5    A    So -- yeah.  I think, you know, having the
6 doctors' visits, you take the child to the visit and
7 you bring them back to school.  Family counseling
8 could be as a family.  Typically meaning the parents
9 and the child, but typically it's more for the
10 parents and/or grandmother or -- so -- so yes, at
11 times that would be, again, hours, perhaps out
12 of the, you know, special needs school at Avondale
13 House.
14   Q    (BY MS. PALEY)  Okay.  There would also be
15 the weekly developmental specialist, right?
16   A    Yeah.  I think that would be a
17 consideration to -- for him and his family to see.
18   Q    And the weekly behavioral psychologist?
19   A    Yes.
20   Q    Okay.  What transportation options does
21 Avondale school provide?
22   A    I don't think that they can pick him up
23 from their house.  Discussing with the family, they
24 would drive, either grandmother or the two parents,
25 would drive him to that -- to Avondale House.

265

1    Q    Okay. So you did specifically discuss
2  transportation with the Palmquists?
3    A    We did touch on that when I was there at
4  the home visit.
5    Q    Okay. So let's move to the -- we were
6  looking at Page 213 that has the rehabilitation
7  services. The post acute neuro day program, Item 12.
8    A    Yes.
9    Q    Is this essentially a bridge program
10 between ending school and entering a residential
11 home?
12    A    Yes. Speaking with the family on some of
13 the preferences, you know, kind of the 18 to 21
14 transition age. And so that's where we call it the
15 post acute day neuro program where then Ethan would
16 come home and sleep at the house, but he would be
17 then back in school the next day.
18    Q    Okay. And do you have any sense of the
19 transportation options that this program would
20 provide?
21    A    I think it was similar to what we were
22 discussing with the family; that they would be
23 responsible to take him there.
24    Q    Okay. I know you've got within your
25 report about $500 a month, I believe, for

266

1  transportation costs. What is that meant to cover?
2    A    I think Sarah and Grant did mention things
3  about their work schedule. At times, they may not be
4  able to balance their workflow and be able to do all
5  the care that they're already doing with Ethan. And
6  that's why grandmother or grandparents I was told
7  drive him at times.
8        And so if we have a transportation
9  allowance, that would allow for a consistent driver
10 to some of these daily routines, like the special
11 needs school at Avondale House, and take the burden
12 away from the parents and try to decrease their
13 amount of caregiver burnout.
14    Q    Okay. And I misspoke. It's actually $500
15 a week in transportation costs.
16        And if we want to look, it's Page 246 of
17 your report. But there's --
18    A    I recall, yes.
19    Q    Okay. Your report includes no vendor
20 survey or any -- frankly, any substantiation for $500
21 a week in transportation costs, right?
22    A    I'm happy to discuss it now if you'd like.
23    Q    Yeah. I'm just wondering, what's the
24 support for the $500 per week?
25    A    Sure.

267

1    Q    Because I don't see anything in the
2  report.
3    A    Yeah. You know, I -- so basically if we
4  were to use a professional driver or like -- I hate
5  to say the ride-sharing, but that type of option, $50
6  one day -- one way, excuse me, return home, another
7  $50, that's a hundred dollars a day. That's five
8  days a week. That's $500 a week. And that would be
9  able to get Ethan to Avondale House and not rely upon
10 the parents to decrease their personal revenue.
11        And then I think that also would
12 contribute to the parents having caregiver burnout
13 doing that.
14    Q    Okay. But in your report, there's no
15 substantiation for the hundred dollars a day, right?
16 It's just kind of a number you've picked because it
17 sounded right?
18    A    It's a number I picked based on
19 conservative estimate on how much it costs to get a
20 professional driver, an Uber, a Lyft, a ride share,
21 things like that.
22    Q    But none of that is documented in your
23 report, right?
24    A    No. This is -- isn't typically documented
25 in my report. I reserve usually this discussion for

268

1  this type of environment in deposition.
2    Q    Since we're on the page, let's just run
3  through the other two quickly. Home modification,
4  $50,000. Again, nowhere documented in your report is
5  what that $50,000 would be spent on. There's no cost
6  survey, right?
7    A    Not --
8    Q    Let me strike that, and I can ask again.
9        Does your report include any sort of a
10 cost survey or other data to support the $50,000
11 number specifically?
12    A    Excuse me. It's an estimate based upon
13 things outlined in like the history of present
14 illness, what the damage he's caused to the house
15 specifically. So those would be safety modifications
16 and repairs. And this was, in my mind, very, very
17 conservative, given the experience I have and the
18 type of repairs and costs right now this year.
19        And so that is the logic and explanation
20 for home modifications. The bars on the window,
21 repairing the drywall and the kitchen damage, things
22 like that, the fence damage, the yard damage, safety
23 concerns and/or repairing.
24    Q    Did you talk to any contractors? Do you
25 provide any substantiation for the $50,000

269

1 specifically in the report?
2    A   It's just an estimate based upon my
3 experience for those safety and -- concerns and
4 damages already caused by Ethan.
5    Q   Okay.  And that's your experience as a
6 layperson who might have done work on his house?
7    A   I have a little bit more experience than
8 just a layperson.  But that's, again, a conservative
9 estimate in my mind, walking through their entire
10 home and listening to the family describe what --
11 what needs they have for safety and what damage he
12 has already caused.
13    Q   Okay.  And just very briefly, what is
14 that -- that experience beyond a layperson
15 experience?
16    A   Oh.  I -- my wife and I have three LLCs
17 for development, entitlement, zoning, and she's a
18 professional landscape architect.  So we have lots of
19 projects that we work on together.
20    Q   But you're not talking about yard
21 beautification here.  You're talking about like bars
22 on windows?
23    A   So one thing for him is a bar on a window.
24 I'm not talking about landscape for yard
25 beautification.  We're talking about fixing some

270

1 exposed areas of mud and dirt that he was getting in.
2 There's exposed areas of the fence he can crawl under
3 and then go to the neighbor's pool.  And that would
4 not be good.
5       And there's other damage that he's caused
6 in the house all over the place, from drywall to
7 baseboards to kitchen to cabinets to drawers to
8 bathrooms.  So that, again, is an overall estimate
9 that is just a -- I think a conservative estimate of
10 what it would cost until the age of 21 when he's out
11 of the house, for them to maintain safety for Ethan
12 and the two younger daughters.
13    Q   Okay.  But there's no -- there are no
14 details in your report as to how you came up with
15 that estimate; is that correct?
16    A   That's correct.
17    Q   Okay.  Essential services, a thousand
18 dollars a month.  What do you mean by essential
19 services?
20    A   Essential services could be a maid
21 service, a lawn service, help with laundry.  So
22 things like that.  It could be a chef.  It could be
23 helping with cooking, cleaning up.  Their house,
24 unfortunately, was in poor repair.  There was lots of
25 clothes exposed with soil in the laundry room with

271

1 about five or six baskets of dirty clothes in
2 succession.
3       And so essential services would be all of
4 those different things in the home environment for
5 home maintenance, home cleaning, to decrease that
6 burden on the parents so they can focus on the two
7 younger daughters and Ethan and their jobs.
8    Q   Now, everyone -- you and I and Mr. Parker
9 here -- we all have to either keep our homes clean or
10 pay someone to keep them clean.  But that has nothing
11 to do with having a child with autism, right?  We all
12 have to cook, right?
13    A   Well, I think it does have to do with
14 child's specific -- excuse me, Ethan's specific
15 diagnoses or a child with autism, because they were
16 very clearly -- and my home -- is unable to maintain
17 a clean environment, which does have concerns,
18 because both parents are working.  She has a lot of
19 things on her plate as a physician.  And it was
20 not -- it was not clean with the amount of dirty
21 laundry.  And she expressed concerns about that and
22 how essential services would be extremely helpful for
23 her and her family.
24    Q   But I mean, you have no evidence that --
25 strike that.

272

1       You also suggest that Ethan should have --
2 I think it's 28 hours a day of home healthcare,
3 right?
4    A   Not exactly.
5    Q   Well, you have a 16-hour a day
6 recommendation every day of the year and a 12-hour
7 recommendation every day of the year, right?
8    A   So this is two at once.  And so it's
9 recommended by me and others that he have two adults
10 supervising him.  So if we were considering, again,
11 kind of the amount of time in school and
12 transportation and then having the hours for the home
13 healthcare aides to drive to his house and then
14 supervising him 16 and 8 would be 24, the lower
15 number.  12, I think then I have supplemented with a
16 licensed vocational nurse for medication
17 administration.  That would be the only way for the
18 parents to functionally take care of the two younger
19 daughters and be able to leave the house with Ethan
20 at the house, outside of eight hours in school, with
21 two adults, home healthcare aides, watching him,
22 which includes time at night.
23    Q   Okay.  So let me make sure I got that.
24    A   Okay.
25    Q   Do you -- do your estimates include the

273

1  home healthcare aides going to school with Ethan or
2  being at the Palmquists' home when Ethan is at
3  school?
4      A   So let me just review Page 250, nursing
5  attendant care, make sure we're exactly on the same
6  page discussing this.
7          Item 2 is home health aide, 16 hours, and
8  3 is the home health aide -- 12 hours --
9      THE REPORTER:  I'm sorry?
10     THE DEPONENT:  Which part?  I'm sorry.
11     THE REPORTER:  Item 2 is home health aide,
12 13 hours?
13     A   Correction, Item 2, home health aide,
14 16 hours; Item 3, home health aide, 12 hours; Item 4,
15 LVN care, four hours.
16         So the thought process and the methodology
17 here is two adults, which would be home health aide
18 16 and then home health aide 12, it's plus LVN 4.
19 That gives two adults supervising him at all times
20 when he's home and not at school, and that accounts
21 for the different changes in the schedule, et cetera,
22 utilizing what we already talked about, an average of
23 eight hours a day in school.
24         LVN care is so that the licensed
25 vocational nurse can actually administer the

274

1  medications for Ethan, because a home health aide
2  would not do that. So that, in my mind, covers his
3  safety. It allows the parents to take care of the
4  daughters, prevent their caregiver burnout. And that
5  then is the eight hours roughly in school for a total
6  of a 24-hour period.
7      Q   (BY MS. PALEY) So your recommendation is
8  essentially, except for an estimated eight hours a
9  day at school, Ethan at all times has two
10 non-parental adults monitoring him, watching him,
11 including two while he's sleeping at night?
12     A   We definitely have some history of
13 outbursts at night and things and aggression at
14 night. And then, again, we have to protect the
15 younger daughters.
16         In addition, I think it's important that
17 the general methodology and sort of the plan for home
18 healthcare aides cannot always include a spouse or
19 parents because they're not always available.
20 There's a high rate of caregiver burnout. And so as
21 we're predicting costs for these life care plans,
22 family members, spouses, parents are removed from
23 that supervision to then optimize this 16 hours a day
24 home supervision. And then that's where then the
25 cost analysis comes from.

275

1      Q   Okay. And so under this plan, the
2  Palmquists could both leave the home, you know, at
3  any time with their -- say their other daughters or
4  Ethan could remain home with the home health aides;
5  is that correct?
6      A   Until the age of --
7      Q   Until the age of 18 or I think 21.
8      A   -- 21. So we very well could extend that
9  forever to the age of 70 and then remove the
10 additional cost of the day -- not day program but the
11 full adult home.
12         So the preference was, with the family, to
13 have this now until the age of 21. But then
14 realistically they were telling me they don't think
15 they can keep him there as a bigger-sized adult,
16 because that would mean -- his baby sister is seven
17 years younger -- 15 or so. So this was kind of the
18 idea that we discussed together, the transition age
19 21 out of the house. And so this accounts for the
20 safety and the care from age 7 to age 21.
21     Q   Okay. But my question was, under this
22 regimen of care, the Palmquists could leave the home
23 at any -- any time with like their other daughters or
24 to go to work, and Ethan could stay home with the
25 home health aides?

276

1      A   That's correct.
2      Q   And overnight, at all times from now until
3  he's 21 years old, there would be two people sitting
4  there ready to act in the instance that he had any
5  sort of an outburst at night?
6      A   So I think it's variable on the
7  scheduling, right. So if there would be more care
8  during the day hours when he's running around doing
9  hurricane type of aggressive behavior, as I describe
10 it, and there is a parent home at night, maybe
11 there's only one home healthcare available at night.
12 Versus if they're doing something else or if
13 Dr. Sarah is at the hospital overnight call or she
14 has to be on-call in her home office, then that then
15 could substitute both adults via home healthcare
16 aides there overnight for that supervision.
17         So this plan on how to enact the 16 hours
18 a day I think is flexible.
19     Q   But under the plan that you have, at all
20 times when Ethan is not in school, there would be
21 two, two health aides. So if you only have one at
22 night, you would need fewer hours, or you could have
23 three during the day. But you have enough hours here
24 to have two providers at every hour of the day,
25 right?

277

1     A    That's what I think is best for safety,
2  for him, the family dynamic, the younger sisters.
3  And that's something I did discuss with Dr. Lisa
4  Settles as well.
5     Q    Home health aides, they help with things
6  like hygiene and toileting; is that correct?
7     A    I would say yes.  And the general
8  activities of daily living; dressing, eating,
9  et cetera.  We don't rely upon home healthcare aides
10 to administer medication or do the laundry, mow the
11 yard, do the dishes, things like that.
12    Q    Okay.  But they would give Ethan meals,
13 put those dishes in the dishwasher, generally kind of
14 do the activity -- do the activities that he might
15 otherwise do for himself during the day as if he were
16 a neurotypical individual.  He would go to the
17 bathroom by himself.  He would give himself a
18 sandwich.  Things like that?
19    A    I mean, I think generally that's a very
20 big -- big statement.  Now, there's not a lot of
21 seven-year-olds that I know of that just go in and
22 make a sandwich by themselves, just to kind of
23 contradict that last statement.
24         But in general, it's activities of daily
25 living.  So this is going to be hygiene, showering,

278

1  bathing, bowel/bladder function.  And he has lots of
2  incontinence and very weird things where he poops on
3  the house and self-stimulates naked and goes through
4  multiple clothes and has accidents.  And they've
5  already have to change part of their house because of
6  stains, is what they told me.  Plus the eating, plus
7  activity.
8         So, again, when he's running around, there
9  has to be that supervision.  So activities of daily
10 living for home health aides, but then again the LVN
11 for the medication administration as a nurse.
12    Q    So can home health aides in Texas provide
13 basic oral medications?
14    A    Home health aides provide basic oral
15 medications.  I --
16    Q    I just don't know.  Oral medications.
17 Pills.
18    A    So it's my --
19         MS. PALEY:  Charlie, I don't think you
20 want to testify on the record.  I'm just asking the
21 doctor.  I don't know.  I didn't look it up.
22         MR. PARKER:  I was going to say, it's
23 complex.
24    A    It's complex.  I don't think -- I don't
25 think they can administer prescription medications.

279

1  I think they can give a Children's Motrin or Tylenol,
2  an over-the-counter or a Pedialyte, something that
3  you could buy at Target or Walmart.  But it's my
4  understanding that we need LVN, LPN, RN level for
5  prescription medications, is my understanding.
6     Q    (BY MS. PALEY)  And right now, except for
7  Humira, Ethan's prescription medications are all
8  oral, correct?
9     A    The oral pills and the tincture.
10    Q    And the tincture?
11    A    Yes.  Yes.
12    Q    And right now, his parents take care of
13 the administering of the medications, correct?
14    A    I believe in addition to his parents, both
15 sides of maternal, paternal grandparents do that as
16 well at times.
17    Q    Okay.  And the total time spent
18 administering medications to Ethan every day, how
19 many minutes would you estimate that takes?
20    A    Well, there's different doses, timeframes
21 and frequency.  So it's -- it's a -- I don't know.
22 That's a hard question.
23    Q    I mean, he -- the most he takes any one
24 medication is three times a day, right?
25    A    (Nodded head.)

280

1     Q    And would you, as a parent -- I'm sorry,
2  is that true?
3     A    I can review really quickly.  I think
4  that's true.  So . . .
5     Q    And generally when administering
6  medications to a child, do you try to -- you know, do
7  all the twice-a-day medications at the same time?
8  Like you do your morning, you do your afternoon?
9     A    Dr. Sarah did not make it sound like it
10 was that easy at all.  He runs away from her.  He's
11 outside naked.  He knows that an oral medicine is
12 inside an applesauce or a peanut butter, spits it
13 out.  They try again.
14    I was of the understanding and observing
15 that it was a very difficult process.  So the LVN,
16 LPN four hours should account for that care per day,
17 again, removing the parents from administering any of
18 those medications.
19    Q    Do you believe it takes the parents about
20 four hours a day to administer Ethan's medications?
21    A    So it's not just those four hours for the
22 LVN care.  At times, they also may or may not
23 supervise the home health aide.  But I think four
24 hours is actually a conservative estimate to have a
25 more well trained healthcare provider in the home

281

1  during the most troublesome hours.
2      Q   My question is, do you believe it takes
3  Ethan's parents four hours a day to administer his
4  medication?
5      A   I do not think strictly it takes them four
6  hours just for medications.
7      Q   Okay.  Thank you.
8          And do you provide any practice
9  guidelines, peer-reviewed literature or
10 recommendations from Ethan's providers that
11 demonstrate he would need, at all hours of the day,
12 two adult individuals devoted to doing nothing but
13 supervising him, including the time during which he's
14 asleep?
15     A   I don't think there's any specific
16 peer-reviewed articles with his constellation of
17 multitude of diagnoses.  And, again, I don't think
18 the treating providers are addressing or prescribing
19 care like I'm recommending, because there's still
20 heavily involved grandparents.  Plus he was in ABA as
21 of recently.  Plus both parents were working from
22 home, which I understand is changing.  So that's the
23 answer.
24     Q   Do you know of any peer-reviewed
25 literature or practice guidelines or other

282

1  recommendations that suggest that for a child with
2  severe autism that they need 24-hour-a-day, two adult
3  to one child, individual supervision?
4      A   Well, I think that we have to consider his
5  individual case from my recommendations, but I'm not
6  aware of any specific peer-reviewed literature.  And
7  just to reiterate, at times these guidelines or
8  practice parameters are not inclusive or exclusive.
9  There's always unique situations at hand, which
10 clearly we're dealing with a severely impaired child
11 with disabilities with a unique situation.
12     Q   Is that a -- is that a no?
13     A   I'm sorry, can -- can I ask you to read
14 back my reply?
15     Q   I think you included, I'm not aware of any
16 specific peer-reviewed literature.
17         Are you aware of any guidelines?  That's
18 just the last part of the question.
19     A   So I think the guidelines that you
20 presented me, again, reviewing them briefly on our
21 downtime, demonstrate a comprehensive approach, a
22 family-centric approach, and they're not inclusive or
23 exclusive.  And that's why there's both the art and
24 science of the practice of medicine.  We have to
25 evaluate situations at hand as the individual comes.

283

1      Q   But I'm not asking about the guidelines I
2  showed you.  I'm asking about whether you're aware of
3  any guidelines that would support your recommendation
4  for the two-to-one, 24-hour-a-day home health aide
5  and LPN care included in your life care plan.
6      A   So I'm not aware of any other specific
7  guidelines or parameters, other than my experience,
8  my recommendations and discussing with Dr. Settles,
9  who was in agreement with this type of supervision.
10     Q   Okay.  And you do not regularly act as a
11 treatment coordinator for severely autistic children,
12 right?
13     A   We've covered that.  That's correct.
14     Q   Okay.  In terms of at-night care, it would
15 be possible to provide other like technology-based or
16 physical bars or barriers to Ethan doing something
17 like leaving his room at night and eloping, correct?
18         MR. PARKER:  Objection as to form.
19     A   Well, I think --
20         MS. PALEY:  Oh, I think your mic --
21         MR. PARKER:  I object as to form.  Making
22 a prison for the kid.
23     A   You know, that's a good point.  Right now,
24 there -- there are two main locks from the bedroom to
25 the hallway and the bedroom to the bathroom and bars

284

1  on the windows and tons of damage in his room from
2  ripping, hitting, banging his head on things.  And
3  then beyond that, there's a flat mattress on the
4  ground, and that's it.  There's nothing else in there
5  because of safety concerns.
6          I don't think that it's going to be as
7  beneficial to have technology or a camera or, you
8  know, any other -- whatever you're including in
9  physical barriers, because he also is doing things
10 like having incontinence and throwing his poop.  And
11 at times Dr. Sarah reported he's actually eaten his
12 feces.  And that's really where a lot of this comes
13 from, where you have to have more adult supervision
14 and these therapy recommendations to kind of move
15 forward with this child's care, in my opinion.
16         MS. PALEY:  Could -- I'd just like to
17 know -- ask counsel not to testify on the record
18 there, last comment.
19     Q   (BY MS. PALEY)  Can you show me anything
20 in the records that demonstrates frequent nighttime
21 interruptions, such as what you have just noted:
22 Throwing poop, eating poop, things like that?
23     A   This was reported from the family during
24 my home visit.  I don't recall any specific treating
25 physicians summarizing that.  And I understand why.

285

1  They're focusing on some other things, like
2  diagnostic tests and medication management and
3  prescriptions, is what I think.
4      Q    Under your plan for home health aides,
5  those -- you have two home health aides present at
6  all times during all of Ethan's other home-based
7  therapies, correct?
8      A    (Nodded head.)
9      Q    Okay.  So for at least three hours a day
10 at home, there would be three adults other than his
11 parents or grandparents who were directly supervising
12 and directing Ethan, correct?
13     A    Well, that may be correct, depending on
14 the scheduling.  But sometimes a PT/OT might co-treat
15 at the same time, right.  I don't know if his
16 grandparents will be there.  Somebody has to take
17 care of an approximately 9- to 12-month-old at this
18 point, the baby sister, right.  Plus their parents
19 are working.
20         It's my understanding that Grant has to go
21 back to work.  I don't know his hours, but that means
22 off home, back on-site somewhere.  And Dr. Sarah also
23 has to be on-site at times.  And so there may be
24 overlay.  And this plan is something that we
25 discussed with the family.  And then this -- this was

286

1  the higher frequency that I recommended.  And then,
2  you know, here we are discussing those specifics.
3      Q    Okay.  And I think that you might have
4  taken my question a little bit wrong.  I'm saying
5  apart from whenever the parents are at home and
6  whenever the grandparents are there caring for other
7  siblings, setting aside those other people who may be
8  in the home, under your plan at all times Ethan would
9  have at least two dedicated individuals, but
10 sometimes three dedicated individuals, watching him
11 or providing him therapies at any given time?
12     A    That would be correct for the home health
13 aides.  And then the frequency or intermittent visits
14 from the therapists at home for their focused OT or
15 speech-language pathology.
16     Q    Okay.  And that's three therapies provided
17 each day, 365 days a year, right?
18     A    That's kind of the general recommendation
19 at this time, based upon the information at hand.
20     Q    Okay.  So if an LPN or an LVN, four hours
21 a day, 365 days a year, that's -- that's more than a
22 half-time job.  If a job is eight hours a day, five
23 days a week, having someone four days, four hours a
24 day every day of the year, that's more than a
25 half-time job for a -- an LPN, correct?

287

1      A    I'm not exactly sure what you're trying to
2  describe right now.
3      Q    Just the total hours that you have for LPN
4  care each year is essentially more than a half-time
5  job.
6      A    So it's not just one person all the time.
7  It would be -- it would be the total of the hours,
8  right?  It could be one LVN at four hours.  Most
9  likely it's going to be two home health aides to make
10 the 16.  It could be two home health aides, six
11 and six for the 12, or one that does a long shift.
12         That is up to the scheduling of the family
13 and the companies.
14     Q    And I'm not saying it's one individual
15 person.  I'm saying you're -- just simple math, 4
16 times 7, you're having 28 hours a week of nursing
17 care, right?
18     A    Referring to LVN, the four hours a day?
19     Q    Yeah.
20     A    Yes.  That's -- 7 times 4 is 28.
21     Q    Okay.  So respite care.  You include
22 respite care here, Item 7 on Page 250 of your report.
23     A    Yes.
24     Q    Respite care, is that where Ethan would
25 like go to a care center and stay there for,

288

1  essentially, you know, one -- one weekend a month?
2      A    It's the opposite.  It's for his parents
3  and his caregivers.
4      Q    Well, my -- my only experience with
5  respite care is where I had a friend who had two
6  children who had fatal genetic disorders.  And I know
7  that for them, the respite care was essentially the
8  children went to, so the parents could be home alone
9  for a weekend.
10         Is that not what's envisioned here?  Would
11 the respite care come to the Palmquists' home?
12     A    So that can be, I guess in your personal
13 experience, an option.  Here, it was more for
14 additional care to manage the younger daughters so
15 the parents can have a break, or costs for the
16 parents and the younger daughters to remove
17 themselves from Ethan for the 48 hours every month to
18 try to have a more balanced life and, again, to
19 decrease my major concern of the parents having
20 caregiver burnout for Ethan's high amount of hands-on
21 care.
22     Q    But you're -- during the 48 hours a month
23 of respite care, your assessment also includes full
24 home healthcare and LVN care at the same time, right?
25     A    That's correct.

289

1    Q    Okay. So at that point, during the
2  respite care -- and let's just look at -- did you
3  include a cost survey on respite care? Or did you
4  include just one vendor? Let's look at this.
5    A    Yeah, let me review. I don't recall all
6  the 200 pages here. Again, I think it's variable,
7  depending on if the two younger daughters are there
8  or not. And if they take them out of the house or if
9  it's mom alone versus dad alone and they rotate every
10 month, et cetera.
11   Q    So Page 100 of your report, you have the
12 respite care options. So it's Home Care Options,
13 Synergy Home Care Houston and Temporary Home Care.
14       So its -- I'm not trying to be dense here.
15 Is the idea that the respite care providers would
16 come into the Palmquists' home?
17   A    Yes. As we discussed that with the
18 family, that then allows them extra coverage for the
19 daughters so they can take a break, whether it's the
20 couple together leaves or just mom, for the 48 hours
21 and then comes back, et cetera.
22   Q    And so once a month, there -- were the
23 respite care providers specifically asked if they
24 would provide care for, say, the other children?
25   A    We did not ask them that specifically.

290

1  More of the options and then the price for that home
2  healthcare option to allow for the respite care.
3    Q    Okay. Let me look at that.
4        And so if, say, the Palmquists, Grant and
5  Sarah and their daughters, decided to leave the home
6  for the weekend, 48 hours --
7    A    Uh-huh.
8    Q    -- once a month for respite care, at that
9  point would the Palmquist home have your two home
10 health aides or LPNs, two individuals watching Ethan
11 every hour of the day, and a respite care person
12 staying in the home, and the three hours a day of
13 therapists coming into the home?
14   A    I think if -- if the family and the
15 parents decided to completely do that, both parents
16 and both daughters, then that certainly would have
17 that type of adult supervision and respite care and
18 home health aides in the home for Ethan.
19       I don't think that that's likely what
20 would occur. But that would be up to the family to
21 decide how they would want to utilize those
22 resources.
23   Q    Okay. So at that point if they did
24 utilize the respite care in that way, you could have
25 up to four people in any given hour dedicated to

291

1  watching Ethan over the course of the respite care
2  weekend?
3    A    Well, I mean, not necessarily any given
4  hour, right. Because an occupational therapist and
5  speech therapist isn't dedicated to watching Ethan.
6    Q    I said up to. You'd have three and
7  sometimes four, right?
8    A    And then also the respite care likely is
9  going to be there for the other things that the home
10 healthcare aides aren't doing because they're
11 watching Ethan and/or something surrounding the
12 daughters or something else that's going on, if only
13 one adult leaves.
14       So this is a cost analysis to provide some
15 number on what this would look like for respite care.
16 And it would be up to, again, the family to decide
17 how they want to utilize that.
18   Q    Okay. But if they -- if they utilized it
19 in that way, there would be three to four adults
20 watching Ethan at any -- three to four adults with
21 Ethan, dedicated to Ethan, at any given time during
22 the course of a, say, weekend? I just want to make
23 sure I've got my math right.
24   A    Well, yeah, simple math, 1, 2, 3, 4. But
25 it's just not four adults watching him doing the

292

1  exact same thing, right. Respite care is going to be
2  in one role. The therapists are doing another role.
3  And then the two home health aides versus the four
4  LVN, LPN are directly helping manage him and taking
5  care of his ADLs and medications.
6    Q    What does the respite care person do if
7  the Palmquists have all left the home?
8    A    They probably, in my opinion, would not
9  then schedule the respite care home health aides or
10 care team to come, because the two daughters and
11 the two parents have left. So, again, it would be up
12 to the family to determine their frequency of
13 utilization with this amount of care I'm
14 recommending.
15   Q    Okay. And if the two parents and the two
16 daughters didn't leave and it was just, you know, one
17 parent goes out for a while, the respite care folks
18 would -- would they essentially act as babysitters
19 for the other children?
20   A    That is one option, babysitters, helping
21 with their normal functioning, meaning like the
22 diapers for the young -- the youngest one or the
23 five-year-old reading books, food prep, things like
24 that. All those normal ADLs that the parents are
25 doing constantly for a child with special needs,

293
1  Ethan, plus two younger children.
2      Q    But under your plan, the home healthcare
3  aides are doing that for Ethan.  So the parents would
4  just be doing those ADLs for their other daughters,
5  right?
6      A    Correct.
7      Q    And so under your plan, the parents would
8  be relieved of those normal parental duties for up
9  to, you know, 48 hours a month using their respite
10 care?
11     A    Essentially that's what we've been
12 discussing, yeah.
13     MS. PALEY:  Okay.  Let's go off the
14 record, take a little stretch break.  I'm going to
15 look at my --
16     MR. PARKER:  Thank you.
17     MS. PALEY:  Yeah.  It's hot in here.  I
18 think we're probably all -- oh, let's go off the
19 record.
20     THE VIDEOGRAPHER:  The time is 4:30.
21 We're off the record.
22     (Recess from 4:30 p.m. to 4:53 p.m.)
23     THE VIDEOGRAPHER:  The time is 4:53.
24 We're back on the record.
25     Q    (BY MS. PALEY)  All right.  Welcome back,

294
1  Doctor.  We're in the home stretch here.
2      A    Well, I thank you.  Welcome back,
3  everyone.
4      Q    All right.  Everyone is getting a little
5  stir crazy on this 90-some degree Friday afternoon.
6      I'm going to mark very briefly Exhibit 16.
7      (Exhibit Number 16 was marked.)
8      Q    (BY MS. PALEY)  This is just a two-pager
9  that I printed off the Avondale House --
10     A    Thank you.
11     Q    It says, Avondale House residential
12 services for individuals with autism.
13     Do you see that at the top center?
14     A    Yes.
15     Q    Okay.  And this is the program that the
16 Palmquists have said they would like Ethan to attend,
17 correct?
18     A    Correct.
19     Q    Okay.  And based on your knowledge of
20 Avondale House's offerings, what sorts of services
21 does the special needs group home provide to patients
22 or assist patients with?
23     A    I think it's mostly like activities of
24 daily living so that they can kind of be a little bit
25 more functional.  I think there's also some volunteer

295
1  projects or perhaps even at times they could be
2  employed.  So that's kind of my understanding when
3  they're 21 years age and older, full-time living here
4  at the Avondale House.
5      Q    Okay.  And activities of daily living,
6  that's things like cooking, cleaning, laundry, stuff
7  like that?
8      A    Yeah.  I think on Page 2, it or -- yes,
9  Page 2, it kind of says some of that.
10     Q    Maybe it even says that, right?
11     A    Yeah.
12     Q    Okay.  And I think it also -- even some
13 assistance with hygiene as well, right?
14     A    Bath, shower, hygiene, toothbrush,
15 et cetera, yes.
16     Q    Okay.  And in -- in getting the $13,000 a
17 month figure from Avondale House, did the individuals
18 who called this school ask of whoever they spoke to
19 what families pay on average after any sort of grants
20 or aid or discounts?
21     A    That's not my understanding.  I don't
22 think that was asked.  I think it was just, What is
23 the self-pay rate.
24     Q    Okay.  Just a little bit of here and there
25 cleanup -- not cleanup, but a few questions on the

296
1  variety of areas of your report.  On Page 84, you
2  list EGDs.  As I understand, that's the sort of
3  scoping from the top from the throat into the
4  stomach?
5      A    And the small intestine.  That's correct.
6      Q    Okay.  And I'll turn to Page 84 so we're
7  looking at the same thing.  Also on Page 144, you
8  have your chart for how frequently Ethan would get an
9  EGD under your plan.
10     As I understand it, it's one every two
11 years from now until he's -- until he passes away.
12 And that's Page 144.
13     A    Yes.  We have that as a duration of
14 70 years and an interval of once every two years.
15     Q    And Ethan had an EGD in 2019; is that
16 right?
17     A    That's what my memory serves me.  I don't
18 have any reason to contradict that at this moment.
19     Q    Okay.  And was that part of determining
20 whether like he needed Humira or -- I should strike
21 that.
22     What was the purpose -- purpose of the EGD
23 that he had in '19?
24     A    I think we touched on that at the very,
25 very beginning.  I think that's when the

297

1 gastroenterologist does the objective visualization,
2 the scope. I don't want to say it to confuse
3 everybody, esophagogastroduodenoscopy.
4    Q    That's why I said EGD.
5    A    So that's visualizing the lesions, and
6 then that grades the extent of lesions, involvement,
7 depth. And then, you know, after you get a
8 diagnosis, then they recommend the treatment,
9 medications, et cetera.
10    Q    And so that was a -- essentially an
11 exploratory and diagnostic procedure?
12    A    Sure.
13    Q    Okay. Can you point me to anything in the
14 records demonstrating that Ethan's providers have
15 recommended repeated EGDs?
16    A    Just the discussion with Dr. Krigsman.
17 Along with most patients with inflammatory bowel
18 disease and Crohn's disease do get repeat, you know,
19 at serial intervals, to check severity of the
20 disease.
21    Q    Did you and Dr. Krigsman discuss the
22 specific frequency of EGDs that you've recommended?
23    A    I don't recall if we discussed every year
24 versus every two years or every five years.
25    Q    And do you routinely order EGDs as part of

298

1 your medical practice?
2    A    Not routine -- not routinely. I definite
3 do in the hospital at times, when we have a
4 significant clinical concern. But that then is
5 transferred to the GI specialist that does the
6 procedure.
7    Q    Okay. And are those concerns sort of, you
8 know, exploratory and hopefully diagnostic of
9 whatever is going on?
10    A    Bleeding ulcers, anemia, masses, tumors,
11 severe pain, unresponsive to medication management,
12 et cetera.
13    Q    Okay. And let's look, then, here -- also
14 on Page 144 -- Item 6. You have essentially repeated
15 EEGs also every other year but starting at age 10; is
16 that correct?
17    A    Okay. So Item Number 6?
18    Q    Item Number 6 on Page 144.
19    A    Yep. Age 10. One EEG every two years.
20    Q    And these questions will sound a little
21 repetitive to you, but can you point me to anything
22 in the medical records that indicates Ethan's
23 providers have recommended routine monitoring with
24 EEGs on the frequency of approximately the spaces. And
25    A    I don't recall those recommendations. And

299

1 they typically won't recommend that unless it's like
2 a narrative report or they're a retained expert or
3 we're doing a life care plan. But I did discuss
4 repeat EEG to monitor and/or diagnose seizure
5 severity with the treating neurologist.
6    Q    And that's Dr. Rotenberg?
7    A    Correct.
8    Q    Okay. And did you and Dr. Rotenberg
9 discuss the -- specifically the frequency with which
10 you were recommending repeated EEGs?
11    A    Not this specific frequency, but moving
12 from pretty frequent -- like the annual one when he's
13 younger -- to less frequent, one every two years,
14 after the age of 10.
15    Q    Okay. Let's look at Page 213 of your
16 report, and I want to direct you to Item 9, and this
17 is just a grab bag of items that we're covering.
18        MR. PARKER: We've been on this page
19 before.
20        MS. PALEY: We have.
21    A    Sure. Yeah. Go to for it.
22    Q    (BY MS. PALEY) So Item 9 on Page 213 is
23 occupational therapy sensory integration.
24    A    Uh-huh.
25    Q    And you recommend, is it weekly sensory

300

1 integration therapy for Ethan until he's 18 years
2 old?
3    A    Age 7 for 11 years once a week, correct.
4    Q    Okay. Do you know if the Avondale House
5 school provides any sensory integration services?
6    A    I'm uncertain if they provide the
7 occupational therapist. I think part of being in
8 school at that type of special needs facility, yes,
9 you're going to be touching things and hearing things
10 and seeing things for sensory. But this one is a
11 little bit different. Specific OT sensory
12 integration is what I was conveying here.
13    Q    Okay. And I think the brief answer is
14 you're uncertain if they provide an occupational
15 therapist at Avondale school for sensory integration?
16    A    Correct.
17    Q    I know you picked 45-minute -- sorry.
18 Strike that.
19        Can you provide any basis in the medical
20 records suggesting that Ethan needs weekly sensory
21 integration therapy?
22    A    I mean, other than the entire medical
23 records of his impairments and diagnoses that leads
24 me then to recommend the sensory integration to help
25 with. I don't recall if this has been ordered by any

301

1  other treating physician at this time.
2      Q   Okay.  And can you -- have you surveyed
3  the medical literature, the peer-reviewed literature
4  to determine whether sensory integration has been
5  found to be effective?
6      A   I have not.
7      Q   Okay.  Let's look very quickly -- I'm
8  going to mark as -- oh.  Oh, I think we already -- we
9  already marked it.  I don't know what number it was,
10  but it was the Practice Parameters in Autism, that
11  article that we took a five-minute break to read.
12      A   Exhibit 11.
13      Q   Exhibit 11.  Thank you.
14          Okay.  And so you've spent a little bit of
15  time on this, right?
16      A   Yes.
17      Q   Can you look on Page 245.  Now, the bottom
18  right corner of 245 is where we had discussed earlier
19  psychosocial intervention, right?
20      A   Yes.
21      Q   Okay.  The next sentence, which I hadn't
22  read out loud, I'll read now.  Studies of sensory
23  orient -- sensory-oriented interventions, such as
24  auditory integration training, sensory integration
25  therapy and touch therapy massage have -- contains

302

1  methodological flaws and have not yet to show
2  replicable improvements.
3          Did I read that correctly?
4      A   Yes.  I see that.
5      Q   Okay.  Do you have any evidence that would
6  contradict these findings from the American Academy
7  of Child and Adolescent Psychiatry regarding the
8  effectiveness of sensory integration therapy?
9      A   So the way I read this is that they did
10  not have a replicable improvement, which means that
11  the study was not repeated, and there's extreme
12  difficulty in pediatric autism studies.  I would need
13  to just review the actual studies they're
14  referencing, 108, 109.
15      Q   Okay.  But you didn't review those studies
16  as part of preparing your life care plan, right?
17      A   That's correct.
18      Q   Okay.  I'm going to mark as Exhibit 17 an
19  article by Susan Hyman, et al.
20          (Exhibit Number 17 was marked.)
21      Q   (BY MS. PALEY)  I actually shouldn't say
22  article.  It's listed as a clinical report in the
23  American Academy of Pediatrics.  At the top it says,
24  Clinical Report, Guidance For the Clinician in
25  Rendering Pediatric Care, American Academy of

303

1  Pediatrics.  And it says, Identification, evaluation
2  and management of children with autism spectrum
3  disorder.
4          Did I read that correctly?
5      A   Yes.
6      Q   And the publication date at the bottom
7  left is January of 2020?
8      A   Yes.
9      Q   Okay.  Let's look at Page 26.  Actually --
10  yeah, Page 26.  Now, starting in the left-hand column
11  on Page 26, do you see it begins a section called,
12  Other therapeutic interventions?
13      A   Yes.
14      Q   Okay.  And then in a slightly different
15  font, it -- an italicized font, it lists a range of
16  specific interventions.  It starts with Speech and
17  Language Interventions.
18          Do you see that?
19      A   Yes.
20      Q   And then the next section, which is in the
21  right-hand column on Page 26, is Motor Therapies.
22  Very bottom.
23      A   Yes.
24      Q   Okay.  Moving on to Page 27, the center
25  column top is Sensory Therapies, right?

304

1      A   Yes.
2      Q   Okay.  Now, within that Sensory Therapies
3  category, let's look at the right column.  Okay.  And
4  I'm going to read about a third of the way, almost
5  halfway down the column, a sentence that says,
6  Although sensory-based therapies are among the most
7  commonly requested therapies by caregivers, the
8  evidence supporting their general use remains
9  currently limited.
10          Do you see that?
11      A   Yes, I see that.
12      Q   And just to be sure, do you have any more
13  up-to-date evidence beyond this 2020 article from the
14  American Academy of Pediatrics that would suggest
15  that sensory therapies have been found to be, you
16  know, consistently helpful for children with autism?
17      A   Just -- I'm just looking at the articles
18  that they're citing, 378 and 379.  No.  I don't have
19  any other specific articles.  I'd be curious to read
20  these and understand the specific type of research
21  and then where this meta-analysis by Dr. Hyman
22  concluding that it's limited.
23      Q   Okay.  But you didn't review those in
24  preparing your life care plan, right?
25      A   That's correct.

305

1    Q    Okay. Let's just mark one more, for the
2 fun of it.
3    A    As with any . . .
4    Q    Exhibit 18.
5        (Exhibit Number 18 was marked.)
6    Q    (BY MS. PALEY) Sorry. There we go.
7        Now, Exhibit 18 is in the journal of
8 Pediatrics. Do you see that?
9    A    Yes, at the bottom. Pediatrics, November
10 2012.
11    Q    Uh-huh. And the title is Non-Medical
12 Interventions for Children with ASD, Recommended
13 Guidelines and Further Research Needs. Do you see
14 that?
15    A    Yes.
16    Q    Okay. Let's see. It looks like the
17 authors include folks from the Rand Corporation and
18 the Center For Autism Research and Training at UCLA.
19 I just wanted to give you a minute if you want to
20 review this. But I'll point your attention to Page
21 S-172. And the top middle column is titled Results.
22    A    Yes.
23    Q    And it says, Systematic review of
24 scientific evidence. Do you see that?
25    A    Uh-huh.

306

1    Q    Okay. And then here if you -- if you scan
2 this, do you see that they're discussing sort of a
3 summary of the -- sort of the trials so far in
4 certain kinds of therapies in children with autism?
5    A    Yep.
6    Q    Let's look at the right-hand column, that
7 first paragraph, which is a trail-over from the
8 middle column. And I just want to look at the
9 penultimate sentence. It says, Auditory integration
10 therapy was found ineffective in four of five trials.
11 Do you see that?
12    A    In the top right?
13    Q    S-172.
14    A    Oh, I see it, yes, now, the last sentence.
15        Auditory integration training was found
16 ineffective in four of five trials. Further details
17 about results are available in the full report.
18    Q    Okay. And if you turn to Page S-175 in
19 the middle column. The middle column -- well, if you
20 look to the left, there's a heading Programs for
21 Individuals with Limited or No Language.
22        Do you see that? It's very light print.
23 S-175, left-hand column.
24    A    Yes.
25    Q    Okay. And Ethan has limited or no

307

1 language; is that correct?
2    A    Correct.
3    Q    Okay. Let's look at the middle column
4 there, which is a trail-over from the Programs for
5 Individuals with Limited or No Language. And do you
6 see the second paragraph says, Small but
7 well-designed controlled trials found auditory
8 integration therapy ineffective in addressing any of
9 the core deficits of autism. Guideline: Given the
10 current state of the scientific evidence, auditory
11 integration therapy cannot be recommended to address
12 the core deficits of autism.
13        Do you see that, Doctor?
14    A    Is it still under the same Interventions
15 for Children with Limited Language?
16    Q    I believe so. Left-hand column has
17 that -- that header. The sentence at the bottom of
18 the left-hand column follows into the center column.
19 And then --
20    A    I'm just not seeing where you are. I'm
21 sorry.
22    Q    I'll hold up a highlighted copy so you can
23 see. This is S-175.
24    A    Oh.
25    Q    And this is the language I'm looking at.

308

1    A    I'm sorry. I'm on the wrong --
2    Q    Wrong page?
3    A    The 3 looked like 5.
4    Q    Ah.
5    A    No wonder. Okay. All right.
6        Let me see the pink. Got it.
7    Q    Yeah.
8    A    Small but well-designed controlled
9 trials -- got it.
10    Q    Do you have any, you know, literature or
11 guidelines that would contradict this finding that
12 auditory integration therapy cannot be recommended to
13 address the core deficits of autism?
14    A    I don't have anything handy or literature
15 to refute this statement.
16    Q    And -- strike that. Sorry.
17        Let's move off of sensory integration
18 therapy. And I want to ask you a couple of questions
19 about lab tests. Your life care plan includes a
20 range of lab studies that you believe Ethan will
21 possibly need over the course of his life; is that
22 right?
23    A    Correct.
24    Q    Okay. And we can look at your report,
25 Page 181, to see your summary chart of the

309

1 recommended tests and their frequency.
2     A    Okay.
3     Q    Okay. And similar to my earlier questions
4 about things like, you know, going to the dentist or
5 going to the GP, have you -- in recommending these
6 frequencies, have you tried to sort of back out or
7 subtract whatever frequency a neurotypical person
8 might pursue any of these tests?
9         And I'll give an example. If, you know,
10 if a neurotypical person would get a complete blood
11 count once a year as part an annual exam, do you
12 subtract that from your frequency for Ethan to come
13 up with, you know, what's the difference between
14 Ethan and a neurotypical person?
15     A    So a lot of questions that -- in that
16 statement. Typically children without significant
17 diagnoses and prescription medications don't need a
18 complete blood count. Complete blood count, CMP,
19 urinalysis, really all of these were discussed
20 briefly with Dr. Krigsman, because being on Humira
21 has potential risks and we need to identify his blood
22 work for things like infection or low white blood
23 cells or low platelets. Those are the main Item 1
24 and 2 bloodworks, four times a year, as well as 10
25 and 11, once a year because of the monoclonal

310

1 antibody for the Crohn's disease.
2         And then, in general, yes, if an adult
3 were to have an annual CBC blood count once a year in
4 addition to that annual workup, I'm also recommending
5 the four per year for life.
6     Q    Okay. So for Ethan it's essentially
7 saying he needs five, but your average person will
8 have one, so we're going to attribute four to the
9 life care plan? Or do you think he just needs four?
10     A    We could say he needs six, you know, every
11 two months if he has abnormalities with these
12 medications. Prescription medications can definitely
13 affect his entire system. That's, again, why we do
14 screening with patients on these prescription
15 medications.
16         So I'm recommending that this is the
17 frequency that we're looking at on this page.
18     Q    Okay. And I'm just trying to understand
19 like how you very specifically came up with four. If
20 it --
21     A    Okay.
22     Q    -- was something that just sort of seemed
23 probably a safe frequency? Or is it based on some
24 sort of, you know, particular guidelines or
25 recommendations, things like that?

311

1     A    Yeah. Every three months, I'm getting a
2 blood count and a chemistry panel when you're on
3 Humira. It seems pretty standard for me, in my
4 experience, along with Dr. Krigsman confirmed that we
5 needed to maintain a high-frequency of screening
6 blood work, along with the other options, 10 and 11,
7 specifically related to these monoclonal antibody
8 trough levels. And then an antibody antibody is what
9 Number 11 is. It's an antibody to the antibody.
10     Q    Sorry. Just a second.
11         You said it seemed the complete blood
12 count every three months seems pretty standard to me
13 in my experience. How often are you monitoring
14 patients on Humira?
15     A    So I don't do the monitoring, but they
16 definitely report to me what's going on, reading
17 things, continuing medical education and then also
18 discussing things with GI doctors, whether it's in
19 the clinic, the hospital or, in this case,
20 Dr. Krigsman.
21         So four times a year is every three months
22 to do basic blood work, which is a standard of care,
23 is my understanding, when you're on a monoclonal
24 antibody for inflammatory bowel disease.
25     Q    And when you say "they," are you saying

312

1 patients?
2     A    They, regarding gastroenterologists or
3 they, as in patients?
4     Q    You say, They definitely report to me on
5 what's going on, reading things.
6     A    Yeah. So patients will tell me what
7 they're doing when they come in and visit regarding
8 their other diagnoses and their other physicians.
9 And then in the hospital, I have to have that
10 complete understanding of their full history, all
11 their medical comorbidities and kind of where is the
12 frequency of normal, you know, blood work, when was
13 the last one, we have to do it today, et cetera.
14         So four times a year is -- is pretty
15 consistent with my understanding. Again, this is
16 something I discussed with Dr. Krigsman, the treating
17 GI doctor.
18     Q    Okay. But then you didn't discuss the
19 very specific frequencies with Dr. Krigsman, right?
20     A    We -- we likely did discuss quarterly here
21 on this one.
22     Q    Okay. And your life care plan also calls
23 for a micronutrient test profile, right? That's
24 Item 5?
25     A    Yes. I think that was a recommendation

313

1   from one of the treating providers as well.
2       Q    Okay.  And what's generally included in a
3   micronutrient test profile?
4       A    So in my experience, there are things that
5   are not as prominent compared to the other blood
6   work, like a complete blood count or comprehensive
7   metabolic panel which tells me like the basic salt,
8   sodium, potassium.  So micronutrients could be
9   enzymes, different things like the levels of
10  vitamins, minerals.  So all of those would be -- even
11  micronutrients -- that we could test for to identify
12  if he has any deficiencies.
13      Q    And I'm going to mark probably one last
14  exhibit.  I think we're on 20?
15           THE REPORTER:  19.
16           MS. PALEY:  19.  Thank you.  This is why
17  they don't let me monitor my own exhibits or keep
18  track.  All right.
19           (Exhibit Number 19 was marked.)
20      Q    (BY MS. PALEY)  I looked online to see
21  what a micronutrient test profile might include.  And
22  I found this from DHA Laboratory.  You see it says
23  Micronutrient Test on the front?
24      A    Yes.
25      Q    And then if you look in here a couple

314

1   pages in, it tells you, you know, there's something
2   about the clinical applications, and then it says
3   Analytes.
4        And those are the things that are being
5   analyzed, right?
6       A    That would be my understanding, yes.
7       Q    Okay.  And if you take a quick look, are
8   the analytes that you see here, you know, pretty
9   consistent with what a micronutrient test profile
10  would include?
11      A    Vitamins, minerals, glutathione, fatty
12  acids, chromium.  Yep.
13      Q    And is Vitamin D3 the same as Vitamin D?
14      A    Is Vitamin D3 the same as Vitamin D.
15           Generally speaking, yes.
16      Q    Okay.  This micronutrient test profile
17  includes Vitamin B12, right?
18      A    This specific DHA Laboratory brand, yes,
19  does say -- does say B12.
20      Q    Okay.  And you said that what's included
21  in here is pretty consistent with what you would
22  expect in a micronutrient test profile, right?
23      A    This is pretty comprehensive.
24      Q    All right.  So you're -- looking back to
25  your report, back to Page 181 of the laboratory

315

1   studies?
2       A    Uh-huh.
3       Q    In addition to the micronutrient test
4   profile once a year, you also recommend B12
5   monitoring once a year, right?
6       A    Correct.
7       Q    At $131.62 per, for 70 years, right?
8       A    Correct.
9       Q    You also recommend Vitamin D level
10  monitoring once a year, right?
11      A    Correct.
12      Q    Now, this micronutrient test profile also
13  includes Vitamin D, doesn't it?
14      A    That's what I'm seeing here.  Now, I guess
15  I would have a question is, are all of these able to
16  be analyzed at one time with one blood draw sending
17  it to the lab?
18      Q    Well, I don't know.  Maybe you can look
19  through there and see if it says that they can.
20           But if you flip the page in the mineral
21  section --
22      A    Uh-huh.
23      Q    -- you see it also includes zinc, right?
24  Manganese, copper and zinc?
25      A    Yes.

316

1       Q    Okay.  And your plan also separately
2   includes annual monitoring of zinc levels, right?
3       A    Correct.
4       Q    Okay.  So if the micronutrient test
5   profile calls -- measures Vitamin B12, Vitamin D and
6   zinc, you know, annually, then you don't need to
7   separately do blood draws for each of those three
8   items annually as well, right?
9       A    If it was this comprehensive from DHA that
10  included everything, then this -- this absolutely
11  would suffice for one lab report annually for
12  everything.
13      Q    Okay.  And maybe particularly with a
14  patient like Ethan where there are some, you know,
15  challenges with blood draws and it probably causes
16  some stress, you might want to minimize how
17  frequently you're drawing blood, right?
18      A    Well, I mean, if we're doing one blood
19  draw and eight tubes for this panel or eight tubes
20  for what I recommended, essentially that's the same
21  amount of blood, once a year at the same time.  So I
22  think that part is comparable.  Yes, in general,
23  minimizing the amount of procedures and blood draw.
24  And that kind of also I think leads into some of the
25  clonidine and some of the other medication

317

1 recommendations.
2    Q    Okay.  And you don't -- you don't know how
3 many tubes this DHA profile -- this DHA laboratory
4 requires, right?  You don't know if it's one or eight
5 or what?
6    A    In my experience, I mean, we deal with
7 blood draw and blood tubes frequently, almost daily.
8 I don't think that this is possible for one tube of
9 blood to identify 30-plus different micronutrients.
10 And I'm not seeing here a volume, a milliliter or a
11 number of tubes.
12    Q    Okay.  So you just -- you just can't say
13 one way or the other how many tubes or what the
14 volume is?
15    A    I mean, I would -- I would think this is
16 more than one, but I would -- yeah, we'd have to
17 figure out specifically from -- from the laboratory
18 and which type of tubes are needed for this.
19    Q    Okay.  You also include lead levels.  Just
20 one lead level measurement this year when Ethan is 7,
21 is that blood lead level?
22    A    I was thinking more that would be a blood
23 lead level.
24    Q    Okay.  And why the blood lead level?
25    A    I think I added that because I didn't

318

1 recall seeing that previously in the specific lab
2 data reports.
3    Q    Okay.  So you haven't seen any of Ethan's
4 blood lead level --
5    A    You know, I'm trying to think why I added
6 that --
7    Q    -- measures?
8    A    -- for just one time now.  I think that
9 might have been the reason.  I have to look back at
10 those reports.
11    Q    Okay.  But it sounds like, sitting here
12 today, you don't recall seeing blood lead level
13 analyses for Ethan?
14    A    That is true.
15    Q    Okay.
16    A    It doesn't look like it's on this
17 micronutrient array panel.  Okay.
18    Q    Okay.  If you can give me five minutes to
19 just look at my pages, I may be done possibly.  But I
20 just need to take --
21    MR. PARKER:  Sure.
22    MS. PALEY:  Are you going to have
23 questions?
24    MR. PARKER:  Oh, yeah.  About an hour's
25 worth.

319

1    MS. PALEY:  Well, hey, man, I'm here until
2 6:30 in the morning.
3    MR. PARKER:  These people would kill me.
4    MS. PALEY:  All right.  So let's go off
5 the record.
6    THE VIDEOGRAPHER:  Okay.  The time is
7 5:26.  We're off the record.
8    (Recess from 5:26 p.m. to 5:35 p.m.)
9    THE VIDEOGRAPHER:  The time is 5:35.
10 We're back on the record.
11    Q    (BY MS. PALEY)  All right.  Doctor, I
12 promise to be brief.  I will be brief here.
13    Your report on Page 98 includes your cost
14 survey for the home health aide providers.  Do you
15 see that?
16    A    Yes, ma'am.
17    Q    Okay.  And the rates that are here that
18 range from like $21 an hour to $35 an hour, just so I
19 understand what the rates are, those would be the
20 rates that the Palmquists would pay to the home
21 health aide agency to cover the home health aide but
22 also just whatever other administrative costs are
23 included in engaging the agency; is that right?
24    A    That's my understanding.
25    Q    Okay.  And -- I actually have one more

320

1 question.  I promise you, this is the end.
2    In putting together these estimates or in
3 selecting these particular providers for your cost
4 survey, were these providers also taken from the PLCP
5 sort of database or spreadsheet of Houston area
6 providers?
7    A    Regarding home healthcare aides?
8    Q    Yes.
9    A    You know, I'm not sure.  I think -- I
10 think this was different where they likely called.
11 But I'd have to -- I'd have to speak with my staff to
12 clarify.
13    Q    Okay.  So do you have any sense of the
14 methodology that was used to determine who to call?
15    A    There likely is some list of the
16 providers.  I don't have access to that, but -- given
17 the amount of work in Houston and the state of Texas.
18 But I can't speculate on that.  So I'd have to talk
19 to my staff and specifically ask them the
20 methodology.
21    In the past, my understanding was they --
22 they would look at the different businesses via the
23 location, start calling and then get the hourly rates
24 that way.
25    MS. PALEY:  Okay.  That's all.  It's a

321

1  wrap.
2       MR. PARKER:  Great.  We reserve our
3  questions until time of trial.  Thank you all.
4       THE VIDEOGRAPHER:  Before we go off the
5  record, I need to know.  Do either of you need copies
6  of the video?
7       MS. PALEY:  Not right now, but I'm sure we
8  will at some point.
9       MR. PARKER:  Whenever they order one, I
10  want one.
11       MS. PALEY:  That's the right answer,
12  Charlie.
13       THE REPORTER:  And what about the
14  transcript?
15       MR. PARKER:  What's that?
16       THE REPORTER:  A transcript?
17       MR. PARKER:  Oh, a transcript, yes.  I do
18  not need an expedited copy, just final transcript.
19       THE REPORTER:  Do you want a rough draft?
20       MR. PARKER:  No, no rough draft.
21       MS. PALEY:  And what's the turnaround on
22  regular time for the final?
23       THE REPORTER:  I will have to look that up
24  for you.
25       MS. PALEY:  Let's take a rough, but it

322

1  does not need to be this weekend.  Early next week is
2  fine.  And then we'll take a regular time final.
3       THE REPORTER:  Thank you.
4       THE DEPONENT:  Silly question.  So --
5       MS. PALEY:  We'll go off the record.
6       THE VIDEOGRAPHER:  Are we through with
7  orders?
8       MS. PALEY:  Yes.
9       THE REPORTER:  Yes.
10       THE VIDEOGRAPHER:  This concludes today's
11  proceedings.  The time is 5:38.  We're off the
12  record.
13       WHEREUPON, the within proceedings were
14  concluded at the approximate hour of 5:38 p.m. on
15  June 17, 2022.
16
17
18
19
20
21
22
23
24
25

323

1  I, MATTHEW HYZY, do hereby certify that I have read
2  the foregoing transcript and that the same and
3  accompanying amendment sheets, if any, constitute a
4  true and complete record of my testimony.
5
6
7
8  _____
     Signature of Deponent
9
10       ( ) No Amendments
         ( ) Amendments Attached
11  Acknowledged before me this
12  _____ day of _____, 2022.
13
14  Notary Public:_____
15  My commission expires_____
16  Seal:
17
18
19       BJD
20
21
22
23
24
25

324

1  STATE OF COLORADO)
2            )  ss.      REPORTER'S CERTIFICATE
3  COUNTY OF DENVER )
4       I, Barbara J. Davalos, do hereby certify
5  that I am a Registered Merit Reporter and Certified
6  Realtime Reporter within and for the State of
7  Colorado; that previous to the commencement of the
8  examination the deponent was duly sworn to testify to
9  the truth.
10       I further certify that this deposition was
11  taken in shorthand by me at the time and place herein
12  set forth, that it was thereafter reduced to
13  typewritten form, and that the foregoing constitutes
14  a true and correct transcript.
15       I further certify that I am not related to,
16  employed by, nor of counsel for any of the parties or
17  attorneys herein, nor otherwise interested in the
18  result of the within action.
19       In witness whereof, I have affixed my
20  signature this 27th day of June, 2022.
21
22
23       _Barbara J. Davalos_
         Barbara J. Davalos, RMR, CRR
24       216 - 16th Street, Suite 600
         Denver, Colorado  80202
25